# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

**WEST VIRGINIA PARENTS FOR RELIGIOUS FREEDOM, PASTOR CHRIS FIGARETTI,** and **JUDD UHL,**

Plaintiffs,

v.

Case No. 23-1887
(5:23-cv-158-JPB)

**DR. MATTHEW CHRISTIANSEN,**
in his official capacity as the State
Health Officer and Commissioner of the
Bureau of Public Health,

Defendant.

---

## MOTION FOR LEAVE TO FILE *AMICUS CURIAE* BRIEF IN SUPPORT OF DEFENDANT AND IN FAVOR OF AFFIRMANCE OF THE DISTRICT COURT'S ORDER

---

Brock M. Malcolm (WV State Bar # 7994)
**BOWLES RICE LLP**
125 Granville Square, Suite 400
Morgantown, West Virginia 26501
Phone:  (304) 285-2516
bmalcolm@bowlesrice.com
*Counsel of Record for Amicus Curiae*

**MOTION FOR LEAVE TO FILE *AMICUS CURIAE***
**BRIEF IN SUPPORT OF DEFENDANT AND IN FAVOR OF**
**AFFIRMANCE OF THE DISTRICT COURT'S ORDER**

Pursuant to Rule 29(a) of the Federal Rules of Appellate Procedure, the Center for Rural Health Development, Inc., which serves as the lead agency of the West Virginia Immunization Network, and which is joined herein by West Virginia State Medical Association; West Virginia Chapter of the American Academy of Pediatrics; West Virginia Hospital Association; West Virginia Rural Health Association; Association for Professionals in Infection Control & Epidemiology – West Virginia; West Virginia Academy of Family Physicians; West Virginia Association of Local Health Departments; West Virginia Pharmacists Association; West Virginia Osteopathic Medicine Association; West Virginia Association of School Nurses, Inc.; West Virginia Nurses Association; and West Virginia Affiliate of American College of Nurse-Midwives (collectively the "Movants"), by and through counsel, moves this Honorable Court for leave to file an *Amicus Curiae* brief in support of the Defendant in this matter. In support of this motion, the Movants provide as follows:

1. On or about April 26, 2023, Plaintiffs filed a verified Complaint for Declaratory and Injunctive Relief against the Defendant in the United States District Court for the Northern District of West Virginia.

2.      On or about April 28, 2023, Plaintiffs filed their Motion for Preliminary Injunction and Expedited Consideration and the Memorandum in Support of the same.

3.      Following an initial hearing on May 10, 2023. the District Court (Judge Bailey) issued an Order setting forth the briefing schedule for motions for summary judgment in this matter.

4.      In accordance with Rule 24(b)(1) of the Federal Rules of Civil Procedure, the Movants sought, and were granted, leave to intervene for purposes of filing an Amicus Brief, having asserted (i) that there is a significant public interest in maintaining the school immunization requirement being contested by Plaintiffs; (ii) that, collectively, the Movants represent a substantial portion of the public health agencies, private healthcare providers, and patient advocates serving the State of West Virginia; (iii) that their collected position on the challenged immunization requirements is relevant to the disposition of this case; and (iv) that, as such, the Movants should be permitted to intervene for purposes of filing an amicus brief.

5.      On August 2, 2023, the District Court issued its Order Denying Plaintiffs' Motion for Summary Judgment and for Permanent Injunction and Granting Defendant's Cross-Motion for Summary Judgment.

6.      On August 23, 2023, Plaintiffs filed their notice of their Appeal to the United States Court of Appeals for the Fourth Circuit, and, on August 25, 2023, this Court issued its Briefing Order for this appeal.

7.      Pursuant to that Briefing Order, the Movants hereby again assert (i) that there is a significant public interest in maintaining the school immunization requirement set forth in W. Va. Code § 16-3-4 ("Compulsory Vaccination Law"); (ii) that, collectively, the Movants represent a substantial portion of the public health agencies, private healthcare providers, and patient advocates serving the State of West Virginia; (iii) that their collected position regarding the Compulsory Vaccination Law is relevant to the disposition of this case; and (iv) that, as such, the Movants should be permitted to file an amicus brief in support of the Defendant in the appeal of this matter.

8.      If this Honorable Court grants the Movants' Motion for Leave to File Amicus Curiae Brief in Support of the Defendant and in Favor of Affirmance of the District Court's Order, it will not cause any delay or prejudice to the parties, and it will present no new questions to this Court.

9.      In accordance with applicable Federal Rules of Civil Procedure, the Movants have prepared the attached "Amicus Curiae Brief in Support of Defendant and in Favor of Affirmance of the District Court's Order" as Exhibit 1 hereto. The corporate statement and the introduction of amici and their interests in this matter, as required by

Rule 29(a)(3) and (4), is contained in <u>Appendix A</u> hereto.  The required Counsel

Statement, as set forth in Rule 29(a)(4)(E), and the Certificate of Compliance, as

required by Rule 29(a)(4)(G), are contained in <u>Appendix B</u> hereto.

Based on the foregoing, the Movants respectfully request that this Honorable

Court grant its motion, as well as any other relief this Court deems appropriate and

just.

Respectfully submitted,

**/s/ Brock M. Malcolm**_____

Brock M. Malcolm (WV State Bar # 7994)
**BOWLES RICE LLP**
125 Granville Square, Suite 400
Morgantown, West Virginia 26501
Phone:  (304) 285-2516
bmalcolm@bowlesrice.com
*Counsel of Record for Amicus Curiae*

**EXHIBIT 1**

---

**AMICUS CURIAE BRIEF IN SUPPORT OF DEFENDANT AND
IN FAVOR OF AFFIRMANCE OF THE DISTRICT COURT'S ORDER**

---

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

**WEST VIRGINIA PARENTS FOR**
**RELIGIOUS FREEDOM, PASTOR CHRIS FIGARETTI,**
and **JUDD UHL,**

          Plaintiffs,

    v.                                 **Case No. 23-1887**
                                            **(5:23-cv-158-JPB)**

**DR. MATTHEW CHRISTIANSEN,**
in his official capacity as the State
Health Officer and Commissioner of the
Bureau of Public Health,

          Defendant.

