**Appeal No. 23-1877**

In The

# United States Court of Appeals for the Fourth Circuit

WEST VIRGINIA PARENTS FOR RELIGIOUS FREEDOM; PASTOR CHRIS FIGARETTI; JUDD UHL, *individually and on behalf of their minor children, and on behalf of others similarly situated*

*Plaintiffs–Appellants,*

*and*

ANDREW WALDRON

*Plaintiff*

*versus*

DR. MATTHEW CHRISTIANSEN, *in his official capacities as the State Health Officer and Commissioner of the Bureau of Public Health*

*Defendant–Appellee*

*and*

BELINDA MOSS, *in her official capacity as the Principal Administrator of Cheat Lake Elementary School*; MINDY WILSON, *in her official capacity as the Principal Administrator of the Jefferson Elementary Center*

*Defendants*

On Appeal from the United States District Court
for the Northern District of West Virginia at Wheeling,
No. 5:23-cv-00158-JPB

### PLAINTIFFS'/APPELLANTS' OPENING BRIEF

Aaron Siri
Elizabeth A. Brehm
Walker Moller
SIRI & GLIMSTAD LLP
745 5th Avenue, Suite 500
New York, NY 10151
Tel: 212-532-1091
aaron@sirillp.com

Christopher Wiest (KY 90725)
Chris Wiest, Atty at Law, PLLC
25 Town Center Blvd, Suite 104
Crestview Hills, KY 41017
Tel:   513/257-1895
chris@cwiestlaw.com

*Counsel for Plaintiffs-Appellants*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to FRAP 26.1, and Local Rule 26.1, Plaintiffs/Appellants West Virginia Parents for Religious Freedom, Pastor Chris Figaretti, and Judd Uhl ("Plaintiffs" or "Appellants") make the following disclosures:

1. Appellants are not a publicly held corporation or other publicly held entity;

2. Appellants do not have any parent corporations;

3. A publicly held corporation or other public entity does not own 10% or more of any stock of Appellants.

Appellants are not a subsidiary or affiliate of a publicly owned corporation. There is no publicly owned corporation, not a party to the appeal, which has a financial interest in the outcome of this appeal.

## **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT .................................................. ii

TABLE OF CONTENTS .................................................................................. iii

TABLE OF AUTHORITIES ............................................................................ v

INTRODUCTION ............................................................................................ 1

JURISDICTIONAL STATEMENT ................................................................ 2

STATEMENT OF THE ISSUES .................................................................... 4

STATEMENT OF THE CASE AND FACTS ................................................ 5

    A. Plaintiffs' Religious Beliefs Are Substantially Burdened By the CVL, and Each Plaintiff Continues to Suffer Irreparable Harm. ..... 5

    B. The CVL's Discretionary Medical Exemption Framework .................. 9

    C. Plaintiffs' Complaint Pursued Relief Exclusively Under the First Amendment, Before EPRA Was Active. ........................................ 12

    D. The District Court Abstains Under Pullman. .......................................... 14

SUMMARY OF THE ARGUMENT ............................................................ 16

ARGUMENT .................................................................................................. 17

I.    This Court Has Appellate Jurisdiction Over The District Court's Stay Order. ....................................................................................... 17

    A. The *Pullman* Order is Final Because Plaintiffs Are Now "Effectively Out of Court." ...................................................... 18

    B. The District Court's Stay is a Collateral Order. ............................... 24

II.   The District Court Abused its Discretion by Abstaining Under *Pullman.* .......................................................................................... 28

A. The Standard of Review. ............................................................ 28

B. The District Court's Order Does Not Satisfy the Requirements
   for *Pullman* Abstention. ....................................................... 29

C. It Would Be Improper to Create a State Court Exhaustion
   Requirement For § 1983 Claims. ........................................... 34

D. *Pullman* Abstention Was Also Improper Because the CVL
   Plainly Violates the First Amendment. ................................. 37

   1. The Challenged Law, Both Facially and As-Applied, Plainly
      Violates the First Amendment Under *Fulton* .................... 41

   2. Defendant Plainly Cannot Demonstrate that the
      Challenged Statute is Neutral and Generally Applicable
      Under *Tandon.* .................................................................. 48

   3. Strict Scrutiny Also Applies on Alternative Grounds
      because This Case Involves Recognized "Hybrid Rights" ..... 55

   4. The CVL Cannot Survive Strict Scrutiny. ........................... 57

      a. Defendant failed to demonstrate that the State's interests
         are sufficiently "compelling". ...................................... 57

      b. Defendant also failed to demonstrate that the statute is
         narrowly tailored. .......................................................... 62

CONCLUSION ................................................................................ 66

STATEMENT CONCERNING ORAL ARGUMENT ........................... 67

CERTIFICATE OF COMPLIANCE ..................................................... 68

iv

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*AFA Distributing Co., Inc. v. Pearl Brewing Co.,*
  470 F.2d 1210 (4th Cir. 1973) .............................................................. 15

*Ankenbrandt v. Richards,*
  504 U.S. (1992) ....................................................................................... 2

*Archdiocese of Washington v. WMATA,*
  897 F. 3d 314 U.S. App. D.C. 461 (D.C. Cir. 2018) ............................ 56

*Babbitt v. United Farm Workers Nat'l.,*
  442 U.S. 289 (1979) .............................................................................. 37

*Batterman v. Leahy,*
  544 F.3d 370 (1st Cir. 2008) .......................................................... 3, 22

*Bosarge v. Edney,*
  2023 U.S. Dist. LEXIS 152814 (S.D. Miss. Aug. 29, 2023) ..... 15, 36, 45

*Brown v. Entm't Merchs. Ass'n,*
  564 U. S. 786 (2011) ...................................................................... 57, 59

*Brown v. Hot, Sexy and Safer Productions,*
  68 F. 3d 525 (1st Cir. 1995) ................................................................ 56

*Burford v. Sun Oil Co.,*
  319 U.S. 315 (1943) ....................................................... 19, 21, 24, 27

*Cantwell v. Connecticut,*
  310 U.S. 296 (1940) .............................................................................. 55

*Cheyney State College Faculty v. Hufstedler*,
703 F.2d 732 (3d Cir. 1983)....................................................................22

*Church of Lukumi Babalu Aye v. City of Hialeah*,
508 U.S. 520 (1993) ......................................................... 40, 44, 57, 63

*City of Houston v. Hill*,
482 U.S. 451 (1987) ......................................................... 27, 32, 33, 38

*Cohen v. Beneficial Indus. Loan Corp.*,
337 U.S. 541 (1949) ..................................................................... 3, 26

*Cohens v. Virginia*,
19 U.S. 264 (1821) ............................................................................29

*Colo. River Water Conservation Dist. v. United States*,
424 U.S. 800 (1976) ..................................................................... passim

*Cornerstone Christian Schools v. University Interscholastic League*,
563 F. 3d 127 (5th Cir. 2009) ............................................................56

*Cox v. Plan. Dist. I Cmty. Mental Health & Mental Retardation
Servs. Bd.*, 669 F.2d 940 (4th Cir. 1982)............................................29

*D.J. v. Mercer County Bd. of Educ.*,
2013 WL 6152363 (W. Va. Nov. 22, 2013) .........................................62

*Dahl v. Bd. of Trustees of Western Michigan Univ.*,
15 F. 4th 728 (6th Cir. 2021).................................................... 15, 36, 45

vi

*Deakins v. Monaghan*,
484 U.S. 193 (1988) ............................................................29

*Doster v. Kendall*,
54 F.4th 398 (6th Cir. 2022) .......................................59, 60

*Educ. Servs., Inc. v. Md. State Bd. for Higher Educ.*,
710 F.2d 170 (4th Cir. 1983) .........................................5, 30

*Elrod v. Burns*,
427 U.S. 347 (1976) ............................................................35

*Employment Div. v. Smith*,
494 U.S. 872 (1990) ..................................................... passim

*England v. La. State Bd. of Med. Exam'rs*,
375 U.S. 411 (1964) ............................................................38

*Examining Board of Engineers, Architects and Surveyors v. Otero*,
426 U.S. 572 (1976) ............................................................36

*Fitts v. Kolb*,
779 F. Supp. 1502 (D.S.C. 1991) ........................................38

*Fraternal Ord. of Police Newark Lodge No. 12 v. City of Newark*,
170 F.3d 359 (3d Cir. 1999) .........................................41, 44

*Fulton v. City of Philadelphia*,
141 S. Ct. 1868 (2021) ................................................. passim

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
546 U.S. 418 (2006) ............................................................54

*Hall v. Virginia,*
  385 F.3d 421 (4th Cir. 2004) ............................................................ 52

*Harman v. Forsennius,*
  380 U.S. 528 (1965) ........................................................................ 38

*Hawaii Housing Authority v. Midkiff,*
  467 U.S. 229 (1984) ........................................................................ 32

*Haywood v. Drown,*
  556 U.S. 729 (2009) ........................................................................ 34

*Hovsons, Inc. v. Sec'y of Interior,*
  711 F.2d 1208 (3d Cir. 1983) ...................................................... 3, 22

*Idlewild Bon Voyage Liquor Corp. v. Epstein,*
  370 U.S. 713 (1962) ...................................................... 18, 19, 20, 24

*Jones v. Coleman,*
  848 F.3d 744 (6th Cir. 2017) ...................................................... 3, 22

*Kennedy v. Bremerton Sch. Dist.,*
  142 S.Ct. 2407 (2022) .................................................................... 41

*Knick v. Twp. of Scott,*
  139 S. Ct. 2162 (2019) .................................................................... 34

*Martin v. Stewart,*
  499 F.3d 360 (4th Cir. 2007) ...................................................... 27, 29

*Mast v. Fillmore Cnty.,*
141 S. Ct. 2430 (2021) .......................................................... 64

*Mazanec v. N. Judson-San Pierre Sch. Corp.,*
750 F.2d 625 (7th Cir. 1984) ......................................... 3, 22

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,*
460 U.S. 1 (1983) ........................................................ passim

*Nationwide Mut. Ins. Co. v. Unauthorized Prac. of L. Comm., of State
Bar of Texas,* 283 F.3d 650 (5th Cir. 2002) ......................... 28

*New Orleans Pub. Serv., Inc. v. Council of New Orleans,*
491 U.S. 350 (1989) .......................................................... 30

*Pierce v. Society of Sisters,*
268 U.S. 510 (1925) .......................................................... 55

*Porter v. Jones,*
319 F.3d 483 (9th Cir. 2003) ......................................... 3, 22

*Quackenbush v. Allstate Ins. Co.,*
517 U.S. 706 (1996) .................................................... passim

*Railroad Comm'n of Texas v. Pullman Co.,* 312 U.S. (1941) ......... passim

*Richmond, Fredericksburg & Potomac R. Co. v. Forst,*
4 F.3d 244 (4th Cir. 1993) ................................................. 28

