# NO. 23-1887

In The

# United States Court Of Appeals
## For The Fourth Circuit

**WEST VIRGINIA PARENTS FOR RELIGIOUS FREEDOM;
PASTOR CHRIS FIGARETTI; JUDD UHL,
individually and on behalf of their minor children,
and on behalf of others similarly situated,**

*Plaintiffs – Appellants,*

v.

**DR. MATTHEW CHRISTIANSEN,
in his official capacities as the State Health Officer and
Commissioner of the Bureau of Public Health,**

*Defendant – Appellee.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
AT WHEELING**

———————————

**BRIEF OF APPELLEE**

———————————

**J. Zak Ritchie**
**Michael B. Hissam**
**Maureen F. Gleason**
**HISSAM FORMAN DONOVAN**
  **RITCHIE PLLC**
**P. O. Box 3983**
**Charleston, WV 25339**
**(681) 265-3802 – Telephone**
**(304) 982-8056 – Facsimile**

*Counsel for Appellee*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 23-1887      Caption: W. Va. Parents for Religious Freedom et al v. Christiansen

Pursuant to FRAP 26.1 and Local Rule 26.1,

Dr. Matthew Christiansen
(name of party/amicus)

who is _____ Appellee _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2. Does party/amicus have any parent corporations?  ☐YES ☑NO
   If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐YES ☑NO
   If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
   If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
   If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
   If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
   If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ J. Zak Ritchie                    Date: 09/08/23

Counsel for: Appellee

- 2 -

Print to PDF for Filing

# TABLE OF CONTENTS

**Page:**

TABLE OF AUTHORITIES ................................................................ iv

INTRODUCTION .............................................................................. 1

JURISDICTIONAL STATEMENT ..................................................... 3

STATEMENT OF THE ISSUES ......................................................... 3

STATEMENT OF THE CASE ............................................................. 3

    I.    The West Virginia Legislature acts to protect the children in its schools from entirely preventable deadly diseases ................................................................................. 3

    II.    In 2023, the West Virginia Legislature enacts the Equal Protection for Religion Act .................................... 11

    III.    Appellants urgently seek a first-of-its-kind federal constitutional ruling from the District Court ....................... 12

SUMMARY OF ARGUMENT ........................................................... 15

ARGUMENT ..................................................................................... 16

    I.    The District Court did not abuse its discretion by abstaining under *Pullman* ..................................................... 16

    II.    Appellants fail to satisfy the *Ex parte Young* exception to state sovereign immunity ................................................. 24

    III.    Appellants lack standing to sue Dr. Christiansen .............. 27

        A.    Appellants' alleged harm is not fairly traceable to Dr. Christiansen's conduct ........................................... 28

        B.    Appellants' alleged harm would not be redressed by a ruling against Dr. Christiansen ........................... 30

IV. The scope of the Court's appellate jurisdiction is limited to review of the *Pullman* abstention and any predicate issues ...................................................... 30

V. On the merits, West Virginia Code § 16–3–4 does not violate the First Amendment ............................... 35

    A. Courts have uniformly rejected Free Exercise challenges to childhood vaccination laws .................... 36

    B. West Virginia Code § 16–3–4 is not subject to strict scrutiny because it is a valid and neutral law of general applicability ........................................... 39

        1. The law is neutral .............................................. 39

        2. The law is generally applicable .......................... 40

            a. Religious and medical exemptions are not "comparable." ...................................... 41

            b. The statute does not create a system of discretionary exceptions ........................ 44

        3. Even if strict scrutiny applies, the law is narrowly tailored to serve a compelling interest ............................................................. 47

            a. W. Va. Code § 16–3–4 is not underinclusive ........................................... 51

            b. W. Va. Code § 16–3–4 is not overbroad ..... 53

    C. The statute does not present a "hybrid rights" situation .................................................................... 54

    D. The statute is constitutional under rational basis review ....................................................................... 56

CONCLUSION ......................................................................... 57

STATEMENT ON ORAL ARGUMENT ................................................ 58

CERTIFICATE OF COMPLIANCE...................................................... 59

# TABLE OF AUTHORITIES

**Page(s):**

**Cases:**

*Air Evac EMS, Inc. v. Cheatham,*
  910 F.3d 751 (4th Cir. 2018) .......................................... 28

*Archdiocese of Washington v. WMATA,*
  897 F.3d 314 (D.C. Cir. 2018) ........................................ 55

*Ashwander v. Tennessee Valley Authority,*
  297 U.S. 288 (1936) ...................................................... 16

*Bosarge v. Edney,*
  -- F. Supp. 3d --, 2023 WL 2998484 (S.D. Miss. Apr. 18, 2023) ..... 38

*Brown v. Smith,*
  24 Cal. App. 5th 1135, 235 Cal. Rptr. 3d 218 (2018) ................... 38

*Cantwell v. Connecticut,*
  310 U.S. 296 (1940) ...................................................... 35

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah.,*
  508 U.S. 520 (1993) ................................................ 39, 47

*City of Houston v. Hill,*
  482 U.S. 451 (1987) ................................................ 22, 23

*Cohen v. Beneficial Indus. Loan Corp.,*
  337 U.S. 541 (1949) ....................................................... 3

*Combs v. Homer-Ctr. Sch. Dist.,*
  540 F.3d 231 (3d Cir. 2008) ........................................... 55

*County of Allegheny v. Frank Mashuda Co.,*
  360 U.S. 185 (1959) ...................................................... 18

*Cutter v. Wilkinson*,
    544 U.S. 709 (2005) ...................................................................... 32

*Deal v. Mercer Cnty. Bd. of Educ.*,
    911 F.3d 183 (4th Cir. 2018) ............................................... 27-28, 30

*Disability Rts. S.C. v. McMaster*,
    24 F.4th 893 (4th Cir. 2022)................................................... 29, 30

*D.J. v. Mercer Cnty. Bd. of Educ.*,
    No. 13-0237, 2013 WL 6152363 (W. Va. Nov. 22, 2013)..... 47-48, 57

*Does 1-6 v. Mill*,
    16 F.4th 20 (1st Cir. 2021) ......................................... 41, 42, 47, 57

*Doe v. Va. Dep't of State Police*,
    713 F.3d 745 (4th Cir. 2013) ......................................................... 30

*Doster v. Kenall*,
    54 F.4th 398 (6th Cir. 2022) *cert. granted, judgment vacated*,
    No. 23-154, 2023 WL 8531840 (U.S. Dec. 11, 2023) ...................... 48

*Doyle v. Hogan*,
    1 F.4th 249 (4th Cir. 2021)............................................................ 25

*Educ. Servs., Inc. v. Maryland State Bd. for Higher Educ.*,
    710 F.2d 170 (4th Cir. 1983) .................................................. 19, 22

*Emp. Div., Dep't of Hum. Res. of Oregon v. Smith*,
    494 U.S. 872 (1990) .................................................. 35, 39, 54, 56

*Escambia Cnty. v. McMillan*,
    466 U.S. 48 (1984) ........................................................................ 16

*Ex parte Young*,
    209 U.S. 123 (1908) .................................................. 24, 25, 27, 29

*FCC v. Beach Commc'ns*,
    508 U.S. 307 (1993) ...................................................................... 56

*F.F. v. State,*
>194 A.D.3d 80, 143 N.Y.S.3d 734, *appeal dismissed,*
>*leave to appeal denied,*
>37 N.Y.3d 1040, 176 N.E.3d 304 (2021), *cert. denied,*
>142 S. Ct. 2738, 212 L. Ed. 2d 797 (2022)...............................38-39

*Fifth Ave. Presbyterian Church v. City of N.Y.,*
>293 F.3d 570 (2d Cir. 2002)..........................................................56

*Frank Krasner Enters., Ltd. v. Montgomery Cnty.,*
>401 F.3d 230 (4th Cir. 2005) ........................................................29

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.,*
>528 U.S. 167 (2000) .....................................................................30

*Fulton v. City of Philadelphia,*
>593 U.S. --, 141 S. Ct. 1868 (2021) ........................................ *passim*

*Gary S. v. Manchester School Dist.,*
>374 F.3d 15 (1st Cir. 2004)...........................................................55

*Goldfarb v. Mayor & City Council of Baltimore,*
>791 F.3d 500 (4th Cir. 2015) ........................................................32

*Gonzalez v. O Centro Espirita Beneficente Uniao de Vegetal,*
>546 U.S. 418 (2006) .....................................................................49

*Gregory v. Ashcroft,*
>501 U.S. 452 (1991) ...............................................................17, 21

*Jacobson v. Commonwealth of Massachusetts,*
>197 U.S. 11 (1905) .......................................................................36

*Kissinger v. Board of Trustees of Ohio State Univ.,*
>5 F.3d 177 (6th Cir. 1993) ............................................................55

*Leebaert v. Harrington,*
>332 F.3d 134 (2d Cir. 2003)..........................................................55

*Massachusetts v. Mellon*,
    262 U.S. 447 (1923) ...................................................................... 26

*Masterpiece Cakeshop, Ltd. v. Colo. Civ. Rts. Comm'n*,
    584 U.S. 617, 138 S. Ct. 1719 (2018) ............................................ 40

*McCarthy v. Boozman*,
    212 F. Supp. 2d 945 (W.D. Ark. 2002) ........................................... 38

*Moses Enterprises, LLC v. Lexington Ins. Co.*,
    66 F.4th 523 (4th Cir. 2023) ........................................................... 32

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
    138 S. Ct. 1461 (2018) .................................................................... 27

*Navy Seals 1-26 v. Biden*,
    27 F.4th 336 (5th Cir. 2022) ........................................................... 48

*Nivens v. Gilchrist*,
    444 F.3d 237 (4th Cir. 2006) .............................................. 1, 18, 22

*Phillips v. City of New York*,
    775 F.3d 538 (2015), *cert. denied*, 577 U.S. 822 (2015) .......... 37, 38

*Prince v. Massachusetts*,
    321 U.S. 158 (1944) ........................................................................ 37

*Quackenbush v. Allstate Ins. Co.*,
    517 U.S. 706 (1996) .......................................................................... 3

*Rizzo v. Goode*,
    423 U.S. 362 (1976) ........................................................................ 17