---

# AMICUS CURIAE BRIEF IN SUPPORT OF DEFENDANT AND
# IN FAVOR OF AFFIRMANCE OF THE DISTRICT COURT'S ORDER

---

Brock M. Malcolm (WV State Bar # 7994)
**BOWLES RICE LLP**
125 Granville Square, Suite 400
Morgantown, West Virginia 26501
Phone:  (304) 285-2516
Fax:     (304) 285-2575
bmalcolm@bowlesrice.com
*Counsel of Record for Amicus Curiae*

# **TABLE OF CONTENTS**

Table of Authorities                                                                4

Argument                                                                            6

I.      IMMUNIZATION IS AN IMPORTANT COMPONENT OF BOTH
        PUBLIC HEALTH AND HEALTHCARE FOR ALL CHILDREN          8

A.      Currently required immunizations are highly effective                13

B.      Belief exemptions increase risks to all children                      15

II.     PLAINTIFFS FAIL TO ESTABLISH A PRIMA FACIE CASE
        FOR A FREE EXERCISE CLAIM                                            17

III.    PARENTS HAVE NO CONSTITUTIONAL RIGHT TO
        ENDANGER THE HEALTH OF THEIR CHILDREN                     21

A.      Denying Plaintiffs an exemption does not violate their substantive
        Due Process rights                                                   21

B.      Even if Plaintiffs adequately stated a Free Exercise claim,
        rational basis review still would apply                               24

C.      Even if heightened scrutiny is applied, State officials have acted
        constitutionally in denying Plaintiffs an exemption                   25

IV.     PLAINTIFFS' CHILDREN HAVE A CONSTITUTIONAL RIGHT
        TO EQUAL PROTECTION OF THEIR INTEREST IN AVOIDING
        PREVENTABLE DISEASES                                               29

Conclusion                                                                          31

Appendix A:  Corporate Statement and Description of Amici Curiae           33

Appendix B:  Counsel Statement and Certificate of Compliance              37

Certificate of Service                                                              38

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*Anderson v. Georgia*, 65 S.E.2d 848 (Ga. 1951)……………………….………28
*Boone v. Boozman*, 217 F.Supp.2d 938 (E.D. Ark. 2002)……………………….28
*Brown v. Stone*, 378 So.2d 218 (Miss. 1979)……………………………………28
*Bruesewitz v. Wyeth*, 562 U.S. 223 (2011)……………………………..…………8
*Civil Liberties for Urban Believers v. City of Chicago*, 342 F. 3d 752
    (7th Cir. 2003), cert., denied, 541 U.S. 1096 (2004)……..…..….…..………17
*Combs v. Homer-Center School District*, 540 F 3d 231 (3rd Cir. 2008)..................25
*Cude v. State*, 377 S.W.2d 816 (Ark. 1964)…………………………………….....28
*Davis v. State*, 451 A.2d 107 (Md. 1982)…………………………………………28
*Employment Division v. Smith*, 494 U.S. 872 (1990)………....………6, 24, 25, 26, 28
*F.F., ETC. v. State of New York, et al.*, 2021 NY Slip Op 01541 (2021),
    cert., denied, on May 23, 2022……………………………………..…….…..…9
*Herndon by Herndon v. Chapel Hill-Carrboro City Board of Education*,
    89 F. 3d 174 (4th Cir. (N.C.) 1996)...…………………………………….........22
*Jacobson v. Massachusetts*, 197 U.S. 11 (1905)…………………………………...23
*Jehovah's Witnesses v. King County Hospital*, 390 U.S. 598 (1968)……..……...28
*Kissinger v. Board of Trustees*, 5 F.3d 177 (6th Cir. 1993)…………………......25
*McCarthy v. Boozman*, 212 F.Supp.2d 945 (W.D. Ark. 2002)……………………28
*Mosier v.  Barren County Bd. of Health*, 215 S.W.2d 967 (Ky. 1948)……………28
*Prince v. Massachusetts*, 321 U.S. 158 (1944)……………………………..26, 27, 28
*Railroad Commission of Tex. V. Pullman Co.*, 312 U.S. 496 (1941)………………..6
*Sadlock v. Board of Education*, 58 A.2d 218 (N.J. 1948)…………………………28
*State v. Miskimens*, 490 N.E.2d 931 (Ohio Com. Pl. 1984)…………………….....30
*Troxel v. Granville*, 530 U.S. 57 (2000)……………………………………………22
*We the Patriots USA, Inc., et al. v. Connecticut Office of Early Childhood*
    *Development, et al.*, 579 F.Supp.3d 290 (D. Conn. 2022)……..……………10
*Wisconsin v. Yoder*, 406 U.S. 205 (1972)…………………………………………25, 26
*Workman v. Mingo County Board of Education*, 419 F.App'x 348
    (4th Cir. (W.Va.) 2011)(Unpublished)…………………….....7, 8, 10, 27, 28
*Wright v. DeWitt School  Dist.*, 385 S.W.2d 644 (Ark. 1965)……………………...28

### <u>West Virginia Statutes</u>

W.Va. Code § 16-3-4………………………………………………7, 10, 20, 23, 24, 28

## <u>Constitutional Provisions</u>

U.S. Constitution Amendment 1……………………………..…6, 9, 10, 17, 25, 31

U.S. Constitution Amendment 14……..……………………………..…….…..21,  25, 30

# ARGUMENT[1]

West Virginia has opted to be a national leader in protecting children's health, rather than a follower of those states who have buckled under political pressure and left children unprotected from preventable diseases. West Virginia's compulsory vaccination law is religiously neutral and generally applicable, meeting the requirements established in *Employment Division v. Smith*, 494 U.S. 872 (1990), and, thus, subject to rational basis review, which Defendant has easily satisfied. West Virginia has put the rights and needs of children first, recognizing that children are persons in their own right, having fundamental interests at stake in connection with their healthcare.

Indeed, allowing parents to withhold immunization from their children based on their disagreement with the law, or even alleged religious beliefs, would violate the children's rights to Equal Protection under the law. West Virginia has responsibly created an exemption only for medical cases in which State officials verify the benefits of immunization are outweighed by the risks to the child. The Constitution does not

---

[1] The amici argue in support of Defendant and in favor of affirmance of the District Court's Order granting, in part, summary judgment to Defendant. Amici do not dispute that abstention is appropriate under the well-established principles established in *Railroad Commission of Tex. v. Pullman Co.*, 312 U.S. 496, 501 (1941), and subsequent cases. However, because Plaintiffs continue to assert First Amendment arguments on appeal, amici focus solely on the merits of Plaintiff's Free Exercise claim and the appropriate scrutiny to be applied when considering West Virginia's compelling interest in ensuring the immunization of school children.

require the State to create additional exemptions for Plaintiffs, and this Court should decline to second guess the decision of the West Virginia Legislature.