*Roberts v. United States Jaycees,*
468 U.S. 609 (1984) .......................................................... 56

ix

*Roman Diocese of Brooklyn v. Coumo,*
   141 S. Ct. 63 (2020) .......................................................................... 48, 65

*San Jose Christian College v. Morgan Hill,*
   360 F. 3d 1024 (9th Cir. 2004) ............................................................. 57

*Seals 1-26 v. Biden,*
   578 F. Supp. 3d 822 (N.D. Tex. 2022) .................................................. 45

*Steffel v. Thompson,*
   415 U.S. 452 (1974) ............................................................................... 34

*Stultz v. VA DMV,*
   185 F. Supp. 3d 890 (W.D. VA. 2015) ................................................... 36

*Tandon v. Newsom,*
   141 S. Ct. 1294 (2021) ................................................................... passim

*Thornburgh v. American College of Obstetricians,*
   476 U.S. 747 (1986) ............................................................................... 37

*U.S. Navy Seals 1-26 v. Biden,*
   27 F.4th 336 (5th Cir. 2022) ................................................................. 61

*United States v. Under Seal (In re Grand Jury),*
   478 F.3d 581 (4th Cir. 2007) ................................................................ 28

*W. Va. State Bd. of Educ. v. Barnette,*
   319 U.S. 624 (1943) ............................................................................... 13

x

*Will v. Hallock*,
   546 U.S. 345 (2006) ....................................................... 24, 28

*Wisconsin v. Constantineau*,
   400 U.S. 433 (1971) ............................................................ 36

*Wisconsin v. Yoder*,
   406 U.S. 205 (1972) ............................................................ 56

*Wise v. Circosta*,
   978 F.3d 93 (4th Cir. 2020) ........................................... 30, 31

*Wohl v. Keene*,
   476 F.2d 171 (4th Cir. 1973) ............................................. 34

*Workman v. Mingo County Bd. of Educ.*,
   419 Fed. Appx. 348 (4th Cir 2011) ................................... 61

*Zwickler v. Koota*,
   389 U.S. 241 (1967) ............................................................ 37

**Statutes**

28 U.S.C. §1291 ................................................................. passim

28 U.S.C. §1292. ...................................................................... 20

42 U.S.C. §§ 300aa-11 ............................................................. 52

42 U.S.C. § 1983 ............................................................... passim

Federal Rules of Evidence Rule 201 ........................................................52

W. Va. Code §35-1A-1 (the "EPRA") .............................................. passim

W. Va. Code § 16-3-4 (the "CVL")................................................... passim

W. Va. Code § 18-8-1 .................................................... 7, 53, 65

**Other Authorities**

Abstention Doctrine Today, 125 U. Pa. L. Rev. 590 (1977)....................38

## **INTRODUCTION**

This Appeal arises from a First Amendment Free Exercise challenge to W. Va. Code § 16-3-4, West Virginia's compulsory vaccination law for school attendance (the "CVL"). Plaintiffs filed a lawsuit with one count: a First Amendment claim challenging the law on its face and as applied to religious adherents who have sincerely held religious beliefs in conflict with compelled vaccination. The CVL provides discretionary secular exemptions but does not allow for religious exemptions, violating recent and directly on point Supreme Court precedent in *Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021) and *Tandon v. Newsom*, 141 S. Ct. 1294 (2021).

After denying a preliminary injunction on the basis that irreparable constitutional harm would not occur until the school year started (a mere three months later), the District Court then issued a stay under *Railroad Comm'n of Texas v. Pullman Co.*, 312 U.S. 496 (1941), forcing Plaintiffs to state court to pursue a potential remedy under a newly enacted West Virginia statute – an option Plaintiffs could not have elected even if they had desired to (which they do not) as that option did not exist at the time the complaint was filed. Defendant never asserted that this new statute

1

would *actually* afford Plaintiffs the relief they seek herein, and undoubtedly intends to contend it does not. Critically, the District Court's determination that Plaintiffs must pursue protracted litigation in state court under a state law remedy they never alleged is further exacerbating the constitutional harms that continue to accrue.

Once this Court confirms its appellate jurisdiction, it will find the decision below was in error. The *Pullman* abstention factors are plainly not met. At bottom, abstention is the exception to the rule that federal courts possess a "virtually unflagging" responsibility to exercise the jurisdiction that Congress gave them. *Ankenbrandt v. Richards*, 504 U.S. 689, 705 (1992). This is especially true where, as here, the challenged law is plainly unconstitutional.

Appellants are entitled to a federal forum to resolve the only claim they advanced. For these reasons and those detailed below, the Court should vacate the District Court's order and remand with instructions to adjudicate the merits of Plaintiffs' First Amendment claim.

## JURISDICTIONAL STATEMENT

The District Court possesses federal question jurisdiction over Plaintiffs/Appellants' ("Plaintiffs") federal claims under the First

2

Amendment and 42 U.S.C. § 1983. On August 2, 2023, the District Court granted Defendant's request to stay the case under *Pullman*. JA762. A timely notice of appeal was filed on August 23, 2023. JA776.

This Court has appellate jurisdiction under 28 U.S.C. § 1291. While the Fourth Circuit has not yet confronted the issue of whether *Pullman* abstention orders are immediately appealable, other Circuits have answered affirmatively. *See, e.g., Batterman v. Leahy*, 544 F.3d 370, 373 (1st Cir. 2008); *Hovsons, Inc. v. Sec'y of Interior*, 711 F.2d 1208, 1211 (3d Cir. 1983); *Jones v. Coleman*, 848 F.3d 744, 748 (6th Cir. 2017); *Mazanec v. N. Judson-San Pierre Sch. Corp.*, 750 F.2d 625, 627–28 (7th Cir. 1984); and *Porter v. Jones*, 319 F.3d 483, 489 (9th Cir. 2003). In addition, other types of abstention orders bearing similar hallmarks to *Pullman* abstention orders are also treated as final orders because they put the aggrieved party "effectively out of court," *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 714 (1996), and also because they constitute "collateral orders." *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949).

Accordingly, this Court has jurisdiction over Plaintiffs' appeal under 28 U.S.C. §1291.

3

## STATEMENT OF THE ISSUES

This appeal presents the following questions:

(1) This Court's appellate jurisdiction is generally constrained to final orders under 28 U.S.C. § 1291. A long line of Supreme Court precedent, however, recognizes that a district court stay leaving a party "effectively out of court" constitutes a final order, immediately appealable under § 1291. When a federal court stays its hand pending a parallel state court proceeding, a party is "effectively out of court." Here, there is not even a pending state court action. Plaintiffs never intended to pursue their First Amendment claims or claims related thereto in a state court. Because the District Court's order stayed the case—without any deadlines—and dictated that Plaintiffs must pursue their free exercise claims through protracted litigation in a state court—all while irreparable harms continue to accrue—Plaintiffs/Appellants have been put "effectively out of court." Does this Court have appellate jurisdiction over the District Court's *Pullman* stay order?

(2) To qualify for collateral order review, an order must conclusively determine the disputed question, resolve an important issue completely separate from the merits of the action, and be effectively unreviewable on appeal from a final judgment. Here, the District Court's order conclusively determined the question of its jurisdiction (abstention); resolved an important issue separate from the merits (abstention); and is effectively unreviewable on final judgment (any subsequent state court decision on West Virginia's religious freedom statute would be res judicata for the federal court). Does this Court also have appellate jurisdiction over the District Court's stay under the collateral order doctrine?

(3) *Pullman* abstention is only appropriate where "there is (1) an unclear issue of state law presented for decision, and (2) the resolution of which may moot or present in a different posture

4

the federal constitutional issue such that the state law issue is potentially dispositive." *Educ. Servs., Inc. v. Md. State Bd. for Higher Educ.*, 710 F.2d 170, 174 (4th Cir. 1983) (cleaned up). Here, the District Court did not identify an unclear issue of the only state law at issue. The statute Plaintiffs challenged (the CVL) is facially unambiguous, containing an avenue for exemptions based on medical reasons but not for religious reasons. Plaintiffs did not challenge the CVL on state law grounds and have no intention to do so. However, the District Court went out of its way to unilaterally graft W. Va. Code §35-1A-1, the Equal Protection for Religion Act (the "EPRA"), into Plaintiffs' complaint, and then abstained under *Pullman* on grounds that it was unclear whether, if a lawsuit under EPRA were brought, religious exemptions to the CVL would be required. Even if EPRA had been available when the lawsuit was filed (it was not), and even if Plaintiffs desired to pursue relief under EPRA in a state court (they do not), whether or not EPRA affords them some degree of relief would not moot Plaintiffs' First Amendment claim, or the past, present, and imminent irreparable constitutional harms. Did the District Court abuse its discretion by abstaining under *Pullman* from resolving Plaintiffs' well-pled First Amendment claim?

## STATEMENT OF THE CASE AND FACTS

### A.    *Plaintiffs' Religious Beliefs Are Substantially Burdened By the CVL, and Each Plaintiff Continues to Suffer Irreparable Harm*

Plaintiffs Pastor Chris Figaretti and Judd Uhl are members of Plaintiff West Virginia Parents for Religious Freedom ("PRF"). Both Pastor Figaretti and Uhl possess deeply held religious beliefs that prohibit them from vaccinating their children. JA15-16; JA18-19; *see also*

JA264-265 and JA71-72. While the particulars of their beliefs are unique to each Plaintiff, Plaintiffs are bound together in two significant regards: (1) their religious convictions which prevent them from vaccinating their children are deeply held and substantially burdened by the CVL, and (2) their decision to uphold their religious convictions has entailed significant sacrifices and caused irreparable harm. *Id.*

PRF was formed for the purpose of obtaining a religious exemption to West Virginia's CVL, either legislatively, or through litigation. JA14-15. PRF involves 180 persons (which includes, in some cases, both parents of a family), and involves mostly parents of children who have been adversely impacted by West Virginia's CVL. JA268-269. The impacted parents either homeschool their children or are forced to send them to school out of state. *Id.* at JA269. All PRF members have been harmed by the CVL and its lack of a religious exemption. *Id.*

Many required vaccines contain genetic and cellular material derived from aborted fetuses – materials that would be injected directly into Plaintiffs' children's bodies if they were to comply with the CVL. *See, e.g.,* JA71-83 (excerpts from vaccine researcher and developer, Dr. Stanley Plotkin); JA86 (package insert for M-M-R II Vaccine describing

6

fetal cell components); and JA98 (package insert for VARIVAX vaccine detailing same). Each individual Plaintiff maintains profound objections to the practice of abortion and views childhood vaccinations as irredeemably connected to the practice of abortion. JA16; JA18.

In addition, individual Plaintiffs harbor religious objections because they believe that the body is a temple of the Holy Spirit and that vaccines preemptively tamper with God's design. *Id.*

Plaintiffs' firmly rooted religious beliefs create an insurmountable conflict with West Virginia's compulsory school attendance law which requires every child between the ages of 6 and 17 to be enrolled in an education program, *see* W. Va. Code § 18-8-1a, and the parent's potential criminal prosecution if he/she fails to educate their child. *Id.* at § 18-8-2. At the same time, to enroll in school, West Virginia mandates vaccinations which, if injected, would violate their religious beliefs. JA265-266; JA271-272.