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
    592 U.S. 14 (2020) .......................................................................... 47

*R.R. Comm'n of Tex. v. Pullman Co.*,
    312 U.S. 496 (1941) ............................................................. *passim*

*Rux v. Republic of Sudan,*
 461 F.3d 461 (4th Cir. 2006) .................................................. 33, 34

*S.C. Wildlife Fed'n v. Limehouse,*
 549 F.3d 324 (4th Cir. 2008) ......................................................... 24

*Sherr v. Northport-East Northport Union Free Sch. Dis.,*
 672 F. Supp. 81 (E.D.N.Y. 1987) .................................................... 38

*Singleton v. Wulff,*
 428 U.S. 106 (1976) ....................................................................... 32

*Spokeo, Inc. v. Robins,*
 578 U.S. 330 (2016) ................................................................. 27, 28

*Tandon v. Newsome,*
 593 U.S. 61 (2021) ................................................................... 40, 41

*We The Patriots USA, Inc. v.*
*Connecticut Off. of Early Childhood Dev.,*
 76 F.4th 130 (2d Cir. 2023) ..................................................... 38, 42

*Whitlow v. California,*
 203 F. Supp. 3d 1079 (S.D. Cal. 2016) .......................................... 38

*Workman v. Mingo Cnty. Bd. of Educ.,*
 419 F. App'x 348 (4th Cir. 2011), *cert. denied,*
 555 U.S. 1036 (2011) ....................................................... 37, 47, 57

*Zivotofsky ex rel. Zivotofsky v. Clinton,*
 566 U.S. 189 (2012) ....................................................................... 32

**Statutes:**

28 U.S.C. § 1291 ....................................................................................... 3

28 U.S.C. § 1331 ....................................................................................... 3

42 U.S. §§ 2000bb, *et seq.* ............................................................... 11, 19

Cal. Health & Safety Code §§ 120325, *et seq.*..........................20

Conn. Gen. Stat. § 10-204a ..........................20

Me. Rev. Stat. Ann. tit. 20-A, § 6355 ..........................20

Me. Rev. Stat. Ann. tit. 20-A, §§ 6358–6359..........................20

Me. Rev. Stat. Ann. tit. 22, § 802 ..........................20

Me. Rev. Stat. Ann. tit. 22, § 8402 ..........................20

N.Y. Pub. Health Law § 2164(9) ..........................20

W. Va. Code § 16–1–1..........................7

W. Va. Code § 16–3–4..........................*passim*

W. Va. Code § 16–3–4(a)..........................25

W. Va. Code § 16–3–4(c)..........................8, 25

W. Va. Code § 16–3–4(e)..........................26

W. Va. Code § 16–3–4(h) ..........................9, 25, 41-42, 45

W. Va. Code § 16–3–4(h)(1)..........................9, 46

W. Va. Code § 16–3–4(h)(2) ..........................26

W. Va. Code § 16–3–4(h)(4)..........................10-11, 46

W. Va. Code § 18–5–45..........................44

W. Va. Code § 35–1A–1 ..........................*passim*

W. Va. Code § 35–1A–1(a)(1)..........................12, 19, 21

W. Va. Code § 35–1A–1(b)(1)..........................12

W. Va. Code R. 64–95–1, *et seq.*..........................9

W. Va. Code R. § 64–95–2 ....................................................... 10

W. Va. Code R. § 64–95–2.4 ............................................. 10, 45

W. Va. Code R. § 64–95–2.10 ........................................... 10, 45

W. Va. Code R. § 64–95–16 ....................................................... 9

W. Va. Code R. § 64–95–17.4 .................................................... 9

W. Va. Code R. § 64–95–17.8.d ............................................... 11

W. Va. Code R. § 64–95–17.8.e................................................ 11

**Constitutional Provisions:**

U.S. Const. amend. I ..................................................... *passim*

U.S. Const. amend. XI.......................................................... 25

U.S. Const. amend. XIV ................................................. 17, 35

U.S. Const. art. III, § 2........................................................ 27

**Other Authorities:**

1855 Mass. Acts. 414, § 2 ....................................................... 5

2023 West Virginia Laws Ch. 295 (H.B. 3042)....................... 12

Aamer Imdad et al.,
*Religious Exemptions for Immunization and Risk of Pertussis in
New York State*, 2000-2011, 132 Pediatrics 37, 37–43 (2013)............... 43

CDC,
*A Child's Health is the Public's Health* (Oct. 24, 2022) ..................... 7, 52

CDC,
Contraindications and Precautions .................................... 10, 45

CDC,
*Disease* You *Almost Forgot About (Thanks to Vaccines*)
(Sep. 15, 2022), https://www.cdc.gov/vaccines/parents/
diseases/forgot-14-diseases.html............................................................6

CDC Health Alert Network,
Measles Exposure at Large Gathering in Kentucky,
February 2023 and Global Measles Outbreaks (Mar. 3, 2023)..............50

CDC,
*History of Smallpox* (Feb. 20, 2023)..........................................................5

Charles J. Mullett et al.,
Opinion: West Virginia is a National Leader in Childhood
Immunizations—Let's Stay Protected (Feb. 5, 2023)...............................6

Concepcion F. Estivariz, MD et al.,
Poliomyelitis (Aug. 2021),https://www.cdc.gov/
vaccines/pubs/pinkbook/polio.html. ........................................................6

Daniel R. Feiken et al.,
*Individual and Community Risks of Measles and
Pertussis Associated with Personal Exemptions
to Immunization*, 284(24) JAMA 3145 (2000) .......................................43

David Schraub,
*Liberal Jews and Religious Liberty*,
98 N.Y.U. L. Rev. 1556 (2023)................................................................11

History of the Vaccination Law,
https://code.wvlegislature.gov/16-3-4/......................................................8

Jacqueline K. Olive, et al.,
*The State of the Antivaccine Movement in the United States:
A Focused Examination of Nonmedical Exemptions in
States and Counties*, 15(7) PLOS Medicine (2018)................................43

James Colgrove & Abigail Lowin,
*A Tale of Two States: Mississippi, West Virginia, and*
*Exemptions to Compulsory School Vaccination Laws,*
35:2 Health Affairs 348 (2016) .................................................. 43

Letter from George Washington to Dr. William Shippen, Jr.
(Jan. 7, 1777), Available at https://founders.archives.gov/
documents/Washington/03-08-02-0281 ....................................... 4

Ohio Disease Reporting System,
*Measles Case Summary Central Ohio Outbreak* (Feb. 10, 2023) ....... 7, 50

Saad B. Omer et al.,
*Geographic Clustering of Nonmedical Exemptions to School*
*Immunization Requirements and Associations with Geographic*
*Clustering of Pertussis*, 168 (12) Am. J. Epidemiology 1389 (2008) ....... 43

Saad B. Omer,
*Trends in Kindergarten Rates of Vaccine Exemption and*
*State-Level Policy, 2011-2016*, 5(2) Open Forum
Infectious Diseases (2018) ....................................................... 43

Saad B. Omer et al.,
*Vaccination Policies and Rates of Exemption from Immunization,*
*2005-2011*, 367 N. Engl. J. Med. 1170, 1170–71 (2012) ....................... 43

W. Va. DHHR,
Measles (Rubeoloa) Information Sheet for
General Public (May 2023) .................................................. 7, 51

WV LEGIS 295 (2023) ......................................................... 12

## INTRODUCTION

This is an appeal from an order abstaining under *Pullman* in a case where the Plaintiff-Appellants are seeking a first-of-its-kind decision from a federal court holding that longstanding, compulsory immunization requirements for West Virginia schoolchildren are unconstitutional because they lack a religious exception. The District Court wisely deferred ruling in light of a recent enactment by the West Virginia Legislature of a state-level Religious Freedom and Restoration Act, here called the Equal Protection for Religion Act ("EPRA"), the application of which may moot Appellants' federal claim.

As this Court recently put it, "*Pullman* abstention requires federal courts to abstain from deciding an unclear area of state law that raises constitutional issues because state court clarification *might* serve to avoid a federal constitutional ruling." *Nivens v. Gilchrist*, 444 F.3d 237, 245 (4th Cir. 2006). Far from abusing its discretion by declining to issue a novel First Amendment decision addressing an unprecedented federal constitutional claim, the District Court here was right to allow the state court an opportunity to apply EPRA and, potentially, its strict scrutiny standard to the challenged law.

After all, even the State of West Virginia, who appeared below as amicus for the Appellants, explained that EPRA is "*directly relevant* to the issues raised." JA224 (emphasis added). Specifically, the State argued that West Virginia's compulsory immunization law would not survive the scrutiny under EPRA because it is not the "least restrictive" means of protecting public health. And here, the thorny question of whether strict scrutiny or rational basis applies is the crux of the dispute, as it is in many constitutional challenges.

Accordingly, a state court application of the new religious freedom law—which the State believes requires applying strict scrutiny to the immunization law—may very well moot, or at minimum place in a different posture, the claim before the federal court. There is no sound reason to force the District Court to render a novel constitutional decision when there is good reason to believe a resolution under state law would make a federal decision wholly unnecessary—and thus, advisory.

*Pullman* was made for a case just like this. For these reasons and those that follow, the District Court's judgment should be affirmed.

## JURISDICTIONAL STATEMENT

The District Court had federal question jurisdiction under 28 U.S.C. § 1331. This Court has appellate jurisdiction under 28 U.S.C. § 1291 to review the District Court's *Pullman* abstention order under the "effectively out-of-court" or collateral order doctrines. *See Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 714 (1996); *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949).

## STATEMENT OF THE ISSUES

Whether the District Court abused its discretion by abstaining under *Pullman* from deciding a novel and unprecedented federal constitutional claim challenging longstanding immunization requirements for public schoolchildren where the application of a newly enacted state religious freedom law may well moot or place in a different posture the federal constitutional claim.

## STATEMENT OF THE CASE

### I. The West Virginia Legislature acts to protect the children in its schools from entirely preventable deadly diseases.

The history of compulsory immunization of certain populations at particular risk of deadly diseases goes back to the infancy of our Republic—indeed, one such policy played an essential role in ensuring its very birth.