The exemption being sought would have the potential to become one of the most sweeping religious exemptions ever seen in the United States. Plaintiffs do not specifically allege that their particular religion (each Christianity) is opposed to immunization. Rather, each Plaintiff asserts that their own peculiar practice of that religion is opposed to immunizations required by W.Va. Code § 16-3-4. Were the Court to accept a Free Exercise claim based on such individualized beliefs, the Court could turn every parental objection to any public or child health and safety law into a potential Free Exercise case.[2]

While Plaintiffs are the most recent individuals making this Free Exercise Clause argument, they are not the first to do so in West Virginia's federal courts. In *Workman v. Mingo County Board of Education*, 419 F.App'x 348 (4th Cir. 2011), the Fourth Circuit, in an unpublished opinion, upheld the District Court's decision denying constitutional and statutory claims because West Virginia's compulsory

---

[2] For instance, what if a potential plaintiff decides that the use of required child safety seats and other vehicular restraints violates their personalized religious beliefs? Based upon the allegations contained in the Complaint, it seems fair to surmise Plaintiffs might similarly feel that the use of such safety devices, in advance of a crash, shows a lack of faith in God to prevent it in the first place. *See* Complaint, ¶ 45, 61. If such relief is granted, this Court's ruling could be used to attack laws regarding child safety seats, seat belts, and bicycle/motorcycle helmets, as well as child abuse laws limiting violence as a means of parental discipline in violation of Proverbs 13:24 ("Those who spare the rod hate their children, but those who love them are diligent to discipline them").

school immunization program does not violate the Free Exercise Clause, even under strict scrutiny.

While that unpublished opinion does not constitute binding precedent here, this Court nevertheless should again apply its *Workman* analysis and hold that Plaintiffs have failed to demonstrate a burden on religious faith – the threshold requirement for any Free Exercise claim. Even if Plaintiffs have a religious objection to immunization *per se* or could, on other grounds, show a *prima facie* infringement of a constitutional right, constitutional doctrine uniformly supports a conclusion that protecting the health and safety of children is a compelling State interest justifying generally applicable immunization requirements without religious exemption.

## I.    IMMUNIZATION IS AN IMPORTANT COMPONENT OF BOTH PUBLIC HEALTH AND HEALTHCARE FOR ALL CHILDREN.

The significant reduction, or in some cases elimination, of infectious diseases through immunization became "one of the greatest achievements" of public health in the 20th century.[3] Many of these diseases, which were once widespread and adversely impacted millions each year, are now something of the past. Accordingly, many U.S. physicians have never seen cases of polio, measles, rubella, or diphtheria among their patients. Despite the enormous benefits of modern immunizations, however, some parents choose to not protect their children, proscribing to a misbelief that a vaccine

---

[3]  *See Bruesewitz v. Wyeth*, 562 U.S. 223, 223 (2011).

is more dangerous than the diseases it is meant to prevent. Pseudoscience, misinformation, and growing polarization in the U.S. have further contributed to this movement in today's society.

Every state requires immunizations for school entry and attendance. For decades, West Virginia has been one of the few states that does not allow non-medical exemptions based on religious or personal beliefs. With more states allowing children to go unvaccinated, however, there has been a sharp increase in outbreaks of preventable diseases, most notably measles, resulting in the current trend of states restricting, or eliminating entirely, non-medical exemptions. Notably, New York,[4]

---

[4]  New York repealed its longstanding religious exemption in June 2019. In *F.F., ETC. v. State of New York, et al.*, 2021 NY Slip Op 01541, plaintiffs argued the repeal violates the First Amendment's Free Exercise Clause because (1) either (a) it allows for secular exemptions and, thus, is not generally applicable, or (b) its enactment was motivated by religious bias and, thus, it is not neutral; and (2) it is both under- and over-inclusive and, thus, not narrowly tailored to achieve a compelling governmental interest. On May 23, 2022, the U.S. Supreme Court denied plaintiff's petition for Writ of Certiorari (No. 21-1003), upholding the repeal of the religious exemption. *See* https://www.supremecourt.gov/search.aspx?filename=/docket/docketfiles/html/public/21-1003.html.

Maine,[5] Connecticut,[6] and California[7] recently joined West Virginia in disallowing non-medical exemptions to school-required immunizations.

W.Va. Code § 16-3-4 requires these vaccines for admission to public, private, or parochial schools: chickenpox, hepatitis-b, measles, meningitis, mumps, diphtheria, polio, rubella, tetanus, and whooping cough. To qualify for medical exemption, a licensed physician must certify why a child should not (or cannot) be immunized and demonstrate sufficient medical evidence that immunization is contraindicated. The State's Immunization Officer then renews, grants, conditions, denies, suspends, or revokes the requested exemption.

Each of these diseases is a serious illness that can lead to significant health complications or death. Before the measles vaccination program started in 1963, an estimated 3 to 4 million people got measles each year in the United States. Of these measles cases, on average, about 400 to 500 people died, 48,000 were hospitalized, and 1,000 developed encephalitis (brain swelling) on average each year. Measles is so

---

[5] Maine's enactment of H.P. 586 – L.D. 798 ("An Act To Protect Maine Children and Students from Preventable Diseases by Repealing Certain Exemptions from the Laws Governing Immunization Requirements") became effective on September 1, 2021.

[6] Connecticut Public Act No. 21-6 removed the existing religious exemption to vaccines required for public school entry. In the case of *We the Patriots USA, Inc., et al. v. Connecticut Office of Early Childhood Development, et al.*, 579 F.Supp.3d 290 (D. Conn. 2022), the U.S. District Court for the District of Connecticut dismissed the First Amendment religious claims, referencing the Fourth Circuit's unpublished decision in *Workman v. Mingo County Board of Education* in its discussion.

[7] California repealed its non-medical vaccine exemptions for school enrollment following the Disneyland measles outbreak in 2015.

contagious that if one person has it, up to 90% of the people close to that person who are not immune will also become infected.[8]

Similarly, before the availability of its vaccine, rubella was a common disease that occurred primarily among young children. The last major U.S. epidemic occurred during 1964-1965, when an estimated 12.5 million rubella cases resulted in 2,000 cases of encephalitis, 11,000 miscarriages and therapeutic abortions, 2,100 newborn deaths, and 20,000 infants born with congenital rubella syndrome (CRS), which causes severe birth defects with devastating, lifelong consequences.[9] Because of successful immunization programs, rubella has been eliminated from the United States since 2004. However, rubella is still common in other countries. Unvaccinated people can get rubella while abroad and bring the disease to the United States and spread it to others. During the 1920s, between 100,000 and 200,000 cases of diphtheria were reported each year, resulting in annual deaths of 13,000 to 15,000 Americans.[10] Polio infections peaked in the United States in 1952, with more than 21,000 paralytic cases. Following introduction of effective vaccines in 1955 (inactivated polio vaccine, IPV) and 1961 (oral poliovirus vaccine, OPV), polio incidence declined rapidly.[11]

[8]  *See* https://www.cdc.gov/measles/about/history.html.

[9]  *See* https://www.cdc.gov/rubella/about/in-the-us.html.

[10]  *See* https://www.cdc.gov/vaccines/pubs/pinkbook/dip.html.

[11]  *See* https://www.cdc.gov/vaccines/pubs/pinkbook/polio.html.