Each Plaintiff has been negatively impacted by the decision to exercise his/her sincerely held religious beliefs. JA266-267; JA273-275. Plaintiffs' children are categorically excluded from West Virginia's educational system, yet they must educate their children. JA265-266;

7

JA272-273. Plaintiffs Uhl and Pastor Figaretti each attempted to enroll their children in West Virginia schools with a religious exemption and each was rejected. JA266-267; JA274. Because of his religious objections to mandatory vaccination, Pastor Figaretti's children must cross state lines each morning to attend school in Ohio, one of the forty-five states that permits religious exemptions to school vaccination requirements. JA266. Pastor Figaretti's family has made this educational commute for years, an endeavor that has entailed significant additional expenses and lost time. *Id.* at 266-267. Plaintiff Uhl has been forced to homeschool his children as it is the only educational option in West Virginia available to his family. JA273. Plaintiff Uhl's wife, who has earned a master's in business administration degree from West Virginia University and has a marketable skillset, cannot pursue a professional career, which she desires to do, and Mrs. Uhl has rejected professional opportunities because she must homeschool their children. JA273.

Plaintiffs' children are unable to access the practical and social benefits of a typical education that their secular peers enjoy. JA273-274. In short, without a religious exemption, Plaintiffs are deprived of West Virginia's guarantee of a public education for their children unless they

8

violate their sincerely held religious beliefs; both individual Plaintiffs testified to the coercion they feel to do so, yet they remain steadfast in their beliefs. JA267; JA277.

Critically, the CVL does not cause Plaintiffs' children to disappear from West Virginia. JA267; JA275-276. These children are active members of their communities, routinely participating in sports, in youth church groups, gathering and socializing with friends, and spending most days of the years socializing in group settings with other West Virginia children (typically children in public or private school in West Virginia). *Id.* They are not prohibited from doing any of these things by West Virginia law, yet they cannot receive a formal education and attend school with the many children they already interact with on a daily basis. However, under West Virginia law, unvaccinated children with medical exemptions are allowed to access the benefits of a formal education.

## B.    *The CVL's Discretionary Medical Exemption Framework*

Under the CVL, every "child entering school … in this state must" receive certain vaccines, W. Va. Code § 16-3-4 (b), and no child may be "admitted or received in any of the schools of the state" unless they have

9

done so. *Id.* at § 16-3-4 (c). However, a child may be exempt from the requirements if granted a "[medical] exemption from the compulsory immunization requirements." *Id.*

Through the plain language of the relevant statute, West Virginia has reserved discretion to accept or deny medical exemptions for those students who claim vaccines would burden their health. The statute dictates in relevant part that the health commissioner "is authorized to grant . . . exemptions to the compulsory immunization requirements . . . on a statewide basis, upon sufficient medical evidence that immunization is contraindicated or there exists a specific precaution to a particular vaccine." W. Va. Code § 16-3-4 (h). It offers no similar pathway for an exemption where the requirement substantially burdens a sincerely held religious belief.

The medical exemption process includes even more discretion than what may be initially apparent; there are multiple levels of discretionary review whereby government officials and private physicians are empowered to press either the red or the green light on each medical exemption request. At the first level of review, the state has delegated private healthcare providers discretion to determine the variety of

10

circumstances which are eligible for a medical exemption, and those which are not. Acting on behalf of the state, these physicians conduct an individualized assessment of each request for a medical exemption and have latitude to decide whether to certify the request. JA56. These physicians exercise considerable discretion. JA670-671. If and when a medical exemption form is signed by a physician, it is then forwarded to the state's Immunization Officer for personalized review, who then also exercises considerable discretion. *Id.* at 671-672. If the exemption is approved, that student is permitted to attend school without having received all the mandated vaccines.

If the Immunization Officer denies the medical exemption, the decision can be appealed to the State Health Officer, who reviews the appeal on a case-by-case basis and determines whether to uphold or reverse the State Immunization Officer's decision. *See* W. Va. Code § 16-3-4 (h)(4); *see also* JA68 and JA671-672.

Pastor Figaretti called the West Virginia Department of Health and requested that he be able to submit a religious exemption for his child. JA28. Health Department officials stated they would not accept his religious exemption request but explained he could pursue a medical

11

exemption. *Id.* This evidences that a similar exemption process is unavailable to citizens with religious objections to compulsory vaccination, in violation of the First Amendment and recent and directly on point Supreme Court precedent in *Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021).

### C.    *Plaintiffs' Complaint Pursued Relief Exclusively Under the First Amendment, Before EPRA Was Active*

On April 26, 2023, Plaintiffs filed their complaint in the U.S. District Court for the Northern District of West Virginia. JA37. The only cause of action Plaintiffs pursued was under the First Amendment. JA29-35. Plaintiffs immediately thereafter moved for injunctive relief. JA61. On May 10, 2023, the District Court held a hearing on the motion for preliminary injunction, denying the motion exclusively on grounds that, because the 2023 school year had almost concluded, any harm experienced by Plaintiffs was not imminent and therefore not irreparable because Plaintiffs could seek relief before the next school year. JA210-214.

In early 2023, the West Virginia Legislature passed the West Virginia Equal Protection for Religion Act, W. Va. Code §35-1A-1 (the

"EPRA"), which did not go into effect until May 29, 2023, after the instant action was filed and after the District Court denied injunctive relief. Because the Legislature can just as easily rescind EPRA as pass it, and because legislatures in other states have recently removed religious exemption options for childhood vaccination requirements (e.g., New York, California, and Connecticut), and because West Virginia has repeatedly refused to enact religious exemptions to the CVL, Plaintiffs have no desire to pursue relief under EPRA, which, if granted, will likely only afford temporary relief. For these reasons, notwithstanding the District Court's direction to file a new state law claim in state court, Plaintiffs pursued relief under the First Amendment, and continue to advance their constitutional claim. *See, e.g., W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 638 (1943) ("The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts. One's right to . . . freedom of worship . . . and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections.").

13

After a *Pullman* abstention argument was raised at the preliminary injunction hearing, Plaintiffs immediately thereafter submitted briefing outlining why it would be inappropriate for the District Court to abstain. JA195, JA203-208. Plaintiffs pressed their First Amendment claims, maintaining that a federal court is the appropriate forum to adjudicate the only constitutional claim asserted, and the only viable claim that existed on the date the lawsuit was filed. Plaintiffs sought a declaration from a federal court establishing their constitutional right to a religious exemption option, recognizing that constitutional relief would be insulated from the whims of a future legislature.

## D. *The District Court Abstains Under Pullman*

Rather than adjudicating the First Amendment claims on the merits, the District Court entered an order staying the case indefinitely and ordering Plaintiffs, under *Pullman*, to file a new and separate action, under a newly enacted state law, in state court, using a state statutory religious freedom provision that did not exist at the inception of this case and posing a completely different legal question. JA762.

14

In justifying the stay, the District Court inaccurately framed the issue as "whether or not strict scrutiny applies under federal law" to the CVL. JA772. In reality, the issue is whether or not the CVL, on its face and as applied, violates the First Amendment. Either way, the issue posed to the District Court concerns federal law and a state court's answer as to whether a separate statute might provide a separate remedy does not provide the ultimate answer to the issue posed. The Court went on to call the issue "complicated, contested, and novel," *Id.* at 773, and held that instead of it deciding that issue, the state should be "afforded a reasonable opportunity to pass upon" the newly enacted EPRA, citing *AFA Distributing Co., Inc. v. Pearl Brewing Co.*, 470 F.2d 1210, 1213 (4th Cir. 1973) in support.

However, *AFA Distributing* discussed a state's right to adjudicate state enactments "fairly open to interpretation." Plaintiffs are not challenging the constitutionality of EPRA, which the District Court says the state needs the opportunity to pass upon; rather, Plaintiffs are challenging the constitutionality *of the CVL* which is not fairly open to interpretation but is unambiguous on its face.

15

The District Court is also incorrect that this is a novel issue as it has been addressed by other courts. *See, e.g. Bosarge v. Edney*, 2023 U.S. Dist. LEXIS 152814 (S.D. Miss. Aug. 29, 2023); *Dahl v. Bd. of Trustees of Western Michigan Univ.*, 15 F. 4th 728 (6th Cir. 2021).

In addition, even if Plaintiffs asserted a wholly new claim in state court under EPRA as the District Court directed, and proceeded with protracted constitutional-based litigation in state court and were ultimately successful, that success would likely be extinguished by the legislature that has consistently declined to pass a religious exemption to the state's vaccination requirement.

## SUMMARY OF THE ARGUMENT

The District Court's order should be vacated and the case remanded with instructions to adjudicate this matter on the merits.

This Court possesses appellate jurisdiction for two distinct reasons. First, because the *Pullman* stay order placed Plaintiffs "effectively out of court," this Court has jurisdiction pursuant to a long line of Supreme Court cases addressing the appealability of abstention orders. In short, because the District Court's stay constitutes a final order, it is immediately appealable under 28 U.S.C. § 1291. Second, this Court

16

possesses appellate jurisdiction on alternative grounds because the stay also constitutes a collateral order.

Finally, the District Court abused its discretion in staying the case indefinitely under *Pullman* for a variety of independent reasons.

## ARGUMENT

## I. THIS COURT HAS APPELLATE JURISDICTION OVER THE DISTRICT COURT'S STAY ORDER

The District Court's stay under *Pullman* is immediately appealable under 28 U.S.C. § 1291. Section 1291 states in relevant part that "The courts of appeals . . . shall have jurisdiction of appeals from all final decisions of the district courts of the United States. . . ." While a stay order is "not ordinarily a final decision" for purposes of Section 1291, there are circumstances—present here—where a stay order does constitute a "final decision." *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 10 n.11 (1983).

This Court can properly establish appellate jurisdiction under either the "out of court" doctrine or under the collateral order doctrine. *See Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 713 (1996) (observing that the Supreme Court has analyzed the finality of abstention orders

17

under two "independent grounds:" the "effectively out of court" doctrine and the "collateral order doctrine").

### A.    The Pullman Order is Final Because Plaintiffs Are Now "Effectively Out of Court"

The District Court's *Pullman* Order extinguished, indefinitely, Plaintiffs' ability to pursue Constitutional relief in federal court. Where a stay order places a party "effectively out of court," the Supreme Court recognizes that order is final and immediately appealable under § 1291. *Idlewild Bon Voyage Liquor Corp. v. Epstein*, 370 U.S. 713, 715 n.2 (1962).

A party is "effectively out of court" when a federal court abstains pending the conclusion of related state court or state administrative proceedings. *See id.* at 715 (holding that abstention under the *Pullman* doctrine to allow a state court to interpret and clarify state law put plaintiff effectively out of court); *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 10-13 (1983) (holding that a stay granted under the *Colorado River* abstention doctrine was final on grounds the sole purpose and effect of the stay was to surrender jurisdiction of a federal suit to a state court and, accordingly, that the plaintiff was effectively out

18

of court); *Quackenbush,* 517 U.S. 706 (holding that a remand order under the *Burford* abstention doctrine to allow a state administrative agency to decide the issue put plaintiff effectively out of court).