On January 6, 1777, General George Washington penned a letter ordering the inoculation of his troops—the Continental Army and various states' militia—against smallpox. He famously wrote:

> Necessity not only authorizes but seems to require the measure, for should the disorder infect the Army in the natural way and rage with its usual virulence we should have more to dread from it than from the Sword of the Enemy.

Letter from George Washington to Dr. William Shippen, Jr. (Jan. 7, 1777).[1] General Washington's orders recognized not just the gravity of the communicable disease but also the gift that progressing science had provided the ragtag patriot army against the British regulars.

We should be clear: Vaccines are a modern-day miracle that have virtually eradicated diseases that, in the past, killed millions of children, elderly, and infirm. Many Americans, such as those old enough to have heard the fear of polio or other now-preventable diseases from their parents and immigrants from parts of the world where vaccines are not universally available even today, are important anecdotal witnesses.

---

[1] Available at https://founders.archives.gov/documents/ Washington/03-08-02-0281.

But what is more, the beneficial impact of vaccines can be seen empirically. School immunization policies in the United States can be traced back to the nineteenth century, when they were enacted to control smallpox—the same dreaded virus from which General Washington sought to protect his troops.[2] Since the 6th century, smallpox had traveled the globe killing up to 30% of infected individuals.[3] Thanks to variolation,[4] and later vaccination, smallpox has been eradicated worldwide, *id.*, and we no longer have to fear the virus the Father of Our Country deemed more dreadful than the Sword of the Enemy.

Of course, the wonders of vaccines are not limited to the eradication of smallpox. Vaccines also virtually eliminated Poliomyelitis ("Polio"), which caused yearly epidemics that left tens of thousands of

---

[2] Massachusetts passed the first school vaccine mandate in May 1855. An Act to Secure General Vaccination. 1855 Mass. Acts. 414, § 2 ("The school committee of the several towns and cities shall not allow any child to be admitted or connected to the public schools who has not been duly vaccinated.").

[3] JA332 (CDC, *History of Smallpox* (Feb. 20, 2023)).

[4] Variolation was a process in which healthy individuals were exposed to material from smallpox sores. This exposure typically led to a milder form of the illness and resulted in a significantly lower mortality rate than typical smallpox infection. *See id.*

children paralyzed.[5] In 1952, the United States documented more than 21,000 paralytic cases of the virus. *Id.* There is no cure for Polio, but with the advent and use of safe and effective vaccines, the virus is now avoidable. Vaccines have also given us relief and protection from tetanus, influenza, hepatitis a, hepatitis b, rubella, Hib, measles, pertussis, pneumococcal disease, rotavirus, mumps, chickenpox, and diphtheria.[6]

West Virginia's elected leaders—no doubt familiar with many of these diseases—have long embraced these scientific miracles to protect children from certain death or a lifetime of disability. West Virginia's first compulsory immunization law was passed in 1905. Still today, West Virginia leads the way in childhood vaccination and, as a result, has low incidence rates of deadly childhood diseases, bettering the national average.[7] The State's elected representatives have declared

---

[5] Concepcion F. Estivariz, MD et al., Poliomyelitis (Aug. 2021), https://www.cdc.gov/vaccines/pubs/pinkbook/polio.html.

[6] CDC, *Disease* You *Almost Forgot About (Thanks to Vaccines*) (Sep. 15, 2022), https://www.cdc.gov/vaccines/parents/diseases/forgot-14-diseases.html.

[7] JA335 (Charles J. Mullett et al., Opinion: West Virginia is a National Leader in Childhood Immunizations—Let's Stay Protected (Feb. 5, 2023)).

that "[i]t is the policy of [West Virginia] to promote the physical and mental health of all its citizens and to prevent disease, injury, and disability whenever possible." W. Va. Code § 16–1–1.

And this has been no mere wishful thinking. West Virginia's childhood vaccine rate has proven—as an empirical matter—amazingly effective. For example, in 2019 and 2022, several other states experienced measles outbreaks. In fact, just last year in neighboring Ohio, a measles outbreak among unvaccinated children caused three dozen children to undergo hospitalization.[8] During these outbreaks, there was *not a single documented case in West Virginia*.[9]

Vaccinating children is critically important. Let there be no mistake: West Virginia has a compelling interest in vaccinating and protecting its children. Children are particularly susceptible to infection because they have less developed immune systems than adults.[10]

---

[8] JA340 (Ohio Disease Reporting System, *Measles Case Summary Central Ohio Outbreak* (Feb. 10, 2023)).

[9] JA342 (W. Va. DHHR, Measles (Rubeoloa) Information Sheet for General Public (May 2023)).

[10] JA348 (CDC, *A Child's Health is the Public's Health* (Oct. 24, 2022) ("Children have more contact with others, and they have less developed immune systems to fight off infections. This means they are more likely to catch an illness that can spread from person to person.")).

Accordingly, West Virginia's elected representatives have taken decisive and longstanding measures to protect its children.

As noted, well-over one hundred years ago, the West Virginia Legislature required public schoolchildren to be immunized against smallpox.[11] Over the next century, as science progressed and new vaccinations became available, vaccines were added to the required immunization list and some, like the eradicated smallpox, were removed.

West Virginia's compulsory immunization law is now codified at West Virginia Code § 16–3–4. Since 2015, the law has provided that "[n]o child or person may be admitted or received in any of the schools of the state or a state-regulated child care center" unless the child has been immunized against the following diseases: chickenpox, hepatitis-b, measles, meningitis, mumps, diphtheria, polio, rubella, tetanus, and whooping cough. W. Va. Code § 16–3–4(c). Section 16–3–4 provides a single exemption from this requirement for individuals that cannot safely receive specific vaccines.

_____

[11] The history of the vaccination law can be found at https://code. wvlegislature.gov/16-3-4/.

The exemption process is guided by § 16–3–4(h) and its supporting regulations, which are found at West Virginia Code of State Rules § 64–95–1, *et seq*. *First*, an individual seeking a vaccine exemption for a child may submit a request for an exemption "accompanied by the certification of a licensed physician stating that the physical condition of the child is such that immunization is contraindicated or there exists a specific precaution to a particular vaccine." § 16–3–4(h)(1).

*Second*, the State's Immunization Officer[12]—a licensed physician who is appointed by the Commissioner of the Bureau of Public Health[13]—reviews the evidence presented by the physician and determines if there is "sufficient medical evidence that an immunization is contraindicated or there exists a specific precaution to a particular vaccine." W. Va. Code R. § 64–95–17.4; § 64–95–16.

---

[12] The current Immunization Officer is nonparty Dr. Carmen Rexrode.

[13] Appellee Dr. Christiansen is the State Health Officer and was formerly the Commissioner of the Bureau for Public Health. Dr. Christiansen was sued in both official capacities. On Friday, January 12, 2024, Justin Davis became the interim Commissioner of the Bureau for Public Health. A notice of substitution of parties will be forthcoming.

The terms "contraindicated" and "precaution" are narrowly defined. W. Va. Code R. § 64–95–2. A contraindication is "a medical condition which renders an immunization improper for a particular individual." W. Va. Code R. § 64–95–2.4. The recognized contraindications for each vaccine are provided by the Advisory Committee on Immunization Practices ("ACIP") from the Centers for Disease Control and Prevention ("CDC"). *Id.*[14] A precaution is defined as "a condition defined under the current standards of immunization practice that might increase the chance or severity of an adverse vaccine reaction or compromise the ability of the vaccine to produce immunity." W. Va. Code R. § 64–95–2.10. Those defined conditions are similarly provided by the CDC.[15] If the Immunization Officer determines that there is sufficient evidence that an immunization is contraindicated or a particular precaution exists, an exemption will be granted. If not, it is denied.

*Third*, any denial by the Immunization Officer may be appealed to the State's Health Officer, currently Appellee, Dr. Christiansen. W. Va.

---

[14] JA351 (CDC, Contraindications and Precautions).

[15] *Id.*

Code § 16–3–4(h)(4). At this stage, the State's rules permit the child's parent or guardian to submit additional evidence to support a contraindication or precaution. W. Va. Code R. § 64–95–17.8.d. The State Health Officer then reviews all the evidence and makes a determination regarding whether a contraindication or precaution has been substantiated "based on the preponderance of the evidence." W. Va. Code R. § 64–95–17.8.e. Finally, West Virginia Code § 16–3–4(h)(5) provides that the determination of the State Health Officer "is subject to a right of appeal" under West Virginia's Administrative Procedures Act.

## II. In 2023, the West Virginia Legislature enacts the Equal Protection for Religion Act.

During the 2023 regular session of the West Virginia Legislature, and prior to the filing of this case, the Legislature enacted the "Equal Protection for Religion Act" ("EPRA") into state code. *See* W. Va. Code § 35–1A–1. EPRA is essentially a state-level version of the federal Religious Freedom Restoration Act ("RFRA"), *see* 42 U.S. §§ 2000bb, *et seq.*[16]

---

[16] Describing EPRA as a "state-level RFRA." David Schraub, *Liberal Jews and Religious Liberty*, 98 N.Y.U. L. Rev. 1556, 1632 (2023).

Under its sole section heading titled, "Government limitations related to the exercise of religion," EPRA provides that state action—encompassing conduct by the state or its political subdivisions—may not "substantially burden a person's exercise of religion" unless it can withstand strict scrutiny. W. Va. Code § 35–1A–1(a)(1). The law also creates a cause of action for any person "whose exercise of religion has been substantially burdened, or is likely to be substantially burdened, in violation of this article. . .." *Id.*, § 35–1A–1(b)(1). EPRA became effective on May 29, 2023. *See* WV LEGIS 295 (2023), 2023 West Virginia Laws Ch. 295 (H.B. 3042).

## III. Appellants urgently seek a first-of-its-kind federal constitutional ruling from the District Court.

Appellants filed their constitutional challenge of West Virginia's longstanding compulsory immunization law on April 26, 2023. JA10.[17] The complaint pleads a single cause of action—violation of Appellants' free exercise rights. *Id.* at 20–26. Just two days later—and despite the fact that the school year was nearing its end—Appellants filed a Motion

_____

[17] Although the Plaintiffs' complaint was initially filed against Dr. Christiansen and school principals Belinda Moss and Mindy Wilson, Ms. Moss and Ms. Wilson have since been voluntarily dismissed. JA178.

for Preliminary Injunction and Expedited Consideration. JA61. Dr. Christiansen provided a preliminary opposition to Plaintiffs' motion, JA181, and the parties appeared before the District Court for hearing on May 10, 2023.