Unfortunately, an unintended consequence of this country's extraordinary immunization successes has been people forgetting about the horrors associated with these preventable diseases, particularly among children and people who are pregnant or immunocompromised. Immunizations are among the greatest achievements of medical science, preventing millions of cases of vaccine-preventable disease and their subsequent complications,[12] and saving billions of dollars in medical and public health costs.[13] Despite this tremendous reduction in infectious diseases, unvaccinated children remain at risk for contracting diseases that can cause great suffering and even death, as seen in the 2015 measles outbreaks which were exacerbated by increased numbers of unvaccinated individuals. Individuals who had received non-medical exemptions played a significant role in fueling that outbreak.

During the four-month peak of the 2015 California measles outbreak, 43% of measles cases cited personal belief objections to vaccination, while another 40% of the individuals who contracted measles were unable to be vaccinated because they were either too young or had a medical contraindication to vaccination.[14] These

---

[12]    *See*    https://publications.aap.org/pediatrics/article/150/3/e2021056013/188495/Impact-of-Routine-Childhood-Immunization-in?autologincheck=redirected.

[13]    *See*    https://publications.aap.org/pediatrics/article/150/3/e2021056007/188497/Value-of-the-Immunization-Program-for-Children-in?autologincheck=redirected.

[14]    *See* Measles — United States, January 4–April 2, 2015, *Morbidity and Mortality Weekly Report*: https://www.cdc.gov/mmwr/preview/mmwrhtml/mm6414a1.htm.

numbers show the direct and substantial role that vaccine refusal plays in transmitting deadly diseases to young children and medically compromised individuals.

Similarly, in the 2018 measles outbreak in New York and New Jersey, resulting in 242 cases of measles, immunization coverage in schools within the outbreak area was only 77%. Low community immunization rates facilitated widespread transmission after introduction of imported measles in unvaccinated travelers.[15] This outbreak, which led to New York's removal of non-medical exemptions for school immunization requirements, occurred in a religious community in which there was deliberate, targeted misinformation and a handful of religious leaders who were personally opposed to vaccination. Ultimately, however, rabbinical leaders within that community led the immunization efforts to end the outbreak.[16]

**A.    Currently required immunizations are highly effective.**

All the vaccines required for West Virginia school children have evidence-based data proving their effectiveness. In 2022, the Journal of Pediatrics published a peer-reviewed study,[17] comparing then-current morbidity and mortality for vaccine-

---

[15] *See* Measles Outbreaks from Imported Cases in Orthodox Jewish Communities – New York and New Jersey, 2018–2019, MMWR: https://www.cdc.gov/mmwr/volumes/68/wr/mm6819a4.htm.

[16] *See* https://www.nbcnews.com/news/us-news/brooklyn-measles-outbreak-how-glossy-booklet-spread-anti-vaccine-messages-n993596.

[17] *See* Talbird, S.E., et al. "Impact of Routine Childhood Immunization in Reducing Vaccine-Preventable Diseases in the United States." *Pediatrics*. Sept. 2022.

preventable diseases to the morbidity and mortality of those same diseases in the decade before the vaccines became widely available. The authors found childhood immunization continues to yield considerable, sustained reductions for each of the targeted diseases, estimating 24 million cases of vaccine-preventable disease had been averted in the United States in the 2019 population alone. Cases of diphtheria, Haemophilus influenzae, type b (Hib), measles, mumps, rubella, and polio all had declined by about 100%. Cases of tetanus and varicella (chickenpox) declined by 98%, and hepatitis b and pertussis (whooping cough) decreased by 86%, and 91%, respectively.

In all of 2006, there were only 55 cases of measles (with no measles-related deaths) in the entire country. During the 2018 outbreak in New York and New Jersey discussed above, there were 242 cases. During the most recent Ohio measles outbreak in late 2022, there were a total of 85 cases of measles. Of these cases, 80 of the individuals were unvaccinated, four were under vaccinated, and one had unknown vaccination status. All of the cases were in children under 18 years of age, with 36 (42%) requiring hospitalization.

([https://publications.aap.org/pediatrics/article/150/3/e2021056013/188495/Impact-of-Routine-Childhood-Immunization-in?autologincheck=redirected](https://publications.aap.org/pediatrics/article/150/3/e2021056013/188495/Impact-of-Routine-Childhood-Immunization-in?autologincheck=redirected)).

## B.    Belief exemptions increase risks to all children.

Though immunizations have dramatically reduced the incidence of contagious diseases, West Virginia's unvaccinated children remain at significant risk. Society is more mobile than ever before, and diseases quickly spread from one location to another. In 2008, measles was imported to San Diego from Switzerland and spread through a charter school with a high percentage of religious and personal belief exemptions. Every child who contracted measles in that instance was unvaccinated – either because of parental beliefs or because they were under a year old. In the latter case, the children who could not yet be vaccinated were placed at increased risk because of the presence of children who could be, but were not, immunized.[18]

Children whose parents claim a personal belief exemption are at far higher risk of contracting vaccine-preventable diseases. A Journal of the American Medical Association (JAMA) study reported that children with belief exemptions were 35 times more likely to contract measles than immunized persons.[19] Another JAMA study noted that children with belief exemptions were 5.9 times more likely to contract pertussis (whooping cough) than vaccinated children, and that at least 11% of

---

[18]  Sugerman, D.E., et al. "Measles outbreak in a highly vaccinated population, San Diego, 2008: role of the intentionally undervaccinated." Pediatrics. 2010 Apr;125(4):747-55. doi: 10.1542/peds.2009-1653.

[19]  Salmon, D.A., et al. "Health Consequences of Religious and Philosophical Exemptions for Immunization Laws: Individual and Societal Risk of Measles." *JAMA*. July 1999; Vol. 282: 47-53.

vaccinated children in measles outbreaks acquired infection through contact with a vaccine exemptor.[20]

Unvaccinated children are not only at higher risk for acquiring diseases but also increase the risk to the general public. Vaccines are not perfect and do not always confer 100% immunity, making it possible for a properly immunized child to contract a disease from an unvaccinated carrier, as found in the JAMA study.[21] Importantly, some immunizations cannot be given until a certain age, leaving younger children vulnerable to contagion by older unvaccinated children. The measles vaccine cannot be given until a baby is a year old, yet measles, which is remains a highly contagious, airborne virus, is often passed from older children to babies, who are too young to be vaccinated. Similarly, from 1999 to 2004, 91 U.S. babies died of pertussis, more than half of which were under two months of age and could not yet be immunized.[22]

Polio was declared "eliminated" from the Americas in September 1994 due to the widespread availability of effective vaccines. However, polio has not been eradicated globally. Rather, there continue to be outbreaks of paralytic polio throughout the Middle East and Africa. As was established during the recent global

---

[20] Feiken, D.R., et al. "Individual and Community Risks of Measles and Pertussis Associated with Personal Exemptions to Immunization." *JAMA*. December 2000; Vol. 284: 31-45.