Here, there is no parallel state court proceeding challenging the CVL under any state law, nor could there have been when this litigation was initiated as EPRA only went into effect after litigation was commenced. In addition, a state court proceeding under EPRA would not conclusively resolve or obviate the need to adjudicate the only issue presented in this litigation—whether the CVL violates Plaintiffs' First Amendment rights, causing irreparable constitutional harms under 42 U.S.C. § 1983. As such, Plaintiffs are effectively out of court on the only claim they advanced.

The "effectively out of court" variation of finality doctrine appeared first in *Idlewild*, 370 U.S. at 715 n.2, where the Second Circuit exercised appellate jurisdiction over a claim that the New York Alcoholic Beverage Control Law was unconstitutional as applied to a liquor distributor. *Id.* at 714. The district court refused to resolve the plaintiff's constitutional claim and stayed the lawsuit based on the *Pullman* abstention doctrine, reasoning that a state court's clarification of the New York Alcoholic

19

Beverage Control Law might render a constitutional ruling unnecessary. *Id.* at 714. The Second Circuit determined it had jurisdiction over the appeal and held that the district court had erred in refusing to resolve the constitutional claim, notwithstanding the fact that a state court ruling on the challenged law may have provided helpful clarification on the disputed issues. *Id.* at 714, 715 n.2.

On review, the Supreme Court recognized that abstention under *Pullman* had placed the plaintiff "effectively out of court," and, accordingly, held the Second Circuit had properly exercised appellate jurisdiction under 28 U.S.C. §§ 1291 and 1292. *Idlewild*, 370 U.S. at 715 n.2.

Two decades later in *Moses H. Cone*, the Supreme Court extended *Idlewild*'s "effectively out of court" principle to abstention orders under the *Colorado River* doctrine. *Moses H. Cone*, 460 U.S. at 9–10. In *Moses H. Cone*, a district court abstained from adjudicating the claims under *Colorado River*, reasoning it was unnecessary to exercise concurrent jurisdiction with a parallel state court proceeding. *Id.* at 4; *see also Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817–21 (1976). This Court exercised appellate jurisdiction over the order and

20

reversed the district court stay, and the Supreme Court affirmed on grounds that abstention under *Colorado River* had effectively placed the parties out of court. *Moses H. Cone*, 460 U.S. at 4.

In 1996, the Supreme Court extended the "effectively out of court" doctrine into the *Burford* abstention arena, in which federal courts may dismiss certain cases where a state administrative procedure may obviate the need to adjudicate a constitutional claim. *Quackenbush*, 517 U.S. at 709; *see also Burford v. Sun Oil Co.*, 319 U.S. 315, 333 n.29 (1943). The Supreme Court concluded that abstaining under *Burford*—like abstention under *Pullman* and *Colorado River*—would place the litigants "effectively out of court" and, as such, a *Burford* abstention order constituted a final order subject to immediate appeal. *Quackenbush*, 517 U.S. at. at 714.

The out of court doctrine extends from the maxim that federal courts possess a "virtually unflagging obligation . . . to exercise the jurisdiction given them." *Colorado River*, 424 U.S. at 817. If litigants are expelled from pursuing constitutional claims in federal court—and their right to immediately appeal an abstention order is simultaneously extinguished—federal courts could surrender jurisdiction and their

21

obligations to uphold constitutional rights to state courts, when politically expedient. In such a scenario, litigants would be indefinitely deprived of any practical recourse. *See, e.g., Cheyney State College Faculty v. Hufstedler*, 703 F.2d 732, 735 (3d Cir. 1983) ("An indefinite stay order that unreasonably delays a plaintiff's right to have his case heard is appealable"). This scenario was one of the underlying concerns that gave rise to the effectively out of court doctrine. *See, e.g., Quackenbush*, 517 U.S. at 714 (highlighting that the remand to state court was "precisely to surrender jurisdiction of a federal suit to a state court").

This Court does not need to institute a blanket rule that all *Pullman* abstention orders are final and immediately appealable.[1] This case is unique and militates immediate appellate review, even if other *Pullman* cases may not dictate immediate review. The District Court "surrendered" its jurisdiction over alleged federal claims to a state court,

---

[1] Other Circuits have determined that a stay order under *Pullman* is immediately appealable. *See, e.g., Batterman v. Leahy*, 544 F.3d 370, 373 (1st Cir. 2008); *Hovsons, Inc. v. Sec'y of Interior*, 711 F.2d 1208, 1211 (3d Cir. 1983); *Jones v. Coleman*, 848 F.3d 744, 748 (6th Cir. 2017); *Mazanec v. N. Judson-San Pierre Sch. Corp.*, 750 F.2d 625, 627–28 (7th Cir. 1984); and *Porter v. Jones*, 319 F.3d 483, 489 (9th Cir. 2003).

*see Quackenbush*, 517 U.S. at 714, with the apparent hope that the state court would, somehow, someway, resolve this case under state law, even though a state law claim has not been asserted.

The effect of the District Court's indefinite stay order is clear: the parties are being forced to litigate in a non-federal court in derogation of the federal courts' "virtually unflagging obligation . . . to exercise the jurisdiction given them." *Colorado River*, 424 U.S. at 817. This also includes Defendant's right to have a federal court adjudicate their federal defenses to Plaintiffs' purely federal claim. Yet the Supreme Court noted in *Colorado River* that "as between state and federal courts, the rule is that the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction[.]" 424 U.S. at 817 (cleaned up). Surrendering federal jurisdiction in favor of hoped-for resolution by a state court is the apparent reason the District Court entered the stay below. Because the order on review requires Plaintiffs to initiate a new claim, and then await a decision from a non-federal court on an entirely separate question—whether the CVL violates EPRA—Plaintiffs' First Amendment claims have been "put out of court" in every sense of the phrase.

23

The District Court's *Pullman* order involves a stay resulting in indefinite delay pending the outcome of proceedings that are, as explained below on the merits of *Pullman*, unlikely to control or to substantially narrow Plaintiffs' First Amendment claims or to remedy the ongoing constitutional harms that were indefinitely instituted by the District Court. Accordingly, the District Court's order is final for purposes of § 1291 under the "effectively out of court doctrine," as applied in *Idlewild* and its progeny. This Court can review it now.

### B.    The District Court's Stay is a Collateral Order

The collateral order doctrine provides another avenue for this Court to exercise appellate jurisdiction under § 1291. To qualify for collateral order review, an order must "[1] conclusively determine the disputed question, [2] resolve an important issue completely separate from the merits of the action, and [3] be effectively unreviewable on appeal from a final judgment." *Will v. Hallock*, 546 U.S. 345, 349 (2006) (cleaned up).

For similar reasons the Supreme Court concluded that the *Burford* abstention order was a collateral order in *Quackenbush*, this Court should also conclude that this *Pullman* order constitutes a collateral order subject to immediate appellate review.

24

First, the District Court order conclusively determined the abstention issue pending a resolution of an unfiled state court action. Accordingly, as in *Quackenbush,* the District "disassociate[d] itself from the case entirely." 517 U.S. at 713–14.

The District Court's order meets the second requirement by, among other things, "conclusively determin[ing] an issue that [was] separate from the merits, namely, the question whether the federal court should decline to exercise its jurisdiction in the interest of comity and federalism." *Id.* at 714; *see also* JA773 (District Court holding that "principles of sovereignty [and] comity under the federalist system . . . weigh heavily against this Court retaining jurisdiction"); *see also Moses H. Cone*, 460 U.S. at 12 (explaining that "[a]n order that amounts to a refusal to adjudicate the merits plainly presents an important issue separate from the merits").

The third element is also satisfied because the issue the District Court determined compelled abstention under *Pullman*—whether the CVL violated EPRA—cannot be reviewed on appeal from a final judgment in a federal action "because the district court would be bound, as a matter of res judicata, to honor the state court's judgment" regarding

25

the meaning of EPRA and its reach, under which the District Court determined Plaintiffs must pursue relief. *Quackenbush*, 517 U.S. at 713. There is another problem with this approach: the state courts may determine that the government has compelling interests that are narrowly tailored here, which may have a res judicata or collateral estoppel issue as to these Plaintiffs on the federal question, unreviewable by federal courts.

Finally, the rights asserted here, as in the *Moses H. Cone* and *Quackenbush* appeals, are adequately significant to meet the importance aspects of the *Cohen* factors. *Cohen*, 337 U.S. at 546. In particular, *Quackenbush* pointed to the "strict duty" of federal courts "to exercise the jurisdiction that is conferred upon them by Congress," as well as the "exceptional circumstances" necessary for a proper abstention. *See Quackenbush,* 517 U.S. at 716 (cleaned up). The *Quackenbush* Court explained that an abstention ruling balances the strong federal interest in having certain classes of cases, and certain federal rights, adjudicated in federal court, against the State's interest in maintaining uniformity in the treatment of an essentially local problem and retaining local control over difficult questions of state law bearing on policy problems of

substantial public import. *See id. at* 728 (discussing *Colorado River* and *Burford*). As the *Quackenbush* Court emphasized, "balance only rarely favors abstention." *Id.* (describing *Burford* abstention as "an 'extraordinary and narrow exception'") (cleaned up).

The issues presented here are sufficiently weighty to warrant immediate appellate review. This case invokes constitutional rights of paramount importance, implicating ongoing First Amendment Free Exercise violations that will continue indefinitely should Plaintiffs be forced to pursue protracted litigation in state court. *See City of Houston v. Hill*, 482 U.S. 451, 467-68 (1987) ("statutes are justifiably attacked on their face as abridging [rights arising under the First Amendment]. In such case[s] to force the plaintiff who has commenced a federal action to suffer the delay of state-court proceedings might itself effect the impermissible chilling of the very constitutional right he seeks to protect."). Moreover, the District Court failed to identify grounds under which abstention would be appropriate. *See, e.g., Martin v. Stewart*, 499 F.3d 360, 363 (4th Cir. 2007) (recognizing that "there is little or no discretion to abstain in a case which does not meet traditional abstention requirements") (cleaned up). That is true here. A failure to review the

District Court's order would endanger "a substantial public interest" or "some particular value of high order." *Will*, 546 U.S. at 352–53. Considering these factors, this Court can also exercise appellate jurisdiction under the collateral order doctrine.

## II. THE DISTRICT COURT ABUSED ITS DISCRETION BY ABSTAINING UNDER *PULLMAN*

The District Court abused its discretion by abstaining under *Pullman Co.*, 312, U.S. 496, and by staying the case indefinitely.