The State of West Virginia filed an amicus brief supporting Appellants. In its brief, the State explained that EPRA is "*directly relevant* to the issues raised" by Appellants' complaint. JA224 (emphasis added). According to the argument presented by the State, because EPRA "requires governmental interests be furthered with the least restrictive means so as to not burden a person's exercise of religion,"—in short, requires the application of strict scrutiny—the Court should *in this case* require Dr. Christiansen to "develop and implement" a religious exemption. JA224–225.

The District Court ultimately denied Appellants' motion for preliminary injunctive relief on May 18, 2023. JA210. The District Court observed that Appellants had not been "confronted with the decision to either vaccinate their children or forego attendance at their schools of choice, as they d[id] not suggest that they wish to enroll their children in West Virginia schools in the mere, remaining weeks of the

2022-23 school year." JA214. Accordingly, the District Court concluded that there was no present threat of irreparable injury to the Appellants and ordered the parties to file motions for summary judgment so that the court could adjudicate the matter prior to the start of the new school year. *Id.* Appellants took no appeal of the Court's decision to deny preliminary relief.

The parties filed cross-motions for summary judgment. While both sides sought summary judgment on the merits, Dr. Christiansen also raised several procedural bars to granting Appellants' relief—including, principally, *Pullman* abstention. The District Court agreed, granting Dr. Christiansen's cross-motion for summary judgment to the extent it sought *Pullman* abstention in light of the recent enactment of the Equal Protection for Religion Act by the West Virginia Legislature and the State's position that EPRA is "directly relevant to the issues raised" by Appellants' complaint. JA772.

This appeal followed.

## SUMMARY OF ARGUMENT

The District Court did not abuse its discretion by abstaining under *Pullman* from deciding the novel constitutional question advanced by Appellants.

*Pullman* abstention is proper where "there is (1) an unclear issue of state law presented for decision (2) the resolution of which may moot or present in a different posture the federal constitutional issue such that the state law issue is potentially dispositive." Here, the West Virginia Legislature recently enacted the Equal Protection for Religion Act ("EPRA"), which provides that state action cannot "substantially burden a person's exercise of religion" unless it can withstand strict scrutiny.

Yet, in this novel federal constitutional challenge, arguably the most disputed issue for decision is whether strict scrutiny applies under federal constitutional law. However, the State (in an amicus brief below) has taken the position that EPRA compels the application of strict scrutiny for the same challenge raised here. Because EPRA may moot, or at minimum present the question in this case in a different posture, *Pullman* compels that the state courts be "afforded a

15

reasonable opportunity to pass upon" the new enactment. The District Court was right to abstain, but at minimum did not abuse its discretion in doing so.

## ARGUMENT

I.  **The District Court did not abuse its discretion by abstaining under _Pullman_.**

Federal courts operate under the "well established principle" of constitutional avoidance. *Escambia Cnty. v. McMillan*, 466 U.S. 48, 51 (1984) (citing *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, (1936) (Brandeis, J., concurring)). That is, "the Court will not decide a constitutional question if there is some other ground upon which to dispose of the case." *Id.* And for this reason, "[a]ppeals from the highest court of a state challenging its decision of a question under the Federal Constitution are frequently dismissed because the judgment can be sustained on an independent state ground." *Ashwander*,297 U.S. at 347 (Brandeis, J., concurring).

In addition to the longstanding principles of constitutional avoidance, federal courts must also account for federalism concerns. Indeed, "[f]ew public interests have a higher claim upon the discretion of a federal chancellor than the avoidance of needless friction with state

policies. . .." *R.R. Comm'n of Tex. v. Pullman Co.,* 312 U.S. 496, 500 (1941). After all, our system of dual sovereignty requires us to be "more sensitive to the diverse needs of a heterogeneous society[,] . . . allows for more innovation and experimentation in government[,] and makes government more responsive by putting the States in competition for a mobile citizenry." *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991). The "delicate issues of federal-state relationships" are readily apparent in lawsuits seeking injunctive relief "against those in charge of an executive branch of an agency of state or local governments." *Rizzo v. Goode*, 423 U.S. 362, 380 (1976).

The *Pullman* abstention doctrine is predicated on these twin aims of avoiding premature and unnecessary constitutional decisions and of protecting the delicate balance of power between the states and the federal government. In the seminal case establishing the abstention doctrine, *Railroad Commission of Texas v. Pullman*, railroad porters alleged that a rule established by the Texas Railroad Commission was both unauthorized under Texas law and violated the porters' right to equal protection under the Fourteenth Amendment to the United States Constitution. 312 U.S. 496, 498-99 (1941).

Recognizing the importance of "the avoidance of needless friction with state policies," and concluding that a ruling that the Railroad Commission exceeded its authority under Texas law would avoid the constitutional issue, the Supreme Court directed the lower court to stay its hand pending the determination of the state law issue by a state court. *Id.* at 502.

Abstention under *Pullman* is appropriate "in cases presenting a federal constitutional issue which *might* be mooted or presented in a different posture by a state court determination of pertinent state law." *County of Allegheny v. Frank Mashuda Co.*, 360 U.S. 185, 189 (1959) (emphasis added). Indeed, as this Court has held more recently, "*Pullman* abstention requires federal courts to abstain from deciding an unclear area of state law that raises constitutional issues because state court clarification might serve to avoid a federal constitutional ruling." *Nivens v. Gilchrist*, 444 F.3d 237, 245 (4th Cir. 2006); *see Pullman*, 312 U.S. at 500.

*Pullman* abstention is thus appropriate when there is (1) an unclear issue of state law, (2) that is "potentially dispositive," or will at least present the federal constitutional issue in a different posture.

*Educ. Servs., Inc. v. Maryland State Bd. for Higher Educ.*, 710 F.2d 170, 174 (4th Cir. 1983).

In this case, the *Pullman* abstention standard is readily satisfied, and it certainly was not an abuse of discretion by the District Court to find that it was so. Critical to abstention, the West Virginia Legislature recently enacted the Equal Protection for Religion Act ("EPRA"), W. Va. Code § 35–1A–1 (2023), which is a state-level form of the federal Religious Freedom and Restoration Act, 42 U.S.C. §§ 2000bb *et seq.* EPRA provides that state action cannot "substantially burden a person's exercise of religion" unless that burden is "essential to further a compelling governmental interest," and is "the least restrictive means of furthering that compelling governmental interest." W. Va. Code § 35–1A–1(a)(1).

The State, through an amicus brief supporting plaintiffs' motion for a preliminary injunction, explained that EPRA is "*directly relevant* to the issues raised.*" JA224 (emphasis added). Specifically, the State argued that EPRA requires strict scrutiny for West Virginia's compulsory immunization law. After recognizing that the law furthers a compelling state interest, the State claimed that it does not employ the

least restrictive means of doing so. In view of EPRA's requirements, the State asserted that the court "should mandate that the Defendants develop and implement a process to allow for families to apply for a religious exemption to mandatory immunization based on their religious beliefs." JA224–225.

EPRA is new, and as a result, has yet to be applied by state courts. So the question of whether West Virginia's compulsory immunization law would survive scrutiny under EPRA is an open one, and is surely subject to colorable arguments on both sides. (Here, the State—on its own accord as amicus—has staked out its position already, indicating that the issue is an important one for the State).

What is more, several States have—in the aftermath of outbreaks of vaccine preventable diseases—repealed the preexisting religious exemptions present in their own compulsory immunization laws.[18] Such

_____

[18] In 2015, California repealed the religious exemption to its compulsory immunization law, in response to a significant measles outbreak. Cal. Legis. Serv. ch. 35 (amending Cal. Health & Safety Code § 120325 *et seq.*). In 2019, New York and Maine followed suit. 2019 N.Y. Sess. Laws ch. 35 (McKinney) (amending N.Y. Pub. Health Law § 2164(9)); 2019 Me. Legis. Serv. ch. 154 (West) (amending Me. Rev. Stat. Ann. tit. 20-A, §§ 6355, 6358–6359; tit. 22, §§ 802, 8402). Connecticut repealed its religious exemption in 2021. Public Act 21–6 (repealing Conn. Gen. Stat. § 10-204a).

actions suggest that disallowing a religious exemption is indeed essential to furthering the state's compelling interest in protecting its children from preventable, deadly disease.

Either way, allowing state courts the opportunity to resolve the tension between the compulsory immunization law and EPRA furthers the interest in preserving our system of dual sovereignty, which is "more sensitive to the diverse needs of a heterogeneous society." *Gregory*, 501 U.S. at 458.

By enacting EPRA, West Virginia has demonstrated a desire to provide more stringent protection for religious expression than that provided by the First Amendment by requiring strict scrutiny for all laws the "substantially burden" religious exercise. W. Va. Code § 35–1A–1(a)(1). But, as the District Court (quite correctly) recognized, the "most hotly contested issue" in this case is whether strict scrutiny applies to the compulsory immunization law. JA772. The District Court thus properly abstained under the *Pullman* doctrine to avoid "needless friction" with a state policy that—according to the State itself—demands strict scrutiny under state law. *Pullman*, 312 U.S. at 502.

Rather than create an "exhaustion requirement" for constitutional claims against state laws, as Appellants argue, EPRA does the opposite. It *opens* the courthouse doors to individuals who desire to challenge neutral laws of general applicability, like the law at issue here. Nor did the District Court's abstention create or imply any sort of "exhaustion requirement," as Appellants claim. Abstention under *Pullman* is discretionary. Where the court can see that the question before it could be mooted or even presented in a different posture by the application of state law, then the court may—not must—abstain. *Educ. Servs. Inc*, 710 F.2d at 174. And the court may abstain under *Pullman* even if there is no pending state law claim. *Nivens*, 444 F.3d at 246. If the court determines abstention is proper, it must simply stay the federal proceedings until the state law question can be answered. *Id.* After all, *Pullman* abstention "exists to allow state courts to resolve complicated issues of state law." *Id*. That is precisely the case here.