[21] *See* Feiken, *supra.*

[22] Glanz, J.M., et al. "Parental Refusal of Pertussis Vaccination is Associated With an Increased Risk of Pertussis Infection in Children." *Pediatrics.* June 2009; Vol. 123(6): 1146-1451.

pandemic, the ease with which individuals travel across continents can lead to rapid spreading of viruses. Accordingly, West Virginia – and the country – cannot let down its guard with respect to polio immunization, lest it should expect to see a needless resurgence of this horrifying disease.

Unfortunately, there are increasing numbers of unvaccinated adults and children existing in modern society, and West Virginia children (even those whose parents do not possess any beliefs against immunization) are the most at risk in the United States, as West Virginia has the lowest rates of immunization for young children. The reality is that many of West Virginia's children get "caught up" on immunizations only when they start school and parents are required to take action. As such, the State must do all it can to protect those unvaccinated children and others, including those who are immunocompromised or pregnant.

## II.    PLAINTIFFS FAIL TO ESTABLISH A PRIMA FACIE CASE FOR A FREE EXERCISE CLAIM

As a threshold requirement for a First Amendment Free Exercise claim, Plaintiffs must establish a substantial burden on religious belief.  A substantial burden "is one that necessarily bears direct, primary, and fundamental responsibility for rendering religious exercise effectively impracticable." *Civil Liberties for Urban Believers v. City of Chicago*, 342 F . 3d 752, 761 (7th Cir. 2003), cert., denied, 541 U.S. 1096 (2004). Thus, the State action complained of must directly, clearly, and substantially conflict with a central tenet of a person's religious faith, forcing a person

to engage in specific conduct proscribed by a religious code or to refrain from specific conduct that is an element of religious practice. Plaintiffs assert strongly held religious beliefs, but they do not establish that any churches' tenets are opposed to immunization.

Here, each Plaintiff cites an individual objection to the historic use of aborted fetal cells in the development of vaccines. However, even the Catholic Church, the staunchest anti-abortion organization in the world, has repeatedly lent its support to widespread immunization efforts. In its "Moral reflections on vaccines prepared from cells derived from aborted human foetuses," published by the Pontifical Academy for Life ("Academy") in 2005,[23] the Church clarified its position on using vaccines prepared from cell lines derived from aborted fetuses and addressed parents' rights to oppose immunizations when required for school entry. The Academy focused its "moral reflection" on the best known, and most important, vaccine derived from fetal cells, the vaccine against Rubella (German Measles). The Academy examined scientific facts about the disease:

> For example, the severe epidemic of German measles which affected a huge part of the United States in 1964 thus caused 20,000 cases of congenital rubella, resulting in 11,250 abortions (spontaneous or surgical), 2,100 neonatal deaths, 11,600 cases of deafness, 3,580 cases of blindness, 1,800 cases of mental retardation. It was this epidemic that pushed for the development and introduction on the market of an effective vaccine against rubella, thus permitting an effective prophylaxis against this infection.

---

[23] *See* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6699053/.

Addressing moral objections towards vaccines prepared from aborted fetal cells, the Academy held "all clinically recommended vaccinations can be used with a clear conscience" and that the use of such vaccines "does not signify some sort of cooperation with voluntary abortion."

Instead, the Church placed greater importance on those individuals who are currently living and cited society's shared moral obligation to protect the most vulnerable, including children and pregnant women. In doing so, it clearly distinguished its work seeking to prevent unethical vaccine production from the clear harms arising from non-vaccination:

> There remains a moral duty to continue to fight and to employ every lawful means in order to make life difficult for the pharmaceutical industries which act unscrupulously and unethically. ***However, the burden of this important battle cannot and must not fall on innocent children and on the health situation of the population – especially with regard to pregnant women.*** (Emphasis added.)

Similarly, the Orthodox Union and the Rabbinical Council of America, in statement issued on its website[24] on November 18, 2018, stated:

> Judaism places the highest value on preserving human life. It is well known that those facing even a *potential* life or death situation are instructed to set aside the Sabbath and other key tenets of *halachic* (Jewish law) observance until the emergency has passed. Prayers for good health and for the complete and perfect healing of the ill are an ages-old aspect of Jewish tradition. But prayers must go hand-in-hand with availing oneself of medical science, including vaccination.

---

[24] *See* https://www.ou.org/news/statement-vaccinations-ou-rabbinical-council-america/.

(Emphasis in original). These statements have been widely echoed by the various Christian denominations whose representatives have come forward to refute any Biblical basis for avoiding vaccines.

As such, W.Va. Code § 16-3-4 does not, *per se*, burden religious faith. Instead, Plaintiffs ask this Court to open a Pandora's box whereby parents may object to any public or child health and safety laws, based on personal grounds not supported by any organized faith. This Court must decline to do so, as such a holding would be tantamount to deciding parents can do whatever they wish with their children, regardless of any potential or actual harm, so long as they simply profess to have a personal religious belief supporting their actions.

Disagreement with W.Va. Code § 16-3-4 does not constitute a sufficient burden on religious belief to support a Free Exercise claim, especially where the connection to religious belief is tenuous at best. Plaintiffs must show that their religion requires or prohibits specific conduct and that the State is directly interfering with their ability to comply with that mandate. Denying Plaintiffs' requests for an exemption does not force them to perform any specific act prohibited by their religion, nor does it inhibit, in any way, Plaintiffs from worshipping or expressing their religious beliefs.

Here, Plaintiffs have managed to keep to their beliefs by avoiding the placement of their children in West Virginia schools, and they are free to continue doing so without State action, despite the substantial health risk they create for their children.

Here, Plaintiffs merely seek to avoid the inconvenience created by their professed beliefs by fabricating a Free Exercise claim, hoping to apply a higher level of scrutiny than that required for a substantive Due Process claim. This Court should not credit this stratagem for transforming a run-of-the-mill disagreement between parents and State officials into a Free Exercise Clause case.

## III. PARENTS HAVE NO CONSTITUTIONAL RIGHT TO ENDANGER THE HEALTH OF THEIR CHILDREN.

Even assuming this Court were to find that Plaintiffs have stated a *prima facie* case for infringement of the Fourteenth Amendment substantive Due Process right of parents to child-rearing authority, West Virginia easily satisfies the rational basis test triggered in such a claim. Moreover, even if this Court finds Plaintiffs have adequately alleged an infringement of their Free Exercise rights, the rational basis test would be the appropriate level of judicial scrutiny. Nevertheless, even if this Court applies heightened scrutiny in this case, the State's application of its school immunization requirements is constitutional because it is necessary to serve the State's compelling interest in protecting children from dangerous, yet preventable, diseases.