### A.    *The Standard of Review*

This Court reviews a district court's decision to abstain for abuse of discretion. *See Richmond, Fredericksburg & Potomac R. Co. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993). A district court abuses its discretion whenever "its decision is guided by erroneous legal principles." *United States v. Under Seal (In re Grand Jury)*, 478 F.3d 581, 584 (4th Cir. 2007) (cleaned up).

Appeals courts "review *de novo* whether the requirements of a particular abstention doctrine are satisfied." *Nationwide Mut. Ins. Co. v. Unauthorized Prac. of L. Comm., of State Bar of Texas*, 283 F.3d 650, 652 (5th Cir. 2002). As a result, "there is little or no discretion to abstain in a

28

case which does not meet traditional abstention requirements." *Martin v. Stewart*, 499 F.3d 360, 365 (4th Cir. 2007) (cleaned up).

**B.    The District Court's Order Does Not Satisfy the Requirements for Pullman Abstention**

The Supreme Court has "repeatedly instructed that 'federal courts have a strict duty to exercise the jurisdiction that is conferred upon them by Congress.'" *Martin*, 499 F.3d at 363 (*quoting Quackenbush,* 517 U.S. at 716). That duty constitutes "a virtually unflagging obligation." *Deakins v. Monaghan*, 484 U.S. 193, 203 (1988) (cleaned up). Federal courts have "no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given." *Cohens v. Virginia*, 19 U.S. 264, 404 (1821) (per Marshall, C.J.). "The abdication or postponement of federal court jurisdiction to accommodate state court adjudication, as expressed by the abstention doctrine, 'is the exception, not the rule.'" *Cox v. Plan. Dist. I Cmty. Mental Health & Mental Retardation Servs. Bd.*, 669 F.2d 940, 942 (4th Cir. 1982) (cleaned up).

Only in rare cases when "principles of federalism and comity" outweigh the federal interest in deciding a case is discretionary abstention appropriate to consider. *Quackenbush*, 517 U.S. at 716, 728.

29

The Supreme Court has strictly defined the parameters of that discretion, ensuring the maxim that abstention remains the exception, not the rule. *See New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 359 (1989) (observing that the high Court has "carefully defined . . . the areas in which such abstention is permissible.").

In one of these rare exceptions, under *Pullman* 312 U.S. 496, a federal court is permitted to abstain from exercising subject matter jurisdiction over a claim where "there is (1) an unclear issue of state law presented for decision, and (2) the resolution of which may moot or present in a different posture the federal constitutional issue such that the state law issue is potentially dispositive." *Wise v. Circosta*, 978 F.3d 93, 101 (4th Cir. 2020) (en banc) (*quoting Educ. Servs., Inc. v. Md. State Bd. for Higher Educ.*, 710 F.2d 170, 174 (4th Cir. 1983) (cleaned up)).

This case does not satisfy the traditional *Pullman* requirements. First, no one—including the District Court—has pointed to any "unclear issue ***of state law presented for decision***." *Wise*, 978 F.3d at 101 (emphasis added). Whether or not the CVL violates the EPRA has not been "presented for decision" because it is not and never has been at issue in this litigation as Plaintiffs have not asked a federal court to interpret

30

that statute. Nonetheless, EPRA is the state law the District Court relied upon to abstain under *Pullman,* grafting the statute into Plaintiffs' complaint and then concluding it was ambiguous whether Plaintiffs could be afforded potential relief under EPRA.

The only state law Plaintiffs ever challenged is the CVL, and that statute is unquestionably unambiguous, and, equally, has been enforced by Defendant against Plaintiffs with rigor. In fact, Plaintiffs have not raised questions of state law or state law interpretation, and, for his part, Defendant does not suggest that the CVL is ambiguous or that EPRA requires him to afford Plaintiffs a religious exemption.

Second, it is entirely uncertain what unclear state law question, if resolved by a state court, "may moot or present in a different posture the federal constitutional issue such that the state law issue is potentially dispositive." *Wise*, 978 F.3d at 101. The only claim the District Court abstained from resolving raised a clearly pleaded federal First Amendment constitutional claim, and a state court decision of a hypothetical claim under EPRA would not resolve the constitutional violations alleged. Thus, this exercise of *Pullman* abstention is simply

not defensible under the requirements clearly outlined by this Court. *Id.* at 102.

It must also be emphasized that this case is not like others in which *Pullman* abstention was found to have been proper. Here, there is not an open question "concerning state delegation of authority" that "would moot the constitutional questions presented." *Id.* Nor is there an action "pending in state court that will likely resolve the state-law questions underlying the federal claim," even if there were any such state-law questions in this case. *Id.* While "federal courts should abstain from decision when difficult and unsettled questions of state law must be resolved before a substantial federal constitutional question can be decided," *Hawaii Housing Authority v. Midkiff*, 467 U.S. 229, 236 (1984), it is well settled that "*Pullman* does not command district courts to abstain simply to permit state review of an unambiguous statute." *City of Houston v. Hill*, 482 U.S. 451, 469 (1987).

Here, the only statute at issue, W. Va. Code §16-3-4, is unambiguous. It expressly and plainly requires excluding from school a child without mandated vaccines absent a medical exemption. This law has been interpreted for many decades by West Virginia prior to *Tandon*

32

and *Fulton* to prohibit religious exemptions; Defendant's website makes clear it will not accept religious exemptions; and no West Virginia state court has found otherwise. Therefore, there is nothing that "must be resolved" about the CVL before the federal constitutional question posed by Plaintiffs can be decided.

Additionally, the Supreme Court has made clear that *Pullman* abstention is particularly inappropriate where, as here, a statute is challenged on its face as violating the First Amendment. *City of Houston*, 482 U.S. at 467-68 (holding abstention was inappropriate in a First Amendment challenge where the challenged ordinance was unambiguous on its face and exercising abstention undermined constitutional rights and their vindication). Accordingly, the only question before the District Court was whether W. Va. Code §16-3-4, on its face, and as it currently exists and is being implemented, violates the First Amendment under the Supreme Court's recent decisions in *Tandon* and *Fulton*. Because W. Va. Code §16-3-4 unambiguously prohibits Plaintiffs' children from attending school, despite Plaintiffs' sincerely held religious beliefs, there is nothing ambiguous about it for a state court to first resolve before this Court can adjudicate whether it violates

33

Plaintiffs' Free Exercise rights under the First Amendment. *Wohl v. Keene*, 476 F.2d 171, 174 (4th Cir. 1973) (abstention is improper where nothing is ambiguous about the challenged statute).

### C. It Would Be Improper to Create a State Court Exhaustion Requirement For § 1983 Claims

*Pullman* abstention was also improperly invoked here because it improperly creates a state court exhaustion requirement in West Virginia to *any* claim under 42 U.S.C. § 1983 for violation of Free Exercise under the First Amendment. *See Steffel v. Thompson*, 415 U.S. 452, 472-73 (1974) ("when federal claims are premised on 42 U.S.C. § 1983 . . . we have not required exhaustion of state judicial . . . remedies, recognizing the paramount role Congress has assigned to the federal courts to protect constitutional rights."); *Knick v. Twp. of Scott*, 139 S. Ct. 2162, 2167 (2019) ("[T]he settled rule is that exhaustion of state remedies is not a prerequisite to an action under [42 U. S. C.] § 1983") (cleaned up).

The Supreme Court has made clear it abhors state laws or schemes that have the effect of insulating state actors from the reach of 42 U.S.C. § 1983. *Id.*; *see also Haywood v. Drown*, 556 U.S. 729 (2009) (a state "may not shut the courthouse door to federal claims that it considers at odds

34

with its local policy."). Application of *Pullman* here improperly creates a judicial requirement that *every* Free Exercise claim brought in federal court challenging a state law must first be adjudicated in state court under EPRA, a scenario that should not be countenanced. Such a system creates indefinite delays in obtaining constitutional relief, while irreparable First Amendment harms continue to accrue, indefinitely. *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (holding that First Amendment violations for even minimal periods constitutes irreparable harm).

The District Court reasoned that a state court exhaustion requirement would not be created because "most cases filed under § 1983 do not pose the complicated, contested, and novel issue that is presented here…this case requires this Court to determine what level of strict scrutiny applies to a state statute that provides a single, apparently well-delineated exemption that purports to further the State of West Virginia's stated purposes." JA773. Yet the opposite is true: any Free Exercise claim is likely to present complicated, contested, and novel issues that begin with the sometimes difficult analysis of the level of scrutiny to apply. The District Court's creation of a state court exhaustion requirement through its *Pullman* ruling, for novel or complicated § 1983

35

Free Exercise claims is an affront to the First Amendment and the rights it protects.

The District Court was asked to determine whether the CVL violates the First Amendment. That the District Court found this question to be complex and hotly contested does not warrant discarding its Article III obligations to resolve constitutional claims and to promptly intervene and stop irreparable constitutional harms when confronted with them. The District Court was also incorrect that this is a novel issue. Other courts have addressed these questions considering the Supreme Court's recent and controlling precedent in *Tandon* and *Fulton*. *See Bosarge*, 2023 U.S. Dist. LEXIS 152814; *Dahl*, 15 F.4th 728, 733-734.

Moreover, the Supreme Court cautioned against Defendant's suggested approach because it "would convert abstention from the exception into the general rule," which would then effectively nullify the ability for West Virginia federal courts to adjudicate First Amendment Free Exercise claims. *Examining Board of Engineers, Architects and Surveyors v. Otero*, 426 U.S. 572, 598 (1976); *see also Wisconsin v. Constantineau*, 400 U.S. 433 (1971); *Stultz v. VA DMV*, 185 F. Supp. 3d 890 (W.D. VA. 2015) ("abstention from the exercise of federal jurisdiction

36

is the exception, not the rule."). The danger of converting abstention into the general rule is even more concerning in that it would "force the plaintiff who has commenced a federal action to suffer the delay of state court proceedings [which] might itself effect the impermissible chilling of the very constitutional right he seeks to protect." *Zwickler v. Koota*, 389 U.S. 241, 252 (1967). This Court should decline Defendant's suggestion— which the District Court embraced— that has the effect of making the assertion and completion of a state court EPRA action a *de facto* exhaustion requirement for any First Amendment Free Exercise claim in West Virginia.

### D. *Pullman Abstention Was Also Improper Because the CVL Plainly Violates the First Amendment*

*Pullman* abstention is also improper where a law is clearly unconstitutional. *See Thornburgh v. American College of Obstetricians*, 476 U.S. 747, 756 (1986); *Babbitt v. United Farm Workers Nat'l.*, 442 U.S. 289, 305-12 (1979). Federal courts need not defer to state courts and delay adjudication of a state law that clearly violates the Constitution, which makes sense as federal courts are particularly well-suited— indeed, constitutionally directed—to resolve alleged First Amendment

violations. *See, e.g., City of Houston*, 482 U.S. at 467-68; *Harman v. Forsennius*, 380 U.S. 528, 535 (1965).