Appellants are wrong to insist that *Pullman* abstention is inappropriate here because they have brought a First Amendment challenge to the law. In *City of Houston v. Hill*, the Supreme Court found that *Pullman* abstention was improper in that case because "[a]

federal court may not properly ask a state court if it would care in effect to rewrite a statute." 482 U.S. 451, 471 (1987). But the District Court below did *not* ask the state court to rewrite or reinterpret a law that has been previously interpreted by the courts. Instead, the District Court abstained to provide the state courts an *opportunity* to apply a new state law that has not before been interpreted, and under which, state courts have the power to award Appellants the remedy they seek.

At the end of the day, a state-court ruling under EPRA would either moot Appellants' claims or present them in a different posture. A ruling favorable to them would provide the relief sought and obviate the need for an unprecedented constitutional ruling by the federal court. A ruling favorable to Appellee, on the other hand, would present the case to federal courts in a different posture—having already analyzed the law under strict scrutiny. The District Court thus properly abstained under the *Pullman* doctrine. Appellants fall far short of demonstrating that the District Court's decision to stay its hand constitutes an abuse of discretion.

**II.   Appellants fail to satisfy the *Ex parte Young* exception to state sovereign immunity.**

Even if the Court concludes that the District Court abused its discretion by abstaining under *Pullman*, Appellants are still not entitled to the relief they seek because they fail to satisfy the *Ex parte Young* exception to sovereign immunity.  The exception limits plaintiffs to suing only those officers with *the legal ability to actually remedy* the alleged constitutional violation, thereby ensuring that any federal injunction "will be effective with respect to the underlying claim." *S.C. Wildlife Fed'n v. Limehouse*, 549 F.3d 324, 333 (4th Cir. 2008).

In this case, Appellants seek a "permanent injunction prohibiting Defendants, their agents, employees any other persons acting on their behalf from enforcing West Virginia Code § 16–3–4 unless they provide an option for requesting a religious exemption." JA37. A federal court cannot grant such relief with an injunction against Dr. Christiansen.

Dr. Christiansen has sovereign immunity, and the *Ex parte Young* exception is not triggered here because he does not have sufficient connection to the enforcement of the challenged statute such that an injunction *against him alone* would effectuate the relief Appellants seek. *Ex parte Young*, 209 U.S. 123 (1908). As this Court has explained,

"*Ex parte Young* only authorizes suits against state officers with 'some connection with the enforcement of the act.'" *Doyle*, 1 F.4th at 245. In other words, "the officer sued *must be able to enforce*, if he chooses, the specific law the plaintiff challenges." *Id.* at 255 (emphasis added). "Without this enforcement duty, the officer is merely 'a representative of the State' who cannot be sued because allowing such a suit would essentially 'make the State a party.'" *Id.* at 254–55 (quoting *Ex parte Young*, 209 U.S. at 157).

Put succinctly, this requirement limits plaintiffs to suing only those officers vested with the legal ability to remedy the alleged constitutional violation. *See Ex parte Young*, 209 U.S. at 158. Without specific authority to enforce the challenged law, the state health officer is cloaked with state sovereign immunity, also commonly referred to as Eleventh Amendment immunity.

Here, the only legal authority Dr. Christiansen has under the challenged statute is to: (1) provide parents of newborn children with information on mandated vaccinations, W. Va. Code § 16–3–4(a); (2) provide medical exemptions, W.Va. Code § 16–3–4(c), (h); (3) provisionally enroll students who have met minimum criteria (which

includes "at least one dose of each required vaccine," W. Va. Code § 16–3–4(e)); and (4) appoint and employ an Immunization Officer, W. Va. Code § 16–3–4(h)(2).

Enjoining him from performing any of these actions will *not* remedy Appellants' alleged harm. Most fundamentally, Dr. Christiansen plays no role in admitting or enrolling children into the State's schools.[19] Dr. Christiansen thus lacks the legal ability to remedy the alleged constitutional violation that Appellants identify here. Accordingly, he is cloaked with state sovereign immunity and, if the decision to abstain is determined to have been made in error, judgment must be entered in his favor.

In any event, the District Court lacks the authority to force Dr. Christiansen to effectively rewrite the statute so as to *affirmatively develop* "an option for requesting a religious exemption." JA37. The federal judicial power (and Dr. Christiansen's, for that matter) is not so sweeping. *See Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923) (explaining that the power "to review and annul acts of [the legislative

---

[19] In fact, Appellants *voluntarily dismissed* the officials who were responsible for admitting their children into their preferred public schools. *See* Dist. Ct. Dkt. nos. 33 & 34.

branch]" is "little more than the negative power to disregard an unconstitutional enactment" and that "the court enjoins . . . not the execution of the statute, but the acts of the official"). After all, "courts cannot take a blue pencil to statutes." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1486 (2018) (Gorsuch, J., concurring).

## III. Appellants lack standing to sue Dr. Christiansen.

Even if this Court concludes that the *Ex parte Young* exception to state sovereign immunity is satisfied, Appellants do not have standing to pursue their claim against Dr. Christiansen because traceability and redressability are lacking.

The "judicial Power" extends only to "Cases" and "Controversies." U.S. Const. art. III, § 2. "Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy" that "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). "To satisfy the irreducible constitutional minimum of standing, a plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Deal v. Mercer*

*Cnty. Bd. of Educ.*, 911 F.3d 183, 187 (4th Cir. 2018) (cleaned up).

Appellants, as "the part[ies] invoking federal jurisdiction, bear[] the

burden of establishing these elements." *Spokeo*, 578 U.S. at 338. They

cannot do so here.

In this case, Appellants allege that they are being harmed by the

requirement that they be vaccinated in order to attend public schools

which, lacking a religious exemption, violates the Free Exercise Clause

of the First Amendment.[20] But Appellants fail to demonstrate that such

ongoing harm is fairly traceable to Dr. Christiansen's conduct or would

be redressable by a favorable ruling against him. On either basis,

Appellants lack standing to sue Dr. Christiansen.

### A. Appellants' alleged harm is not fairly traceable to Dr. Christiansen's conduct.

A plaintiff's injury satisfies the traceability element of standing

when there is "a causal connection between the injury and the

[defendant's] conduct complained of by the plaintiff." *Air Evac EMS,

Inc. v. Cheatham*, 910 F.3d 751, 760 (4th Cir. 2018) (cleaned up). "While

the defendant's conduct need not be the last link in the causal chain,

---

[20] While Appellee does not dispute Appellants' sincerely held
beliefs, Appellee does not concede that immunization in-and-of-itself
constitutes an actual injury.

the plaintiff must be able to demonstrate that the alleged harm was *caused by the defendant*, as opposed to the 'independent action of some third party not before the court.'" *Id.* (quoting *Frank Krasner Enters., Ltd. v. Montgomery Cnty.*, 401 F.3d 230, 234 (4th Cir. 2005)) (emphasis added).

Under the circumstances presented here, the Fourth Circuit's traceability analysis applies principles from the *Ex parte Young* context. *See Disability Rts. S.C. v. McMaster*, 24 F.4th 893, 901 (4th Cir. 2022). Specifically, the question of the causal connection looks to whether the defendant has the power to enforce the complained-of statute or otherwise would be empowered (under state law) to actually remedy the plaintiffs' alleged injuries. *See id.* As this Court has made clear, "[t]hese principles apply with equal force in the standing context." *Id.*

Application of standing principles means that "[w]hen a defendant has no role in enforcing the law at issue, it follows that the plaintiff's injury allegedly caused by that law is not traceable to the defendant." *Disability Rights*, 24 F.4th at 902. Therefore, for the same reasons that *Ex parte Young* is not triggered, *see supra* Part II, Appellants fail to satisfy traceability and thus lack standing.

**B.    Appellants' alleged harm would not be redressed by a ruling against Dr. Christiansen.**

Appellants also lack standing to bring their First Amendment claim because their claimed injury cannot be redressed by an order against Dr. Christiansen. "An injury is redressable if it is 'likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *Doe v. Va. Dep't of State Police*, 713 F.3d 745, 755 (4th Cir. 2013) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000)). Appellants must show that they "would benefit in a tangible way from the court's intervention." *Disability Rts. S.C. v. McMaster*, 24 F.4th 893, 905 (4th Cir. 2022) (quoting *Deal*, 911 F.3d at 189)). As discussed above, *see supra* Part II, because Dr. Christiansen lacks the legal authority to rewrite West Virginia Code § 16–3–4 to create a religious exemption or otherwise enroll children into public schools, Appellants do not stand to tangibly benefit from an injunction against him.

**IV.   The scope of the Court's appellate jurisdiction is limited to review of the *Pullman* abstention and any predicate issues.**

In light of its decision to abstain, the District Court did not opine on, much less resolve, the merits of Appellants' First Amendment claim. Even so, Appellants would have this Court effectively address the

merits for the first time on appeal, ostensibly as further grounds for their request that the *Pullman* order be vacated. *See* Opening Br. at 37–66 (arguing that *Pullman* abstention was improper because the state's compulsory immunization law is "clearly" unconstitutional).

To be clear, Appellants are *not* seeking from this Court an order directing entry of judgment in their favor. Rather, they simply request that this Court conclude that the District Court's *Pullman* stay order was an abuse of discretion (and presumably that it therefore be vacated, and the case remanded for further proceedings). *See* Opening Br. at 66. Even so, at least two reasons justify declining to address the merits of Appellants' claim for the first time on appeal.

*First*, prudent judicial management. As explained above, the merits of the case involve novel questions of federal constitutional law that, to date, only one other district court in the country has attempted to address. The District Court here has not yet had the opportunity to address the merits, including whether discovery (or even a trial) is necessary to resolve any outstanding factual disputes. As Dr. Christiansen argued below, even if his motion for summary judgment is denied, Appellants' motion for summary judgment should be denied or

(at a minimum) deferred to permit discovery bearing on disputes of material fact. JA321.