## A. Denying Plaintiffs an exemption does not violate their substantive Due Process rights.

A parental substantive Due Process claim demands less of Plaintiffs than does a Free Exercise or Equal Protection claim. Plaintiffs need only show that the State is making them do something they do not want to do or preventing them from doing

something they want to do with respect to their children. However, the substantive Due Process right also affords parents less protection of their child-rearing preferences. It triggers only rational basis review, requiring only that this Court find that the challenged law is reasonably related to a legitimate State interest. *Herndon by Herndon v. Chapel Hill-Carrboro City Board of Education*, 89 F. 3d 174, 178 (4th Cir. (N.C.) 1996); *See also Troxel v. Granville*, 530 U.S. 57, 80 (2000). Under the rational basis test, the Court must presume the challenged State action is constitutional, and Plaintiffs bear the burden of showing that it bears no reasonable relationship to a legitimate State interest.

The State obviously has a substantial interest in protecting children from preventable disease. Requiring that all children attending school receive the immunizations, unless there is documented reason to believe the immunizations would be medically harmful, is a reasonable approach to serving the State's aim in protecting children from communicable diseases. Entry into school is an opportune time and setting for the enforcement of its requirements because children are then entering into the temporary custody of non-parents. In addition, congregation of children in schools presents a clear danger of rapid spread of communicable diseases. As discussed above, even immunized children may be at risk of contracting diseases from unvaccinated carriers. As such, herd immunity is essential for the protection of the community, particularly those who are immunocompromised.

Plaintiffs may contend that their children have little need for immunizations and pose little danger of spreading diseases because nearly all other school children are immunized, allowing the State to serve its aim while also allowing objecting parents a right to choose. However, the factual assumptions underlying that line of reasoning are objectively false. Furthermore, under rational basis review, the State is not required to fine tune its regulations to minimize impact on potential dissenters, nor to impose its requirement to the minimal extent necessary to serve its aim.

West Virginia already provides a set of objective criteria for exempting children who cannot safely receive specific vaccines. The current process properly limits the application of W.Va. Code § 16-3-4 to cases in which it would, in fact, benefit children medically. Plaintiffs have no constitutional right to force the State to go further or to defer to whatever parents think is best based on religious or personal beliefs. *Cf. Jacobson v. Massachusetts*, 197 U.S. 11 (1905) (rejecting an objection to compulsory immunization of adults based on constitutionally protected liberty and disagreement with the state as to the efficacy of vaccines). Significantly, Plaintiffs suggest no limiting principle for the holding they urge. Rather, in effect, they are arguing that the Constitution requires West Virginia to make immunizations completely optional. No precedent supports this argument.

**B.    Even if Plaintiffs adequately stated a Free Exercise claim, rational basis review still would apply.**

The Supreme Court's decision in *Employment Division v. Smith* established as a general rule for Free Exercise cases that strict scrutiny does not apply unless the challenged State action is discriminatorily targeted against Plaintiffs' religious faith: "The right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." 494 U.S. at 879. After *Smith*, laws that are religiously neutral and generally applicable are subject only to rational basis review.

Plaintiffs do not actually contend that W.Va. Code § 16-3-4, or even the denial of an exemption, targets their religious faith for discriminatory treatment. The law in question is neutral as to religion, is addressed to all parents without regard to religious belief, and contains an exemption entirely unrelated to religious belief. Plaintiffs do claim discrimination, of course, but the alleged discrimination is not on the basis of religious belief. Rather, they allege only different treatment relative to other parents or students who claimed and received a medical exemption.

Plaintiffs frustrated by the *Smith* rule routinely attempt a "hybrid rights" argument for strict scrutiny. Plaintiffs in this case have done the same. However, the only support for such an argument is dicta in *Smith* suggesting that constitutional rights claims might have some additive effect. *See Smith*, 494 U.S. at 881-82. However,

offhand comments do not amount to a holding of the Court, and, subsequent to *Smith*, the Court has never adopted the hybrid rights principle being sought here.

Most lower courts adjudicating Free Exercise cases post-*Smith* have rejected the hybrid rights theory, both in parents' rights cases and in other contexts. *See Combs v. Homer-Center School District*, 540 F.3d 231, 244-47 (3rd Cir. 2008) (rejecting the theory and citing similar decisions of the Second and Sixth Circuits). The Sixth Circuit, explaining why it rejected the very idea of a higher standard of review for so-called "hybrid-rights claims," stated: "Such an outcome is completely illogical; therefore, at least until the Supreme Court holds that legal standards under the Free Exercise Clause vary depending on whether other constitutional rights are implicated, we will not use a stricter legal standard than that used in *Smith* to evaluate generally applicable, exceptionless state regulations under the Free Exercise Clause." *Kissinger v. Board of Trustees*, 5 F.3d 177, 180 (6th Cir. 1993).

**C.    Even if heightened scrutiny is applied, State officials have acted constitutionally in denying Plaintiffs an exemption.**

Prior to *Smith*, the Supreme Court did apply some form of heightened review in all Free Exercise Clause cases, including those, like *Wisconsin v. Yoder*, 406 U.S. 205 (1972), involving parental religious objections to religiously neutral state child welfare laws. Notably, however, in no case has the Court ever held that parents have a right under either the First Amendment or Fourteenth Amendment – or the two in combination – to an exemption from state laws that would benefit their children.

In *Yoder*, the seminal pre-*Smith* parental Free Exercise case, the Court rested its decision on a supposition that compelling Amish children to attend school beyond the eighth grade would not benefit them and, therefore, that recognizing a right of Amish parents to a partial exemption from the compulsory education laws would have no adverse effect on the children. *See Yoder*, 406 U.S. at 229-30. The Court stated, "This case, of course, is not one in which any harm to the physical or mental health of the child or to the public safety, peace, order, or welfare has been demonstrated or may be properly inferred." *Id.* at 230. Importantly, the Court suggested that it would have reached an opposite decision if any danger to the children's interests, or to those of society, were shown:

> To be sure, the power of the parent, even when linked to a free exercise claim, may be subject to limitation under *Prince* if it appears that parental decisions will jeopardize the health or safety of the child, or have a potential for significant social burdens. But in this case, the Amish have introduced persuasive evidence undermining the arguments the State has advanced to support its claims in terms of the welfare of the child and society as a whole. The record strongly indicates that accommodating the religious objections of the Amish by forgoing one, or at most two, additional years of compulsory education will not impair the physical or mental health of the child, or result in an inability to be self-supporting or to discharge the duties and responsibilities of citizenship, or in any other way materially detract from the welfare of society.

*Id.*, at 233-34.

In the two Free Exercise cases in which the Court believed the challenged laws did serve to protect the health interests of children, the Court held in favor of the state.