The improper use of *Pullman* abstention creates costs and delays, which only prolong and further exacerbate the underlying constitutional harm. *See* Abstention Doctrine Today, 125 U. Pa. L. Rev. 590, 602 (1977) (discussing "whether delay is not sometimes the aim of the abstention procedure"); *see also Fitts v. Kolb*, 779 F. Supp. 1502, 1504 (D.S.C. 1991) ("… a federal court should be particularly hesitant in abstaining in cases involving First Amendment violations").

Here, sending Plaintiffs into the state court system on a claim they never asserted and do not intend to advance, concerning a statute that Defendant has never even claimed would require acceptance and issuance of religious exemptions, when Plaintiff's First Amendment Free Exercise rights are clearly and plainly being violated, reflects a use of *Pullman* that various courts and other judicial scholars have warned against. *See, e.g., England v. La. State Bd. of Med. Exam'rs*, 375 U.S. 411, 425 (1964) ("some litigants have long purses. Many, however, can hardly afford one lawsuit, let alone two. Shuttling the parties between state and

federal tribunal [by abstaining under *Pullman*] is a sure way of defeating the ends of justice") (Douglas, J., concurring)).

The Attorney General of West Virginia, charged with defending the constitutionality of West Virginia laws, agrees that Plaintiffs' First Amendment Free Exercise rights have been violated by the lack of a religious exemption. *See* JA222 (stating that because the CVL allows medical exemptions but not a religious exemption option, the law prevents West Virginians "from enjoying the free exercise of a deeply held religious belief or conviction.").

More specifically, the CVL violates the First Amendment because it triggers and clearly cannot survive strict scrutiny. It invokes strict scrutiny on three independent grounds:

**First**, because it contains a mechanism for secular exemptions, but not for religious exemptions, West Virginia made an unconstitutional value judgment that secular reasons for opting out of vaccination are "worthy of solicitude," but that religious reasons are not. *Fulton,* 141 S. Ct. at 1878.

**Second**, West Virginia allows a kaleidoscope of "comparable secular activities" that undermine the CVL's public health goals to

39

counteract diseases to much greater degree than permitting Plaintiffs' children to access a formal education with a religious exemption. *Tandon,* 141 S. Ct. 1294.

**Third,** the CVL invokes recognized hybrid rights, equally triggering strict scrutiny. *Employment Div. v. Smith*, 494 U.S. 872, 881-882 (1990).

The CVL cannot withstand strict scrutiny for independent reasons:

**First**, as evidenced by the many activities West Virginia permits that undermine its purported public health goals, the State cannot present a sufficiently compelling government interest to justify its prohibition of a religious exemption option. *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 531-532 (1993).

**Second**, even if the State could advance an adequately compelling interest, the CVL has not been narrowly tailored in furtherance of that interest to avoid conflict with its citizens' free exercise rights. *Fulton*, 141 S. Ct. at 1881.

40

1.    The Challenged Law, Both Facially and As-Applied,
Plainly Violates the First Amendment Under *Fulton*

Strict scrutiny review is triggered if the law in question either is not

generally applicable, or if it lacks neutrality. *Kennedy v. Bremerton Sch.*

*Dist.*, 142 S.Ct. 2407, 2422 (2022). The CVL fails the general applicability

test because West Virginia's medical exemption scheme permits "the

government to consider the particular reasons for a person's conduct by

providing 'a mechanism for individualized exemptions." *Fulton*, 141 S. Ct.

at 1877 (cleaned up). Where "the State has in place a system of individual

exemptions, it may not refuse to extend that system to cases of 'religious

hardship' without compelling reason." *Id.*

West Virginia made an unconstitutional value judgment that non-

vaccination for secular reasons is "worthy of solicitude" but that non-

vaccination for religious reasons is not. *Id.* at 1878. Thus, the statute

facially violates the general applicability test. *See, e.g., Fraternal Ord. of*

*Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359, 366 (3d Cir.

1999) (Alito, J.) (holding that policy permitting medical but not religious

exemptions triggered strict scrutiny); *see also* JA221-222 (West Virginia

Attorney General citing *Fulton* to conclude that the CVL violates the First

41

Amendment's Free Exercise Clause because "it creates a formal mechanism for parents to seek a medical exemption from mandatory immunization, but no such mechanism is available for parents seeking a religious exemption").

The CVL also lacks general applicability because of how it is applied. The "the inclusion of a formal system of entirely discretionary exceptions [] renders [a policy] not generally applicable." *Fulton*, 141 S.Ct. at 1878. Those administrating the CVL possess latitude to accept or deny medical exemptions on an individualized basis. The customized discretionary review occurs at three levels. First, private physicians have independent discretion to reject or certify the family's exemption request. *See* W. Va. Code § 16-3-4 (h)(1); *see also* JA667-669 (West Viriginia physician testifying to discretionary nature of medical exemption requests). Second, the State Immunization Officer next has discretionary authority to approve or deny the physician's decision. *See* W. Va. Code § 16-3-4 (h)(2). Third, the State Health Officer has discretionary authority to uphold or reverse the State Immunization Officer's decision. *Id.* at § 16-3-4 (h)(4). The State Immunization Officer and the State Health Officer regularly exercise their discretionary power and overrule the professional medical

42

opinions of West Virginia physicians who have determined a medical exemption is warranted. *See* JA670-671 (West Virginia physician testimony about the medical exemption process and discretionary case-by-case decisions by these officials regarding medical exemptions).

Even though the statute only permits secular motivations for declining vaccination, Defendant suggested strict scrutiny should not be invoked because the exemption scheme is set up in a manner that state officials are unable to "create exemptions on a case-by-case basis, exempting individuals from complying with the law for secular reasons, but not religious reasons." JA321-322. In support, Defendant argued that he "has not received a single non-medical request," implying that if he was confronted with a religious exemption request, he might permit such a request, statutory prohibitions notwithstanding. JA324. Yet Pastor Figaretti submitted unrebutted evidence that he called the West Virginia Department of Health and petitioned for a religious exemption for his child, but officials made clear that religious exemptions were categorically prohibited[2] in West Virginia and would not be considered. JA28.

---

[2] An exemption scheme creating categories of exemptions based on secular reasons, while refusing to extend a similar exemption mechanism

43

Defendant further suggested strict scrutiny should not apply because West Virginia's medical exemption option is not the type of "individualized exemption" that causes a law to fail the general applicability test under *Smith* and *Fulton*. According to Defendant, this is because medical exemptions are purportedly granted based on an "objectively defined" criteria. JA322. Defendant is wrong for two reasons.

First, whether strict scrutiny is triggered does not depend on whether a secular exemption is based on objective criteria.[3] *Fulton* is concerned about unconstitutional bias, not whether an exemption scheme

---

for religious objectors, triggers strict scrutiny, even if the secular exemptions are <u>not</u> subject to individualized review. In such cases, the government's unconstitutional bias is baked into the regulation itself. *See, e.g., Newark Lodge*, 170 F.3d at 365 ("While the Supreme Court did speak in terms of "individualized exemptions" in *Smith* and *Lukumi*, it is clear from those decisions that the Court's concern was the prospect of the government's deciding that secular motivations are more important than religious motivations. If anything, this concern is only further implicated when the government does not merely create a mechanism for individualized exemptions, but instead, actually creates a categorical exemption for individuals with a secular objection but not for individuals with a religious objection.").

[3] To be clear, Plaintiffs' position is that the secular exemptions to the CVL are not based on objective criteria. Notably, Plaintiffs submitted unrebutted evidence that the CVL's criteria are not objective and that differing outcomes are generated based on which physician or government official reviews the medical exemption request. JA667-672.

contains objective criteria. Here, Plaintiffs Pastor Figaretti and Uhl have *actually* experienced the unconstitutional partiality the Supreme Court was so concerned about in *Fulton* and *Smith*. *See* JA19 and JA28. Moreover, federal courts across the country have struck down mandatory vaccination schemes under the First Amendment, even though those policies had clearly defined medical exemptions, because the consideration of such medical exemptions involved judgment on a case-by-case basis, just as West Virginia's scheme does. *See, e.g., Bosarge*, 2023 U.S. Dist. LEXIS 67439, at *27 (applying strict scrutiny because "there was a method by which Mississippi officials could consider [and approve or deny] secular exemptions, particularly medical exemptions") (citing *Fulton*, 141 S. Ct. at 1877); *see also Dahl*, 15 F.4th 728, 733-734 (6th Cir. 2021) (vaccination mandate containing defined medical exemptions struck because the case-by-case consideration of exemption requests triggered strict scrutiny under *Fulton* and); *Seals 1-26 v. Biden*, 578 F. Supp. 3d 822, 838 (N.D. Tex. 2022) (same).

*Fulton* also involved well-defined criteria, just as West Virginia's CVL does, but the scheme in *Fulton* nonetheless triggered strict scrutiny. The checklist for receiving a possible exemption in *Fulton*, like here, was

based on secular reasons for opting out of the policy and was examined on a case-by-case basis. 141 S. Ct. at 1875 (the "agency must conduct a home study during which it considers statutory criteria"). What makes something an individualized exemption scheme, as explained in *Fulton*, is the fact that there are criteria that are being applied on a case-by-case basis. *Fulton,* 141 S. Ct. at 1879. Defendant here never suggested that is not what occurs under the CVL, but rather merely glossed over the holding of *Fulton* to suggest that government officials do not have the discretion that the statute, on its face, affords them. *See* W. V. Code § 16-3-4 (h) ("The commissioner ***is authorized*** to grant … exemptions to the compulsory immunization requirements of this section…") (emphasis added). That is merely the authority, not a requirement, to grant exemptions, and it is plainly discretionary. Under *Fulton*, if a state reserves the authority to "grant exemptions based on the circumstances underlying each application," it must provide a compelling reason to exclude "religious hardship" from its scheme. *Fulton*, 141 S. Ct. at 1877 (*quoting Smith*, 494 U.S. at 884). *Fulton*, then, does not speak about objective criteria, it speaks about whether the particular circumstances or attributes of an exemption applicant drives the exemption scheme.

46

Defendant's suggestion that objective criteria would somehow save the scheme from *Fulton* is directly belied by both the facts of, and language used in *Fulton*. And that some courts have defied the Supreme Court precedent and language of *Fulton* is no good excuse for this Court to do so.

Second, even if an objectively defined secular exemption scheme could somehow allow the government to avoid strict scrutiny, the medical exemptions at issue here are *not* based on purely objective criteria. *See* JA323 (Defendant describing a contraindication in broad discretionary terms, namely a "medical condition which renders an immunization improper for a particular individual"). As Defendant highlights, medical exemption requests are assessed on a granular level, on a case-by-case basis by multiple government employees. *See* JA323-325 (Defendant outlining medical exemption process). If the medical exemptions were based on truly objective criteria lacking bureaucratic discretion, they would be automatic. There would be no need for three levels of administrative appellate review whereby government officials are empowered to uphold or overturn each medical exemption request, which they regularly do. *See* JA670-671. Accordingly, West Virginia's exemption

47

scheme is exactly the type of "individualized" and "discretionary" review contemplated by *Fulton* and *Smith* that invokes strict scrutiny.