As has been said many times, the Fourth Circuit is a "court of review, not of first view." *Moses Enterprises, LLC v. Lexington Ins. Co.*, 66 F.4th 523, 529 (4th Cir. 2023) (quoting *Cutter v. Wilkinson*, 544 U.S. 709, 718 n.7 (2005)). *See Singleton v. Wulff*, 428 U.S. 106, 120 (1976) ("It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below."); *Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 515 (4th Cir. 2015) ("The district court is in a better position to consider the parties' arguments in the first instance, which can be presented at length rather than being discussed in appellate briefs centered on the issues the district court did decide."). And "[i]n particular," the Supreme Court has stated that "when we reverse on a threshold question, we typically remand for resolution of any claims the lower courts' error prevented them from addressing." *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 201, (2012). If this Court determines reversal is appropriate, there is no good reason to depart from this approach here.

*Second*, appellate jurisdiction. Although Dr. Christiansen agrees that this Court has appellate jurisdiction to immediately review the District Court's interlocutory decision to abstain under *Pullman* (via either the "effectively-out-of-court" or collateral order doctrines), this Court's appellate review is limited to that question and any issue encompassed by the narrow exception of pendant appellate jurisdiction.

Here, the merits question is beyond the scope of appellate review. For starters, although Appellants purport to cast their arguments on the merits as a reason that abstention was error, the resolution of that issue is, of course, the whole ballgame. *See* Opening Br. at 37–66. The District Court did not base its decision to abstain on the relative clarity of the parties' arguments on the merits. In fact, the court expressly declined to address the merits, abstaining so that the state courts could address the "most hotly contested issue" in this case—the level of scrutiny. JA772.

Pendant jurisdiction is further inappropriate here because the merits of Appellants' novel First Amendment claim are not "so interconnected with the immediately appealable issue[]"—*Pullman* abstention—"that they warrant concurrent review." *Rux v. Republic of*

*Sudan*, 461 F.3d 461, 475 (4th Cir. 2006). As this Court has explained, "[p]endent appellate jurisdiction is an exception of limited and narrow application driven by considerations of need, rather than of efficiency." *Id.*

In other words, *the merits* of Appellants' constitutional challenge to West Virginia's compulsory immunization law for public schoolchildren are in no meaningful way "inextricably intertwined" with the question of *Pullman* abstention. Reasons of efficiency, this Court has emphasized, cannot be a basis for the exercise of pendent appellate jurisdiction. *Rux*, 461 F.3d at 475. ("We are constrained by the language of the Supreme Court as well as our own precedent from recognizing efficiency considerations as a basis for the exercise of pendent appellate jurisdiction.").

\*     \*     \*

Accordingly, for these reasons, if this Court concludes that the District Court abused its discretion by abstaining under *Pullman*, and that no other predicate issue (e.g., state sovereign immunity or standing) bars relief, this Court should vacate the *Pullman* order without addressing the merits and remand for further proceedings.

**V.    On the merits, West Virginia Code § 16–3–4 does not violate the First Amendment.**

To the extent this Court finds itself compelled to address the merits of Appellants' novel First Amendment claim for the first time on appeal, it should conclude that their claim fails as a matter of law.

The First Amendment, applicable to the States through the Fourteenth Amendment, "declares that Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof." *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940); U.S. Const. amend. I. The First Amendment "embraces two concepts—freedom to believe and freedom to act." *Id.* The freedom to believe is "absolute." *Id.* That is, a government cannot compel its citizens to accept or reject any particular creed. *Id.*

The freedom to act, however "cannot be" absolute. *Cantwell*, 310 U.S. at 303. Indeed, "[c]onduct remains subject to regulation for the protection of society." *Id.* at 304. In other words, the right to free exercise of religion does not "excuse [an individual] from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate." *Emp. Div., Dep't of Hum. Res. of Oregon v. Smith*, 494 U.S. 872, 879 (1990). Under *Smith*, a "neutral law of general applicability"

that incidentally burdens religious freedom does not violate the First Amendment if it can survive rational basis review. *Id.* Because West Virginia's compulsory immunization law is neutral and generally applicable, and because it survives rational basis review, it should be upheld.

## A. Courts have uniformly rejected Free Exercise challenges to childhood vaccination laws.

Compulsory immunization laws have survived more than a century of constitutional scrutiny. In 1902, the United States Supreme Court was asked to consider whether a compulsory immunization ordinance invaded "any right given or secured by the Constitution." *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 26-27 (1905).[21] Concluding that the ordinance did not, the Court explained

---

[21] The challenged ordinance provided that "the board of health of a city or town, if, in its opinion, it is necessary for the public health or safety, shall require and enforce the vaccination and revaccination of all the inhabitants thereof, and shall provide them with the means of free vaccination. Whoever, being over twenty-one years of age and not under guardianship, refuses or neglects to comply with such requirement shall forfeit $5." And the ordinance included an exception for "children who present a certificate, signed by a registered physician, that they are unfit subjects for vaccination." *Jacobson*, 197 U.S. at 12. Under this authority, the Board of Health of the City of Cambridge, Massachusetts, mandated vaccination against smallpox. *Id.*

that "in every well-ordered society charged with the duty of conserving the safety of its members the rights of the individual in respect of his liberty may at times, under the pressure of great dangers, be subjected to such restraint, to be enforced by reasonable regulations, as the safety of the general public may demand." *Id.* at 29. In a religious exercise challenge to a child labor law, the Supreme Court discussed the protections for compulsory immunization, explaining that "[t]he right to practice religion freely does not include liberty to expose the community or the child to communicable disease or the latter to ill health or death." *Prince v. Massachusetts*, 321 U.S. 158, 167 (1944).

Since those early challenges, federal courts—including the Fourth Circuit—have routinely concluded that it is well within the police power of the State to mandate vaccination under certain circumstances, and the decision not to provide a religious exemption to such laws does not violate the Free Exercise Clause. *See Workman v. Mingo Cnty. Bd. of Educ.*, 419 F. App'x 348, 352-54 (4th Cir. 2011) (concluding that "the West Virginia statute requiring vaccinations as a condition of admission to school does not unconstitutionally infringe on [the plaintiff's] right to free exercise") *cert. denied* 555 U.S. 1036 (2011); *Phillips v. City of New*

*York*, 775 F.3d 538, 543 (2015) ("[M]andatory vaccination as a condition for admission to school does not violate the Free Exercise Clause.") *cert. denied* 577 U.S. 822 (2015); *McCarthy v. Boozman*, 212 F. Supp. 2d 945, 948 (W.D. Ark. 2002) ("The constitutional right to freely practice one's religion does not provide an exemption for parents seeking to avoid compulsory immunization for their school-age children."); *Sherr v. Northport-East Northport Union Free Sch. Dis.*, 672 F. Supp. 81, 88 (E.D.N.Y. 1987) ("[I]t has been settled law for many years that claims of religious freedom must give way in the face of the compelling interest of society in fighting the spread of contagious disease through mandatory inoculation programs."); *but see Bosarge v. Edney*, -- F. Supp. 3d --, 2023 WL 2998484 (S.D. Miss. Apr. 18, 2023).

What is more, the efforts in several states to *repeal* previously-granted religious exemptions to their compulsory immunization laws have each survived Free Exercise challenges. *We The Patriots USA, Inc. v. Connecticut Off. of Early Childhood Dev.*, 76 F.4th 130, 156 (2d Cir. 2023); *Brown v. Smith*, 24 Cal. App. 5th 1135, 1145, 235 Cal. Rptr. 3d 218, 225 (2018); *Whitlow v. California*, 203 F. Supp. 3d 1079, 1086 (S.D. Cal. 2016); *F.F. v. State*, 194 A.D.3d 80, 88, 143 N.Y.S.3d 734, 742,

*appeal dismissed, leave to appeal denied,* 37 N.Y.3d 1040, 176 N.E.3d 304 (2021), and *cert. denied,* 142 S. Ct. 2738, 212 L. Ed. 2d 797 (2022).

**B.   West Virginia Code § 16–3–4 is not subject to strict scrutiny because it is a valid and neutral law of general applicability.**

The Supreme Court has long held that "a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah.*, 508 U.S. 520, 531 (1993). Thus, a law that is both neutral and generally applicable is subject only to rational basis review. *Smith*, 494 U.S at 890.

**1.   The law is neutral.**

A law is not neutral if it "restricts practices because of their religious nature." *Fulton v. City of Philadelphia*, 593 U.S. --, 141 S. Ct. 1868, 1877 (2021). Even if the law is facially neutral, it may still fail if the challenger can show that "the object of the law" is to prevent or suppress a particular religious practice. *Church of Lukumi Babalu Aye*, 508 U.S. at 533. To determine if a law is not neutral, the court may look to the legislative history and circumstances surrounding its passage. From those sources, the court must decide whether the passage of the

law was motivated by any particular "animosity," "hostility," "distrust," or "negative normative evaluation" of religion. *Masterpiece Cakeshop, Ltd. v. Colo. Civ. Rts. Comm'n*, 584 U.S. 617, --, 138 S. Ct. 1719, 1731 (2018).

West Virginia's compulsory immunization law is neutral. On its face, the law makes no mention of religion or religious practice, and thus is facially neutral. Additionally, there is no evidence that the law was passed for the purpose of targeting certain religious practices. Without any indication that the immunization law targets religious practice *because* of its religious nature, the law is neutral.

## 2. The law is generally applicable.

A law is generally applicable if it treats similar conduct similarly, regardless of its religious nature. *See Tandon v. Newsome*, 593 U.S. 61, 62 (2021). The Supreme Court has explained that a law is not generally applicable in two circumstances. *First*, a law is not generally applicable if it "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton*, 141 S. Ct. at 1877. *Second*, if a law provides "a mechanism for individualized exemptions," that "invites the government to consider

the particular reasons for a person's conduct," then it is not generally applicable. *Id.* It must be emphasized, however, that "*[N]o case of the Supreme Court holds that a single objective exemption renders a rule not generally applicable.*" *Does 1-6*, 16 F.4th at 30 (emphasis added). That statement remains true today.