In *Prince v. Massachusetts*, 321 U.S. 158 (1944), which remains the controlling precedent on conflicts between parental religious beliefs and State actions to protect children's health, the Court upheld a law prohibiting parents from involving their children in distribution of leaflets on the streets after dark, despite the claim that the law interfered with parents' free exercise of religion. Avoiding potential harm to children was all the justification needed to survive heightened judicial scrutiny in that case. After articulating the parents' religious interests, the Court stated:

> Against these sacred private interests, basic in a democracy, stand the interests of society to protect the welfare of children, and the state's assertion of authority to that end, made here in a manner conceded valid if only secular things were involved. The last is no mere corporate concern of official authority. It is the interest of youth itself and of the whole community, that children be both safeguarded from abuses and given opportunities for growth into free and independent well-developed men and citizens.

*Id.*, at 165. The Court further explained, "Acting to guard the general interest in youth's wellbeing, the state as *parens patriae* may restrict the parent's control…," and "the state has a wide range of power for limiting parental freedom and authority in things affecting the child's welfare." *Id.*, at 166-67.

Significantly, the Court in *Prince* referred specifically and favorably to State compulsory immunization laws, which require preventive measures for children who are not presently manifesting disease or impairment. *See id.*, at 166. Numerous lower court rulings since *Prince* have upheld state immunization laws in the face of parental religious objections. *See, e.g., Workman v. Mingo County Board of Education*, 419

F.App'x 348 (4th Cir. 2011)(Unpublished); *Boone v. Boozman*, 217 F.Supp.2d 938 (E.D. Ark. 2002); *McCarthy v. Boozman*, 212 F.Supp.2d 945 (W.D. Ark. 2002); *Davis v. State*, 451 A.2d 107 (Md. 1982); *Brown v. Stone*, 378 So.2d 218 (Miss. 1979); *Anderson v. Georgia*, 65 S.E.2d 848 (Ga. 1951); *Wright v. DeWitt School Dist.*, 385 S.W.2d 644 (Ark. 1965); *Cude v. State*, 377 S.W.2d 816 (Ark. 1964); *Mosier v. Barren County Bd. of Health*, 215 S.W.2d 967 (Ky. 1948); *Sadlock v. Board of Education*, 58 A.2d 218 (N.J. 1948). In his opinion for the Supreme Court in *Smith*, Justice Scalia favorably cited *Cude* in listing general "civil obligations" from which individuals have no right to an exemption under the Free Exercise Clause. *See Smith*, 494 U.S. at 888-89.

In its second decision upholding State action aimed at ensuring healthcare for a child, *Jehovah's Witnesses v. King County Hospital*, 390 U.S. 598 (1968), the Court affirmed a lower court decision that applied *Prince* in ordering blood transfusions for a child needing surgery, over the objection of Jehovah's Witness parents. The health danger for the child in that case was immediate and severe, but the intrusiveness of State action in that case also was much more severe than what is required under W.Va. Code § 16-3-4.

Plaintiffs can point to no explicit statement by any legislature or court that immunizations do not serve a compelling State interest. Moreover, there is today no reasonable alternative to immunization, so the compulsory immunization law is

narrowly tailored to serve the compelling State interest of protecting children's health. While most states currently provide for a belief exemption in immunization laws, it does not follow that they are appropriate, let alone constitutionally required. Moreover, as discussed herein, in light of recent measles outbreaks, several states have removed non-medical exemptions. These states have done so after being brutally reminded of the devastating effects of these diseases on unvaccinated children, and they do not wish to see these outbreaks repeated.

## IV. PLAINTIFFS' CHILDREN HAVE A CONSTITUTIONAL RIGHT TO EQUAL PROTECTION OF THEIR INTEREST IN AVOIDING PREVENTABLE DISEASES.

What often gets overlooked in these kinds of "State versus parent" conflicts over children's healthcare are the individual constitutional rights at stake for the affected child. To grant a limitless religious exemption to parents would amount to denying the children of those parents an important welfare protection that the State ensures to other children and would constitute a denial of Equal Protection to the children who go unprotected.

The compulsory immunization law is designed for children's protection, and the West Virginia only seeks to ensure that all who would benefit from immunization receive that protection, as intended by its Legislature. Empowering parents to countermand the State Legislature and prevent children from receiving these protections would be effectively treating all impacted children as less deserving than

their classmates of the protections afforded by child welfare laws. Such judicial action would constitute a *prima facie* violation of the Fourteenth Amendment Equal Protection Clause, which prohibits State actors, including courts, from denying the law's protections to particular citizens without strong justification. There is no support for the proposition that someone else's personal beliefs can supply such justification, even if that someone else is the parent of the child being denied the protection.

In *State v. Miskimens*, 490 N.E.2d 931 (Ohio Com. Pl. 1984), an Ohio court held that the religious defense to Ohio's felony child endangerment law violated the Equal Protection rights of children whose parents relied on it after failing to secure medical care their children needed.  The court stated:

> ***This special protection [of medical care] should be guaranteed to all such children until they have their own opportunity to make life's important religious decisions for themselves upon attainment of the age of reason.*** After all, given the opportunity when grown up, a child may someday choose to reject the most sincerely held of his parents' religious beliefs, just as the parents on trial here have apparently grown to reject some beliefs of their parents. Equal protection should not be denied to innocent babies, whether under the label of "religious freedom" or otherwise.

*Miskimens*, 490 N.E.2d, at 935-36 (emphasis added).

Furthermore, at the same time that it is protecting the health, safety, and constitutional rights of these children, the State also achieves another compelling interest in protecting other students, teachers, and school employees who are immunocompromised, or pregnant, and reliant on high immunization rates for

protection. All these other individuals have their own constitutional rights that could potentially be adversely impacted by the result sought by Plaintiffs. Just as the First Amendment's Freedom of Speech does protect a speaker who recklessly defames another, Plaintiffs should not be permitted to disguise reckless disregard for protections afforded through immunization as a free exercise of religion.

Without access to the required immunizations, debilitating illness or death could rob these children – and/or others around them – of the opportunity to become autonomous persons capable of making their own decisions about religious beliefs. The required immunizations can prevent such a profound loss, and Plaintiffs have no right to take that protection away from their children or any other person.

## **CONCLUSION**

Any aspect of any child welfare law could conflict with some parent's religious belief, personal philosophy, or judgment about what is best for their child. Consistent with this compelling interest of protecting children from communicable diseases, West Virginia's Legislature has wisely and intentionally refused to enact a religious exemption from its immunization requirement, despite mounting pressure to do so. This Court should decline to establish a precedent whereby any parent is entitled to countermand any child welfare law by merely asserting a vague and unsupported religious belief. Such a precedent would greatly undermine the State's interest in promoting the welfare of children and the public and would result in needless

suffering, disease, bodily damage, and death. Plaintiffs have no legal or moral entitlement to override this legislative judgment or to subject any child to the dangers of terrible, but otherwise preventable, diseases. On the contrary, Plaintiffs' children have a right not to be subjected to these diseases while other children are being protected by the State.