> 2. Defendant Plainly Cannot Demonstrate that the Challenged Statute is Neutral and Generally Applicable Under *Tandon*

Even if Defendant could somehow evade strict scrutiny under *Fulton,* the CVL lacks neutrality and general applicability under *Tandon,* 141 S. Ct. 1294. Government regulations "are not neutral and generally applicable and therefore trigger strict scrutiny under the Free Exercise Clause of the First Amendment, whenever they treat **any** comparable secular activity more favorably than religious exercise." *Id.* at 1296 (*citing Roman Diocese of Brooklyn v. Coumo*, 141 S. Ct. 63, 67 (2020) (emphasis in original)). Defendant asserted the CVL escapes *Tandon's* reach on grounds that medical and religious exemptions do not encapsulate "comparable activity." JA318. Yet, non-vaccination for religious reasons is not only comparable to non-vaccination for medical reasons, the two activities are exactly the same; thus, the challenged statute triggers strict scrutiny for this reason alone.

Nonetheless, Defendant contended it is more dangerous if a child declines vaccination for religious reasons than if a child opts out of

compelled vaccination for medical reasons. JA319. According to the Supreme Court, however, this is an unsupportable position. *See Tandon,* 141 S. Ct. at 1297 (holding that the government cannot "assume the worst when people [exercise their religion] but assume the best when people [engage in secular activities]") (cleaned up)).

Defendant further argued that the possibility of a religious exemption would undermine the government's justifications for the CVL, while medical exemptions and other practical exceptions to its public health goals allegedly would not, and thus contends the activities at issue are not "comparable" under *Tandon*. Whether two activities are comparable for purposes of the Free Exercise Clause depends on "the asserted government interest that justifies the regulation at issue." *Tandon*, 141 S. Ct. 1294, 1296. The government's objective at issue is counteracting the spread of infectious diseases; any sub-objective Defendant proposes is necessarily dependent on satisfying that foundational goal.[4]

---

[4] Defendant asserted a variety of newfound and more nuanced government objectives related to the CVL, all of which are derivative of its overarching infectious disease mitigation objective. These are *post hoc* litigation tactics crafted to evade strict scrutiny. *See* JA513-517 for full

49

When examining regulations intended to counteract the spread of infectious diseases, the Supreme Court has recently made abundantly clear that: (1) the government cannot credibly cabin its objectives to regulating activity at some physical locations, but not others; and (2) that, when conducting the comparability analysis, courts must do a direct comparison between the aggregation of individual secular behaviors the government permits, and the religious exercise it prohibits. *See Tandon*, 141 S. Ct. at 1296. If the cumulative effect of the secular activities the government allows undermines the government's stated interest in a similar manner as the religious activity the government prohibits, the regulation triggers strict scrutiny. *Id.*

What constitutes the official government interest is assessed not by the State's proposed *post-hoc* and ever-changing assertions, but by the government's actions and what is logical in context. For example, in *Tandon,* California contended its goal in containing COVID-19 was

---

discussion of Defendant's shifting government interests. The Supreme Court has made plain that only the government's actually asserted interests as applied to the parties before it count—not *post-hoc* reimaginings of those interests expanded to some society-wide level of generality. *Fulton*, 141 S. Ct. 1868; *Tandon*, 141 S. Ct. 1294.

50

limited to certain types of religious gatherings and, based on this narrowly defined state interest, allowing citizens to gather in barbershops and sporting events did not undermine its purportedly compelling interest to limit religious gatherings. The Supreme Court rejected this nonsensical argument, reasoning that, in the context of regulations intended to counteract infectious disease, comparability "is concerned with the risks various activities pose, not the reasons why people gather." *Id.* at 1296. Here, infectious diseases spread just as easily in school as at a West Virginia Mountaineers' basketball game, and can be spread just as easily by an adult as by a child.

West Virginia permits non-vaccination for an almost limitless variety of activities, not just medical exemptions in school. Considered in isolation, any one of these activities pose a greater threat to its infectious disease mitigation objectives than permitting Plaintiffs a religious exemption option.

Collectively, the secular activities the government allows endangers its public health goal to an exponentially greater degree than a religious exemption option would. It bears noting that where the government permits secular exceptions to policies seeking to curtail the

spread of a disease, it is the burden of the government to "show that the religious exercise at issue is more dangerous" than the assortments of secular activities the government permits. *Id.* at 1297.

West Virginia permits secular exceptions to its infections disease goals in the following areas: (i) allowing thousands of unvaccinated children to attend school who are out of compliance with the CVL;[5] (ii) permitting adults to work in the school system without showing proof of vaccination;[6] (iii) not mandating the COVID-19 vaccines for school attendance; (iv) permitting citizen, adults and children alike, to gather

---

[5] *See* CENTERS FOR DISEASE CONTROL AND PREVENTION, *Vaccination Coverage and Selected Vaccines and Exemption Rates Among Children in Kindergarten – United States, 2021-22 School Year*, *available at* https://www.cdc.gov/mmwr/volumes/72/wr/mm7202a2.htm (detailing non-compliance of 3.5 percent amongst West Virginia kindergarteners in the 2021-22 school year) (last November 16, 2023). Courts may take judicial notice of information contained in official government websites under Rule 201 of the Federal Rules of Evidence. *See, e.g., Hall v. Virginia*, 385 F.3d 421, 424 n.3 (4th Cir. 2004).

[6] Most adults would not have been required to receive most of the pharmaceutical products required under the CVL when they were attending school since, as of 1986, there were only three routine vaccines in the U.S. It was only after 1986, the year Congress gave pharmaceutical companies immunity for liability for injuries caused by childhood vaccines, that the explosion in the vaccine schedule occurred. *See* 42 U.S.C. §§ 300aa-11.

*en masse* for every activity imaginable outside the school setting without showing proof of vaccination; (v) permitting an unlimited number of children to congregate in a school setting without showing proof of vaccination;[7] and (vi) allowing medical exemptions.

Even though West Virginia permits non-vaccination for secular reasons in virtually every scenario imaginable, including in school, it does not mean that public health measures intended to counteract infectious disease are not laudable or commendable in the abstract. Rather, West Virginia's lackadaisical approach when it comes to vaccination (except when enforcing vaccination requirements against religious children in school) demonstrates that the government knows that 4 of the 6 of the mandated vaccines are incapable of preventing infection and transmission of the targeted pathogen in school settings, and, as such, only provide an undefined level of personal protection (which Plaintiffs gladly decline).  JA198, at fn. 2; *see also* JA532-535; JA23. Defendant never contested these facts, which is not surprising

---

[7] Under W. Va. Code § 18-8-1, the government permits unvaccinated children—whatever their reasons for declining vaccination—to be educated in learning pods.

53

given that the CDC confirms the same. *Id.* Defendant also does not credibly contest that the remaining two vaccines—MMR and chicken pox—fail to establish a sufficiently compelling government interest for trampling on its citizens religious freedoms. For example, Defendant does not contest that measles mortality in the United States declined by over 98% between 1900 and 1963, the year the first measles vaccine was introduced, and obviously does not assert that the dramatic decrease in measles cases and mortality was attributable to a non-existent vaccine. JA538-539.

Further, even if the government could show that every one of the mandated vaccines actually prevented infection and transmission, it could still never show that permitting Plaintiffs the option for a religious exemption would endanger its public health goals to a greater degree than the comparable secular activities the government permits. Where First Amendment violations are at issue, Courts cannot rely on "broadly formulated" governmental interests, but must "'scrutinize[] the asserted harm of granting specific exemptions to particular religious claimants." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,* 546 U.S. 418, 431 (2006). Accordingly, the question in this case "is not whether the

54

[Government] has a compelling interest in enforcing its [vaccination mandate] *generally*, but whether it has such an interest in denying an exception" from that requirement to an individual plaintiff *specifically*. *Fulton*, 141 S. Ct. at 1881. Defendant did not rebut that this is the applicable standard, and failed to establish that a child or an adult who declines vaccination for secular reasons is less of a purported transmission risk than a child declining vaccination for religious reasons.

In sum, West Virginia allows a variety of comparable secular activities that undermine its disease mitigation efforts to much greater degree than would permitting the Plaintiffs in this case the option to pursue a religious exemption. As such, *Tandon* dictates strict scrutiny.

> 3.    Strict Scrutiny Also Applies on Alternative Grounds because This Case Involves Recognized "Hybrid Rights"

Defendant has suggested the hybrid rights discussion in *Smith* is dicta. JA325-326. Yet *Smith* relied on the holdings of prior Supreme Court cases that established hybrid right situations trigger strict scrutiny. *See Employment Div. v. Smith*, 494 U.S. 872, 881-882 (1990), *citing Cantwell v. Connecticut*, 310 U.S. 296, 304-307 (1940) (freedom of speech hybrid rights), *Pierce v. Society of Sisters*, 268 U.S. 510 (1925)

(freedom of parents to direct the education of their children), *Wisconsin v. Yoder*, 406 U.S. 205 (1972) (same), and *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984) (association hybrid right). None of those cases have been overturned, and *Smith* merely made clear that they were each still good law. Thus, Defendant's suggestion about mere *dicta* is, in a word, unsupported.

In addition, members of the Supreme Court have expressed their ire regarding courts that have disregarded *Smith*'s holding and refused to recognize hybrid-rights. *Fulton*, 141 S. Ct. 1868, 1888 (Alito, Thomas, Gorsuch, dissenting). For preservation purposes, Plaintiffs submit *Smith* should be overruled and the same standard applied to other constitutional guarantees be applied to the Free Exercise Clause, recognizing that only the U.S. Supreme Court can do so. Yet a number of courts have found such hybrid rights claims viable. *See, e.g., Archdiocese of Washington v. WMATA*, 897 F. 3d 314, 331, 437 U.S. App. D.C. 461 (D.C. Cir. 2018); *Brown v. Hot, Sexy and Safer Productions*, 68 F. 3d 525, 539 (1st Cir. 1995); *Cornerstone Christian Schools v. University Interscholastic League*, 563 F. 3d 127, 136, n. 8 (5th Cir. 2009); *San Jose Christian College v. Morgan Hill*, 360 F. 3d 1024, 1032-1033 (9th Cir.

56

2004). This Court should likewise recognize that the hybrid rights present here trigger strict scrutiny.

4. The CVL Cannot Survive Strict Scrutiny

The Supreme Court has recently made clear that, just because a law targets infectious disease, strict scrutiny "is not watered down." *Tandon*, 141 S. Ct. at 1298. The CVL cannot survive strict scrutiny for two overarching reasons:

a. Defendant failed to demonstrate that the State's interests are sufficiently "compelling"

Defendant asserted mandatory vaccination of schoolchildren is unquestionably "compelling" for purposes of satisfying strict scrutiny. When First Amendment violations are at issue, however, the government cannot support a purported compelling interest when it actively and fundamentally undercuts its public health goals. *Church of Lukumi*, 508 U.S. at 543-547; *Brown v. Entm't Merchs. Ass'n*, 564 U. S. 786, 802 (2011). As already explained throughout, it is clear universal vaccination is not a public health imperative because West Virginia allows for non-vaccination for secular reasons in almost every circumstance imaginable, including in school.