### a. Religious and medical exemptions are not "comparable."

West Virginia's compulsory immunization law does not treat secular activity more favorably than religious activity. In *Tandon*, the Supreme Court reasoned that "whether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue," noting that "[c]omparability is concerned with the risks various activities pose." 141 S. Ct. at 1296. Indeed, as the Court also explained in *Fulton*, for a religious activity to be comparable to secular activity, it must undermine the government's asserted interest "in a similar way." 141 S. Ct. at 1877.

The State's interest in W. Va. Code § 16–3–4 is to protect the health and safety of West Virginia's school children from entirely preventable deadly diseases. The medical exemption provided by W. Va.

Code § 16–3–4(h) allows children for whom certain vaccines are medically unsafe, as recognized by the CDC's written and objective standards, to forego taking those vaccines. They must, however, receive the vaccines that are not contraindicated. This exemption protects the health and safety of these children by allowing them to "avoid the harms that taking a particular vaccine would inflict on them." *We the Patriots*, 76 F.4th at 153; *see also Does 1-6 v. Mill*, 16 F.4th 20, 31 (1st Cir. 2021) ("[P]roviding medically contraindicated vaccines [to healthcare workers] would threaten the health of those workers and thus compromise both their own health and their ability to provide care.").

Indeed, the absence of a religious exemption in a compulsory immunization law protects the health and safety of both vaccinated and unvaccinated children. *We the Patriots*, 76 F.4th at 153. The absence of a religious exemption decreases, "to the greatest extent medically possible, the number of unvaccinated students." *Id.* Allowing a religious exemption, however, would "only detract from the State's interest . . . by increasing the risk of transmission of vaccine-preventable diseases among vaccinated and unvaccinated students alike." *Id.*

And it is not just courts opining about vaccination rates. Studies have shown "the connection between the ease of obtaining vaccine exemptions under a state's law and the number of exemptions in the state and, in turn, between high rates of exemption and the risk of outbreaks of vaccine-preventable disease." JA386 (James Colgrove & Abigail Lowin, *A Tale of Two States: Mississippi, West Virginia, and Exemptions to Compulsory School Vaccination Laws,* 35:2 Health Affairs 348, 352 (2016)).[22]

---

[22] *See* JA397 (Jacqueline K. Olive, et al., *The State of the Antivaccine Movement in the United States: A Focused Examination of Nonmedical Exemptions in States and Counties*, 15(7) PLOS Medicine (2018) (finding states that had increased access to nonmedical vaccination exemptions had lower MMR vaccine coverage)); JA407 (Saad B. Omer, *Trends in Kindergarten Rates of Vaccine Exemption and State-Level Policy, 2011-2016*, 5(2) Open Forum Infectious Diseases (2018)); JA413 (Aamer Imdad et al., *Religious Exemptions for Immunization and Risk of Pertussis in New York State*, 2000-2011, 132 Pediatrics 37, 37–43 (2013)); JA422 (Saad B. Omer et al., *Vaccination Policies and Rates of Exemption from Immunization, 2005-2011*, 367 N. Engl. J. Med. 1170, 1170–71 (2012)); JA424 (Saad B. Omer et al*., Geographic Clustering of Nonmedical Exemptions to School Immunization Requirements and Associations with Geographic Clustering of Pertussis*, 168 (12) Am. J. Epidemiology 1389 (2008) ("Geographic pockets of vaccine exemptors pose a risk to the whole community.")); JA483 (Daniel R. Feiken et al., *Individual and Community Risks of Measles and Pertussis Associated with Personal Exemptions to Immunization*, 284(24) JAMA 3145 (2000)).

Appellants' argument that failing to require vaccination outside of the schools somehow equates to comparable secular activity is simply misdirection. As an initial matter, the protections provided by § 16–3–4 extend beyond the walls of the school. Requiring children to be educated, and requiring those children who attend either public or private school to be vaccinated ensures that the vast majority of children in West Virginia are vaccinated. High vaccination rates protect all West Virginia children—whether they are in school or not. Indeed, schools are the only place in West Virginia where children are *required* to gather together. *See* W. Va. Code § 18–5–45. West Virginia's immunization law is essential to provide protection for those large groups of children who routinely gather at least 180 days per year.

### b. The statute does not create a system of discretionary exceptions.

The medical exemption also does not "invite" the State to consider a person's motivation for requesting a vaccine exemption. The law does not create "a formal system of entirely discretionary exceptions," but rather it provides a limited and objective criterion used to judge all exemption requests. *Fulton*, 141 S. Ct. at 1878. Specifically, the Immunization Officer (a nonparty who considers all exemption

requests) may only consider whether there is "sufficient medical evidence that immunization is contraindicated" for that individual, or whether "there exists a specific precaution to a particular vaccine." W. Va. Code § 16–3–4(h).

Under West Virginia Code of State Rules § 64–95–2.4, "contraindication" means:

> a medical condition which renders an immunization improper for a particular individual. Contraindications for each vaccine are found in statements written and published by the Advisory Committee on Immunization Practices (ACIP) as Recommendations of the Immunization Practices Advisory Committee and in Vaccine Information Statements (VIS) from the Centers for Disease Control and Prevention (CDC). The recommendations of the ACIP and VIS regarding contraindications can be found at http://www.cdc.gov/vaccines.

A "precaution" is defined by West Virginia Code of State Rules § 64–95–2.10 as "a condition defined under the current standards of immunization practice that might increase the chance or severity of an adverse vaccine reaction or compromise the ability of the vaccine to produce immunity." This definition is identical to the one provided by the CDC.[23] The recognized contraindications and precautions to West

---

[23] JA352 (CDC, *Contraindications and Precautions*).

Virginia's mandated vaccines are expressly and objectively limited.

JA354 at Table 4-1 (setting forth recognized contraindications and

precautions); JA440. In other words, the law exempts an *objectively*

*defined category* of people from receiving one or more vaccines.

Far from inviting state officials to consider the motivations behind

an exemption request, the law provides rigid and objective rules under

which to evaluate such a request. As an initial matter, the

immunization officer will deny any request for a medical exemption

unaccompanied by "the certification of a licensed physician stating that

the physical condition of the child is such that immunization is

contraindicated or there exists a specific precaution to a particular

vaccine." W. Va. Code § 16–3–4(h)(1).

If a request containing such certification is denied however, the

requester may appeal the decision to the State Health Officer, Dr.

Christiansen. W. Va. Code § 16–3–4(h)(4). Dr. Christiansen will review

the certification accompanying the request, along with any other

medical evidence presented by the family, to determine if the exemption

request satisfies one of these objectively recognized contraindications or

precautions. If not, he will deny the request. JA439. The family may

then appeal Dr. Christiansen's decision to state court. But at no point may any decisionmaker or tribunal consider anything other than the medical evidence supporting a finding of contraindication or precaution.

### 3. Even if strict scrutiny applies, the law is narrowly tailored to serve a compelling interest.

To survive strict scrutiny, a government policy must advance "interests of the highest order" and be "narrowly tailored to achieve those interests." *Church of Lukumi Babalu Aye*, 508 U.S. at 546. "Put another way, so long as the government can achieve its interests in a manner that does not burden religion, it must do so." *Fulton*, 141 S. Ct. at 1881.

West Virginia's interest in protecting the health and well-being of school children and in preventing the spread of communicable diseases "clearly constitutes a compelling interest." *Workman*, 419 Fed. App. at 353; *Does 1-6*, 16 F.4th at 32 ("Few interests are more compelling than protecting public health against a deadly virus."); *see also Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 18 (2020)(same). Indeed, West Virginia's highest court has held that "the protection of the health and safety of the public is one of the most important roles of the state." *D.J. v. Mercer Cnty. Bd. of Educ.*, No. 13-0237, 2013 WL 6152363, at *4

(W. Va. Nov. 22, 2013) (finding that the State had a compelling interest in requiring proof of vaccinations as a prerequisite to attending the state's public schools).

In certain circumstances, courts have concluded that generalized policy assertions do not constitute a compelling interest in denying a religious exemption. *See Fulton*, 141 S. Ct. at 1881 ("The question . . . is not whether the City has a compelling interest in enforcing its non-discrimination policies generally, but whether it has such an interest in denying an exemption to [the Plaintiff]."); *Doster v. Kenall*, 54 F.4th 398, 422 (6th Cir. 2022) *cert. granted, judgment vacated,* No. 23-154, 2023 WL 8531840 (U.S. Dec. 11, 2023); *Navy Seals 1-26 v. Biden*, 27 F.4th 336, 352 (5th Cir. 2022). But that standard applies only when the law at issue contains a religious exemption. *See id.* In those circumstances, the government may not rely on a generalized policy statement to deny a religious exemption that is available to an individual plaintiff. *See Navy Seals*, 27 F. 4th at 351 (concluding that plaintiffs had asserted a meritorious free exercise claim where Navy denied all requested religious exemptions without providing the

requisite individualized assessment). Such blanket general denials would, after all, be the same as offering no religious exemption at all.

But this does not mean that a law must, as a requirement of the Free Exercise Clause, include a religious exemption. Nor does it mean that, when a religious exemption is not available, the State must conduct an individualized review for each person who requests one. If the State can show that granting a religious exemption to a program would undermine its ability to achieve its compelling interests, then the law will survive strict scrutiny. *See Gonzalez v. O Centro Espirita Beneficiente Uniao de Vegetal*, 546 U.S. 418, 435 (2006).

In this case, West Virginia has a compelling interest in protecting its school-aged children from vaccine-preventable, deadly diseases. And allowing religious exemptions would significantly undermine that goal. The record in this case demonstrates that allowing broad exemptions to vaccination laws leads to higher rates of unvaccinated children, which drastically undermines the State's goal. West Virginia currently enjoys a vaccination rate that allows it to benefit from what is called "herd" or "community immunity." Herd immunity occurs when vaccination or immunity rates are high enough that an infectious disease is unable to

spread throughout the community. West Virginia has achieved those vaccination rates in school children. But any decrease in the vaccination rate threatens the State's herd immunity.