Respectfully submitted,

**THE CENTER FOR RURAL
HEALTH DEVELOPMENT, INC.**,

By Counsel

**/s/ Brock M. Malcolm**
Brock M. Malcolm (WV State Bar # 7994)
**BOWLES RICE LLP**
125 Granville Square, Suite 400
Morgantown, West Virginia 26501
Phone:  (304) 285-2516
bmalcolm@bowlesrice.com
*Counsel of Record for Amicus Curiae*

# APPENDIX A

## CORPORATE STATEMENT AND
## DESCRIPTION OF AMICI CURIAE

Pursuant to Rules 26.1 and 29 of the Federal Rules of Appellate Procedure, the amici curiae hereby states that none of its participants is a publicly held or for-profit corporation and there is neither any parent corporation nor any publicly held corporation that owns 10% or more of the stock in any of the parties.

The lead amicus party is **The Center for Rural Health Development, Inc. ("The Center"),** a private non-profit that works to improve the health of West Virginians and to strengthen West Virginia's health care delivery system, especially in rural communities. The Center serves as the lead agency for the **West Virginia Immunization Network**, a coalition of over 400 members dedicated to the protection of all West Virginians from the consequences of preventable diseases by identifying and removing barriers to immunization services, educating families, providers, and the community about the importance of timely immunizations, and fostering effective public policies to improve immunization rates across the lifespan.

Joining with The Center in its support of the Defendant are the following:

**West Virginia State Medical Association** is a 501(c)(6) physician-based association, established in 1867, serving active physicians, residents, retirees, and students, with a mission of advancing health and promoting quality and safety in the practice of medicine.

**West Virginia Chapter of the American Academy of Pediatrics, Inc.** is a non-profit corporation representing over 275 pediatricians, pediatricians in training, and allied health practitioners and seeking to attain the optimal health and well-being of all infants, children, adolescents, and young adults by uniting and educating pediatricians and other child experts and advocates.

**West Virginia Hospital Association** is a non-profit, membership organization, with the mission to support its members in achieving a strong, healthy West Virginia.

**West Virginia Rural Health Association, Inc.** is a non-profit, membership-driven organization, consisting of individuals and stakeholders from all sectors of West Virginia's healthcare system.

**Association for Professionals in Infection Control & Epidemiology – West Virginia** is a non-profit association with the mission of creating a safer world by advancing the science and practice of infection prevention and control.

**West Virginia Academy of Family Physicians** is a non-profit specialty association with over 1,000 members and the mission of promoting excellence in healthcare and the betterment of health of the American people.

**West Virginia Association of Local Health Departments** represents all of West Virginia's local health departments, with a mission of championing their work by communicating a unified message, maximizing resources, and influencing public

policy to improve health outcomes. All of its members provide childhood immunizations as a part of their services to the public.

**West Virginia Pharmacists Association** is a statewide professional organization representing the interests of licensed pharmacists, pharmacy technicians, and pharmacy students.

**West Virginia Osteopathic Medical Association, Inc.** is a non-profit corporation that has served West Virginia for over 100 years. Its mission is to promote public health by the elevation and maintenance of high standards of osteopathic education and by the collection and dissemination of such knowledge for the education and improvement of the profession and for the benefit of humanity.

**West Virginia Association of School Nurses, Inc.** is a non-profit specialty nursing organization devoted exclusively to meeting the needs of school nurses and the children they serve, with a goal of developing and utilizing evidence-based practices to promote health and wellness in students and staff.

**West Virginia Nurses Association** is a non-profit, 501(c)(6) membership association serving as the collective voice for more than 40,000 nurses, advocating for the nursing profession and the improvement of healthcare in West Virginian, and promoting the highest standards of nursing practice, education, and research.

**West Virginia Nurses Affiliate of the American College of Nurse-Midwives** is the professional membership organization for West Virginia's certified nurse-

midwives and current nurse-midwifery students. It is the state affiliate of the national

American College of Nurse-Midwives.

## APPENDIX B

## COUNSEL STATEMENT AND
## CERTIFICATE OF COMPLIANCE

Statement of Counsel:  I hereby state I have authored the foregoing amicus brief, submitted on behalf of the named amici who have joined in the support of the Defendant in upholding West Virginia's compulsory school vaccination requirements. I was retained by The Center for Rural Health Development, Inc. for the purpose of authoring and submitting this brief, and no other party, including the other named amici parties, has contributed financially to its preparation.

Certificate of Compliance:  This amicus brief complies with the work limitations set forth in Rules 29(a)(5) and 32, because it contains 6,411 words, which is less than one-half of the words permitted for the brief it supports. It also complies with the typeface and type-style requirements of Rules 32(a)(5) and 32(a)(6) because it has been prepared in proportionally spaced typeface, including serifs, utilizing Microsoft Word in Times New Roman 14-point font.

/s/ Brock M. Malcolm
Brock M. Malcolm (WV State Bar # 7994)
**BOWLES RICE LLP**
125 Granville Square, Suite 400
Morgantown, West Virginia 26501
Phone:  (304) 285-2516
bmalcolm@bowlesrice.com
*Counsel of Record for Amicus Curiae*

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

**WEST VIRGINIA PARENTS FOR
RELIGIOUS FREEDOM, PASTOR CHRIS FIGARETTI,**
and **JUDD UHL,**

               Plaintiffs,

      v.                                      **Case No. 23-1887
(5:23-cv-158-JPB)**

**DR. MATTHEW CHRISTIANSEN,**
in his official capacity as the State
Health Officer and Commissioner of the
Bureau of Public Health,

               Defendant.

## <u>CERTIFICATE OF SERVICE</u>

      I hereby certify that, on this 9th day of November, 2023, I electronically filed the foregoing "**MOTION FOR LEAVE TO FILE** *AMICUS CURIAE* **BRIEF IN SUPPORT OF DEFENDANTS**," along with a copy of the Amicus Brief itself (attached to the Motion as <u>Exhibit 1</u>), a Corporate Statement and Description of Amici Curiae (<u>Appendix A</u>), and Counsel Statement and Certificate of Compliance (<u>Appendix B</u>), with the Clerk of Court by using the CM/ECF system. The participants in the case are registered CM/ECF users and service shall be accomplished by the CM/ECF system.

                        **/s/ Brock M. Malcolm**_____
                        Brock M. Malcolm (WV State Bar # 7994)
                        **BOWLES RICE LLP**
                        125 Granville Square, Suite 400
                        Morgantown, West Virginia 26501
                        Phone:  (304) 285-2516
                        bmalcolm@bowlesrice.com
                        *Counsel of Record for Amicus Curiae*