57

Given the *Fulton* Court's directive that a compelling interest in the abstract will not satisfy strict scrutiny when First Amendment freedoms are at issue, West Virginia's assertion of such an interest in the abstract is insufficient. Here, West Virginia must demonstrate its compelling interests are satisfied with respect *to the individual*. *See, e.g.*, *Fulton*, 141 S. Ct. at 1881 (the question "is not whether the [Government] has a compelling interest in enforcing its [vaccination mandate] generally, but whether it has such an interest in denying an exception" from that requirement to an individual plaintiff specifically).

This "to the plaintiff" standard can never be met, considering the assortment of activities the government permits, discussed *supra*, that fatally undermine its vaccine-based health imperative. Having shown it can accomplish its public health goals without universal vaccination, including in educational settings, the State can likewise allow a handful of religious families to pursue a traditional education for their children.

Additionally, by any reasonable measure, the State's objectives have already been fulfilled: West Virginia boasts one of the highest childhood vaccination rates in the Nation. Thus, the State's myopic vaccination drive is now directed at a tiny subset of children, and

especially towards an even smaller subset of children who remain unvaccinated for religious reasons.[8] In other words, while the government may "have a compelling interest in the abstract," that does not mean that it has one "in each marginal percentage point by which" it achieves its general goals. *Brown*, 564 U.S. at 803 n.9; *see also Doster v. Kendall,* 54 F.4th 398, 422 (6th Cir. 2022) (holding the government did not possess a compelling interest in vaccinating a small fraction of airmen who declined vaccination for religious reasons).

Plaintiffs do not contend the public health goals Defendant advanced may be facially commendable in the abstract; they are, however, not sufficiently compelling for purposes of extinguishing first Amendment freedoms and when applied specifically to each Plaintiff. The CVL fails strict scrutiny for this reason alone.

---

[8] West Virginia fights vigorously to keep a miniscule fraction of religious children from receiving a formal education, while, through non-enforcement of the CVL, it permits tens of thousands of unvaccinated children to access the educational system. *See supra,* fn. 5 (discussing non-compliance rates in West Virginia). The government could actually accomplish its public health goals by enforcing the law against children without religious objections to vaccination (whereas it cannot with Plaintiffs, as they have demonstrated they will never vaccinate their children in any circumstance due to their religious beliefs).

59

Moreover, even when analyzed on a broad abstract level, the State's goals are insufficiently compelling because of the assortment of activities the government permits, such as: (i) allowing for medical exemptions; (ii) West Viriginia's lax enforcement of the CVL; (iii) the presence of unvaccinated adults working in the school system; (iv) the government's prohibition of COVID-19 vaccines in school; (v) allowing unlimited numbers of unvaccinated children to be educated in learning pods; (vi) and allowing adults and children to engage in every activity imaginable without showing proof of vaccination. Therefore, having severely undermined its stated vaccination centered goals in a variety of ways (and there are more), the State cannot now credibly argue its interests are sufficiently compelling to trample on Plaintiffs' First Amendment freedoms.

Courts across the country have recently examined the tension between First Amendment freedoms and vaccination mandates. Even during an international pandemic, many courts have found the government interests underlying compulsory vaccination policies are insufficiently compelling where secular exceptions are granted. *See, e.g., Doster*, 54 F. 4th at 423; *U.S. Navy Seals 1-26 v. Biden*, 27 F.4th 336, 352

60

(5th Cir. 2022). The *Doster* and *Navy Seals'* courts confronted vaccine mandates directed at the military—which needed to be ready to deploy its servicemembers worldwide on short notice—during the COVID-19 pandemic, claimed to be the greatest public health crisis in the past century. The military unquestionably possessed a greater abstract interest than what West Virginia can claim here. Even then, the Navy and the Air Force failed to substantiate sufficiently compelling justifications to eradicate the religious freedoms of its service members.

Finally, the recent addition for West Virginian families to educate unvaccinated children in learning pods, as well as the *complete prohibition* of any COVID-19 vaccination requirements anywhere in West Virginia (and the fact that West Virginia does not require vaccines for a long list of infectious diseases reported in West Virginia for which a vaccine exists, but are not mandated), all distinguish this case from the non-binding precedent Defendant relies upon to establish a purported compelling interest. *See, e.g., Workman v. Mingo County Bd. of Educ.*, 419 Fed. Appx. 348, 353 (4th Cir 2011) (unpublished decision finding a compelling state interest in mandatory vaccination before West Virginia had passed legislation in 2022 permitting learning pods, which runs

61

contrary to language about "to the person" compelling interests in *Fulton*); *D.J. v. Mercer County Bd. of Educ.*, 2013 WL 6152363, *4 (W. Va. Nov. 22, 2013) (same). Notably, these cases were also decided before directly on point Supreme Court precedent in *Tandon* and *Fulton*.

Defendant has thus failed to demonstrate the State's interests are sufficiently compelling to satisfy strict scrutiny. West Virginia is requiring that Plaintiffs violate their religious convictions as a prerequisite to educating their children, while the State is actively undercutting its purportedly vital interests in many ways. For this reason alone, the CVL cannot survive strict scrutiny.

      b.    Defendant also failed to demonstrate that the statute is narrowly tailored

The CVL cannot withstand strict scrutiny on alternative grounds because it is not narrowly tailored. When strict scrutiny applies, a government policy survives "only if it advances interests of the highest order and is narrowly tailored to achieve those interests," meaning that "so long as the government can achieve its interests in a manner that does not burden religion, it must do so." *Fulton*, 141 S. Ct. at 1881 (quotation omitted). Given this incredibly high standard, a law will

62

survive strict scrutiny "only in rare cases." *Church of Lukumi,* 508 U.S. at 578.

A law can fail strict scrutiny for lack of narrow tailoring for a variety of reasons, including where: (1) options less restrictive of the plaintiff's religious beliefs are available and the government refuses to take advantage of those less burdensome alternatives; (2) the law is underinclusive, failing to address enough conduct to meet the objectives it purportedly seeks to achieve; or (3), where the law is overbroad, meaning the policy captures more conduct than necessary to realize the government's goals. *Church of Lukumi*, 508 U.S. at 578. The CVL lacks narrow tailoring for each of these reasons.

Defendant argued prohibiting unvaccinated children whose families have religious beliefs against vaccination from attending school is the "least restrictive" option available to accomplish the State's objective of preventing infectious diseases. JA329. That simply is not a credible position given that forty-five states have religious exemption options. *See Mast v. Fillmore Cnty.,* 141 S. Ct. 2430, 2433 (2021) (stating the government's failure to consider less restrictive alternatives to similar public health policies in other states was highly relevant to the

63

strict scrutiny analysis). Requiring families to violate their religious beliefs to access the State's education system is the most restrictive option imaginable, and there are many alternatives the government could deploy to accomplish its public health goals, as a supermajority of other states employ (such as a religious exemption option with quarantine protocols in the rare event of an outbreak, increased enforcement measures, infectious disease education efforts directed at families without religious objection to vaccination, or any combination of the above).

As discussed *supra*, the CVL is also severely underinclusive, allowing for non-vaccination in every scenario imaginable, including in school, for children and adults alike. Through circular reasoning, Defendant argued that the CVL is not underinclusive because the CVL is directed only to children in school, and thus that mandatory vaccination of children in school is not underinclusive relative to that goal. The Supreme Court rejected similarly framed government objectives related to infectious diseases in *Tandon* and *Diocese of Brooklyn*, where California and New York allowed citizens to congregate in large groups while restricting religious activity that posed similar

64

transmission risks. Similarly, West Virginia permits unvaccinated children and adults to congregate *en masse* in every setting imaginable. Even if the goal of preventing infectious disease could somehow logically be limited to children in school settings (it cannot be), the CVL is nonetheless underinclusive relative to that pretextual goal because the State allows medical exemptions and also permits unvaccinated children to congregate in educational settings in unlimited numbers under W. Va. Code § 18-8-1.

The CVL is also glaringly overbroad. That overbreadth is demonstrated by the following: (i) West Virginia requires four vaccines that do not, in fact, prevent spread or transmission in schools; (ii) West Virginia has already achieved a remarkably high vaccination rate; (iii) assuming the vaccines are as effective as Defendant contends, the overwhelming majority of schoolchildren who are vaccinated are protected; (iv) West Virginia requires vaccination in schools that do not have medically vulnerable children (for the interest of protecting medically vulnerable children); and (v) other states permit religious exemptions but do not have outbreaks.

West Virginia's Attorney General, even though tasked with defending the State's laws, recognizes the CVL is unconstitutional and that West Virginians' First Amendment rights have been violated here. *See* JA223 (stating that forty-four states utilize a "less restrictive means" of furthering their public health goals "by allowing for religious exemptions to mandatory immunizations for those with religious objections. It is clear the overwhelming majority of states have found that they can both further the state's compelling interest in preventing the spread of diseases in public schools and also allow families to freely exercise their First Amendment Right[s]").

Because it cannot withstand strict scrutiny review on multiple fronts, the CVL is plainly unconstitutional, and the District Court therefore abused its discretion by abstaining under *Pullman*.

## <u>CONCLUSION</u>

The District Court's stay order is appealable, and it abused its discretion here by indefinitely staying this First Amendment case pursuant to *Pullman* abstention.

66

## STATEMENT CONCERNING ORAL ARGUMENT

The stay issued below, namely granting *Pullman* abstention because a remedy may hypothetically exist under state law—but was not elected by Plaintiffs—presents important issues that threaten the constitutional rights of all persons in this Circuit; oral argument is thus warranted.

Respectfully submitted,

/s/ *Aaron Siri*
Aaron Siri
Elizabeth Ann Brehm
Walker Moller
SIRI & GLIMSTAD LLP
745 5th Avenue, Suite 500
New York, NY 10151
Direct: 212-532-1091
Email: aaron@sirillp.com

/s/ *Christopher Wiest*
Christopher Wiest (KBA 90725)
Chris Wiest, Atty at Law, PLLC
25 Town Center Blvd, Suite 104
Crestview Hills, KY 41017
513-257-1895 (c)
chris@cwiestlaw.com

*Attorneys for Appellants*

## CERTIFICATE OF COMPLIANCE

1.  This document complies with the type-volume limits because, excluding parts exempted by Rule 32(f) of the Federal Rules of Appellate Procedure (i.e., cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, and attachments) this document contains 12,983 words.

2.  This document complies with the typeface requirements because this document has been prepared in a proportional spaced typeface using Microsoft Word in 14-point Century Schoolbook.

*/s/ Christopher Wiest*
Christopher Wiest (KBA 90725)
Chris Wiest, Atty at Law, PLLC
25 Town Center Blvd, Suite 104
Crestview Hills, KY 41017
513-257-1895 (c)
chris@cwiestlaw.com

68