Appellants argue that the fact that neighboring States allow for broad exemptions to compulsory immunization laws demonstrates that less restrictive options exist. But the evidence belies that assertion. Other States with less restrictive vaccination laws have lost (or never gained) herd immunity and have suffered outbreaks of preventable diseases. Ohio, for example, which allows religious exemptions for vaccines, suffered a measles outbreak that led to 85 children contracting measles in 2022.[24] Thirty-six of those children were hospitalized.[25] Similarly, neighboring Kentucky reported a case of the highly contagious virus in February 2023.[26] West Virginia, on the other hand, has not documented even a single case of measles in more than a

---

[24] JA340 (Ohio Disease Reporting System, *Measles Case Summary Central Ohio Outbreak* (Feb. 10, 2023)).

[25] *Id.* None of the children who contracted measles were vaccinated.

[26] JA463 (CDC Health Alert Network, Measles Exposure at Large Gathering in Kentucky, February 2023 and Global Measles Outbreaks (Mar. 3, 2023)).

decade.[27] In fact, "[t]he last reported case of measles in West Virginia was in 2009 following international travel. This is in part due to West Virginia's longstanding immunization laws."[28]

### a.    W. Va. Code § 16–3–4 is not underinclusive.

Appellants claim that West Virginia's compulsory immunization law is underinclusive because it does not require all children in the state to be vaccinated, and because it does not apply to adult teachers or school employees. As explained, *supra*, section B.2, allowing medical exemptions does not undermine the State's goal in protecting its children from communicable and vaccine-preventable disease. Allowing medical exemptions protects children for whom vaccines are contraindicated, while nonmedical exemptions pose an additional risk of harm to those children who cannot safely be vaccinated. JA372; JA475. Keeping the exemption availability narrow allows West Virginia to maintain its high vaccination levels and protect those children who cannot be vaccinated.

---

[27] JA342 (W. Va. DHHR, *Measles (Rubeoloa) Information Sheet for General Public* (May 2023)).

[28] *Id.*

Next, Appellants rely on the fact that West Virginia does not mandate vaccination as a prerequisite for children participating in voluntary organized activities. But this argument misses the point. Schools are the only place in our society where children are *required* to gather in close proximity, in relatively large groups, for long periods of time, and for most of the year. In other words, schools are the only place where contact with other children is *unavoidable*. Children are not required to play sports, go to restaurants or stores, or visit libraries, or even attend "learning pods."

Declining to require immunization for all children residing in the State is one way in which West Virginia has narrowly tailored its compulsory immunization law to still further its interest in protecting the health and safety of its school-aged children. Moreover, the State's limiting of the vaccine mandate to school-aged children—the individuals in our society with the weakest immune systems and who statistically evince the highest rates of virus transmission[29]—is further evidence that West Virginia has endeavored to narrowly tailor its public health laws.

---

[29] JA348 (CDC, *A Child's Health is the Public's Health* (Oct. 24, 2022)).

### b.    W. Va. Code § 16–3–4 is not overbroad.

Appellants contend that West Virginia's compulsory immunization law is overbroad for several reasons. First, Appellants assert that the vaccines required for school admission "do not, in fact, prevent spread or transmission in schools." App. Br. 65. Appellants provide no citation to the record or to any evidence to support this outlandish claim. Second, Appellants claim that because West Virginia has a high vaccination rate and because vaccinated children are already protected, allowing only a medical exemption is overbroad. But the evidence, as discussed, *supra*, shows that the reason West Virginia has achieved such an enviable vaccination rate is precisely *because* it only allows for medical exemptions. Recognizing that fact, other States have repealed their previously-existing religious exemptions in response to outbreaks of vaccine-preventable diseases. Third, Appellants assert—again, without evidence—that "West Virginia requires vaccination in schools that do not have medically vulnerable children (for the interest of protecting medically vulnerable children)." *Id.* Appellants do not even attempt to explain how they can possibly know which schools have students for whom vaccines are contraindicated, and how many. As

noted, discovery has not even occurred in this case. Finally, Appellants

assert that "other states permit religious exemptions but do not have

outbreaks." *Id.* The undisputed record evidence *in this case* contradicts

that claim.

### C.   The statute does not present a "hybrid rights" situation.

Appellants suggest that even if their Free Exercise claim alone is

insufficient to apply strict scrutiny, they remain entitled to strict

scrutiny under a "hybrid rights" theory. But the "hybrid rights theory"

was cobbled together by *Smith* in dicta and remains largely undefined.

And, as noted by Justice Alito, the "hybrid rights theory" has "baffled"

lower courts. *Fulton*, 141 S. Ct. at 1918 (Alito, J., concurring). According

to Justice Alito, this is because the "hybrid rights" theory is "obviously

unworkable and has never been recognized outside of *Smith*." *Id.*

(recognizing that "surely the rule cannot be that asserting two invalid

claims, no matter how weak, is always enough" to trigger strict

scrutiny). Indeed, Justice Alito found it "telling" that the Supreme

Court has not accepted a "hybrid rights" claim in the three decades

since the theory was created in *Smith*. *Id.* at 1915. And Appellants do

not cite a single case in which a court has applied strict scrutiny under a "hybrid rights" theory. This Court should not be the first.

Even assuming the validity of a "hybrid rights" theory, Appellants neglect to explain how this Court—which has never adopted the theory—should apply the hybrid rights theory. As noted by Justice Alito, there is a significant, unresolved circuit split over how to apply the hybrid rights theory. *Fulton*, 141 S. Ct. at 1918 (Alito, J., concurring). Three sister Courts of Appeals have rejected the theory as dicta.[30] Two only apply a hybrid rights analysis if a free exercise claim is accompanied by an independently viable constitutional claim.[31] And two different courts of appeal merely require the free exercise claim to

---

[30] *Kissinger v. Board of Trustees of Ohio State Univ.*, 5 F.3d 177, 180 (6th Cir. 1993) ("[T]hat the legal standard under the Free Exercise Clause depends on whether a free-exercise claim is coupled with other constitutional rights . . . is completely illogical."); *Leebaert v. Harrington*, 332 F.3d 134, 144 (2d Cir. 2003) ("We . . . can think of no good reason for the standard of review to vary simply with the number of constitutional rights that the plaintiff asserts have been violated."); *Combs v. Homer-Ctr. Sch. Dist.*, 540 F.3d 231, 244 (3d Cir. 2008) ("Until the Supreme Court provides direction, we believe the hybrid-rights theory to be dicta.").

[31] *Archdiocese of Washington v. WMATA*, 897 F.3d 314, 331 (D.C. Cir. 2018) (finding no hybrid rights claim stated); *Gary S. v. Manchester School Dist.*, 374 F.3d 15, 19 (1st Cir. 2004) (finding no hybrid rights claim stated).

be accompanied by a colorable companion constitutional claim. Instead of addressing this notable circuit split, Appellants advocate that *Smith* be overturned.

Finally, after failing to argue which "hybrid rights" standard to apply, Appellants fail to identify a right that is "hybrid" with their free exercise claim. Nor do Appellants explain why their purported "hybrid right" should entitle them to strict scrutiny when their religious freedom claim does not. At bottom, West Virginia's compulsory immunization law does not create a "hybrid rights" situation.

### D. The statute is constitutional under rational basis review.

When a law is neutral and of generally applicability, the government "need only demonstrate a rational basis for its enforcement, even if enforcement of the law incidentally burdens religious practice." *Fifth Ave. Presbyterian Church v. City of N.Y.*, 293 F.3d 570, 574 (2d Cir. 2002). Rational basis review requires only that the law be rationally related to a legitimate state interest, and as long as there is a conceivable rational basis for the law, it *must* be upheld. *See FCC v. Beach Commc'ns*, 508 U.S. 307, 313 (1993). Appellants "have the burden to negat[e] every conceivable basis which might support" the law. *Id*. at 315. They cannot satisfy that heavy burden here.

West Virginia's interest in protecting the public health of the community and its schoolchildren is not only legitimate, but also compelling. *See Workman*, 419 F. App'x at 352; *D.J. v. Mercer Cnty. Bd. of Educ.*, No. 13-0237, 2013 WL 6152363 (W. Va. Nov. 22, 2013) (finding "that there is a compelling state interest for the rules requiring proof of these vaccinations to attend public school in this state").[32] Section 16–3–4 is rationally related to this interest, as the allowance of non-medical exemptions threatens community immunity, which the studies amply show. On the other hand, the Legislature's decision to allow medical exemptions does not render the law irrational, as those exemptions further the health of the children for whom vaccines are contraindicated. Therefore, West Virginia Code § 16–3–4 readily withstands rational basis review. *See Does 1–6*, 16 F.4th at 32.

## CONCLUSION

For the foregoing reasons, the District Court's order should be affirmed.

---

[32] Even the State of West Virginia itself has acknowledged as much. *See* JA224 ("States generally have a compelling governmental interest in preventing the spread of diseases in public schools.").

## STATEMENT ON ORAL ARGUMENT

Oral argument will not assist the Court in deciding this appeal. The facts and legal arguments are adequately presented in the briefs and record.

January 17, 2024                    Respectfully submitted,

                                    /s/ J. Zak Ritchie
                                    J. Zak Ritchie
                                    Michael B. Hissam
                                    Maureen Gleason
                                    HISSAM FORMAN DONOVAN RITCHIE PLLC
                                    P.O. Box 3983
                                    Charleston, WV 25339
                                    681-265-3802 – Telephone
                                    304-982-8056 – Facsimile

                                    *Counsel for Appellee*

# CERTIFICATE OF COMPLIANCE

1.  This document complies with type-volume limits because,

    excluding the parts of the document exempted by Fed. R. App. P.

    32(f) (cover page, disclosure statement, table of contents, table of

    citations, statement regarding oral argument, signature block,

    certificates of counsel, addendum, attachments):

    This document contains <u>11,285</u> words.

2.  This document complies with the typeface requirements because:

    This document has been prepared in a proportional spaced
    typeface using Microsoft Word in <u>14-point Century
    Schoolbook</u>.

January 17, 2024          Respectfully submitted

                          /s/ J. Zak Ritchie
                          J. Zak Ritchie
                          Michael B. Hissam
                          Maureen Gleason
                          HISSAM FORMAN DONOVAN RITCHIE PLLC
                          P.O. Box 3983
                          Charleston, WV 25339
                          681-265-3802 – Telephone
                          304-982-8056 – Facsimile

                          *Counsel for Appellee*